## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **PROGRESSIVE EMU, INC., f/k/a** | ) | |
| **JOHNSON EMU, INC. ,** | ) | |
| | ) | **CASE NO.** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **2:12-CV-01079-WMA** |
| | ) | |
| **NUTRITION & FITNESS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## BRIEF IN SUPPORT OF PARTIAL MOTION FOR SUMMARY JUDGMENT

COMES NOW Pro Emu, Inc. and for its Brief in Support of Partial Motion for Summary Judgment pursuant to Fed. R. Civ. P 56, asserts the following:

NFI has still not produced records from which Pro Emu can ascertain the amount of its damages. Pro Emu requests this Court enter an order granting declaratory relief and interpret the contracts in favor of Pro Emu. Pro Emu also requests this Court dismiss all of NFI's claims.

## UNDISPUTED FACTUAL BACKGROUND OF THE PARTIES' RELATIONSHIP

1.     Pro Emu, inc. is an Alabama corporation in the business of raising emus.     Nutrition & Fitness, Inc. ("NFI") is a North Carolina corporation in the business of marketing various health products. Pro Emu developed a blue cream containing emu oil, blue coloring and other ingredients ("Blue Emu"). (App. 1,

1

Martin Depo. at p. 181-82; 221, 224).  In an effort to take Blue Emu to mass market, Pro Emu hired Bill Kazmeier, who introduced Pro Emu to NFI in 2002. The business plan was that Pro Emu would be the manufacturing arm and NFI would be the marketing arm of a joint venture to sell Blue Emu.  (App. 1, Martin Depo. at p. 147-48).

2.      In 2002 NFI and Pro Emu entered into a joint venture agreement whereby NFI agreed to purchase certain quantities of Blue Emu from Pro Emu; NFI agreed to spend significant funds on advertising and marketing to quickly bring Blue Emu to Mass Retail Markets; and the parties agreed to jointly own the trademark and intellectual property rights associated with Blue Emu.  (App. 1, Martin Depo., Exh. 11); *see also* Doc. No. 24, Counterclaim, ¶ 9) (NFI admits the agreement, but denies the Joint Operating Agreement created a joint venture).  The parties operated under the joint venture until March 2003.

3.      In early 2003 the parties negotiated and entered into an agreement executed in March that was made effective as of January 2003 that contained the following provisions:

> a. "Emu Products" were defined as products manufactured by third parties selected by NFI using Pro Emu's oil.  (Doc. No. 24, Counterclaim, Exh. A, ¶ B).

b. Pro Emu agreed to supply emu oil to NFI, but NFI's exclusive remedy for any failure by Pro Emu to do so was to temporarily suspend Pro Emu's exclusive right to sell emu oil to NFI, during which time, NFI was allowed to purchase emu oil from a third party . (Doc. No.24, Counterclaim, Exh. A, § 2.2).

c. NFI had no right to purchase oil it did not need to manufacture Emu Products. (Id.,§ 2.3).

d. During the term of the Agreement, NFI could use Pro Emu's trademarks on Emu Products. (Id., § 1.2).

e. Pro Emu was permitted to continue to manufacture and sell its own products. (Id., §1.4).

f. NFI agreed it would not become affiliated with any other company that sells emu oil and agreed to purchase emu oil exclusively from Pro Emu. (Id., § 1.4).

g. NFI agreed to pay for all marketing and promotional expenses. (Id., § 1.5).

h. The price of oil was fixed at $118.18 per gallon. (Id., § 2.3).

i. Pro Emu was to receive royalties of 8% of net revenues for Blue Emu and 5% of net revenues for other Emu Products sold by NFI.

Net revenues were defined as total revenues reduced by only discounts and refunds. (Id., § 2.4).

j. NFI was granted worldwide exclusivity for the distribution of products containing Pro Emu's emu oil. NFI possessed the right to review existing contracts under which Pro Emu sells and was permitted to continue to sell emu oil and emu oil products. NFI was prohibited from unreasonably withholding consent to any renewal or new contracts. (Id., § 3).

4. In January of 2004, the Agreement was amended to permit Pro Emu to sell emu oil or products to any third parties except those selling the products to "Mass Retail Markets." (Doc. No. 24, Counterclaim, Exh.. B, § 1). NFI was granted a right of first refusal to distribute any new Pro Emu products to Mass Retail Markets. (Id.).

5. In August of 2005, the Agreement was amended to extend its maturity to December 31, 2010 with one five-year renewal.

6. In March of 2008, the Agreement was amended as follows:

a. The price of oil was increased and changed to a per barrel price. (Doc. No. 24, Counterclaim, Exh. E, ¶ 2).

b. Pro Emu agreed not to sell emu oil to any Mass Retail Markets if the oil was required by NFI to manufacture Emu Products. (Id., ¶ 3).

c. Pro Emu gave up the right to a royalty for any Emu Products other than Blue Emu. (Id., ¶ 4).

d. The maturity of the Agreement was extended until December 31, 2015. (Id., ¶ 5).

7. Under the Agreement, as amended, Pro Emu has the right to manufacture and sell products containing emu oil. (Doc. No. 24, Counterclaim, Exh. B, § 1). Pro Emu may sell emu oil to third parties, but not to the Mass Retail Market without the consent of NFI, which cannot be unreasonably withheld. (Doc. No. 24, Counterclaim, Exh. § 1). By letter dated September 20, 2011, NFI demanded that Pro Emu refrain from selling emu oil to all third parties, including those not in the Mass Retail Market. (Doc. No. 24, Counterclaim, ¶ 25).

## COUNTS OF THE PARTIES COMPLAINTS

## I. PRO EMU'S COMPLAINT AGAINST NFI

### A. Count I – Breach of Contract

Pro Emu sued NFI for breach of contract. NFI: (1) wrongfully deducted advertising and marketing costs from Pro Emu's royalty payments for sales of Blue Emu; and (2) NFI wrongfully ordered oil at below market prices in excess of the

amount of oil it required to manufacture emu products for the purpose of stock piling or reselling the oil at market prices and for a profit.

Once Pro Emu filed suit, NFI stopped paying royalties altogether. This is undisputed. Accordingly, Pro Emu supplemented its complaint and added a claim that NFI has breached the contract by failing to pay royalties entirely.

### B.    Count II – Declaratory Judgment – Oil Sales

Pro Emu sued NFI for a declaration that: (1) Pro Emu may sell oil to any third party that does not sell in the Mass Retail Market, as defined; (2) NFI does not have the right to purchase emu oil from Pro Emu that NFI does not require for use in the manufacture of Emu Products within the next sixty days; (3) NFI does not have a right to purchase emu oil from Pro Emu for resale, to store or for any other purpose than that required to manufacture Emu Products; (4) If NFI does not require Pro Emu's emu oil for use in the manufacture of Emu Products within sixty days, NFI must consent and Pro Emu may sell its oil to those selling in the Mass Retail Market; and (5) NFI's breaches of contract, including withholding royalty payments, are material breaches and excuse Pro Emu's further performance under the contract.

### C.    Count III – Declaratory Judgment – Intellectual Property Rights

Pro Emu sued NFI for a declaration that Pro Emu owns the trade secret rights and other intellectual property associated with Blue Emu cream; Pro Emu

and NFI jointly own the Blue Emu trademark and trade dress; and upon breach or termination of the Agreement, Pro Emu is entitled to all intellectual property rights associated with Blue Emu.

## II.     OUTLINE OF COUNTS OF NFI'S COUNTERCLAIMS

### A.     <u>Count I – Breach Of Contract</u>

NFI claims Pro Emu breached the Agreement and the amendments thereto by failing to fill NFI's purchase orders. NFI's exclusive remedy for any failure to fill NFI's purchase order is to purchase the oil on the open market. (Counterclaim, Exh. A, § 2.2). NFI also alleges "upon information and belief" that Pro Emu has breached the Agreement by: (1) selling oil to third parties; (2) entering into contracts with third parties to market or distribute oil; (3) charging per barrel prices for oil rather than per gallon prices; and (4) entering into contracts to sell oil in the Mass Retail Market. To the contrary, the Agreement expressly permits Pro Emu to sell oil to third parties and to contract with third parties, and it provides that oil is to be sold at a particular price per barrel, not gallon. (Counterclaim, Exh. B, § 1; Counterclaim, Exh. E, § 2). Pro Emu has been deposed and has produced its customer lists. NFI is well aware that Pro Emu has not sold to Mass Markets.

### B.     <u>Count II– Breach Of Covenant of Good Faith and Fair Dealing</u>

Under Count II, NFI alleges the same operative facts as alleged in Count I, breach of contract, but sues for a breach of the implied covenant of good faith and

fair dealing.  The failure to act in good faith in performing a contract does not create an independent cause of action.  See, e.g., Stuart Enterprises Int'l, Inc. v. Peykan, Inc., 555 S.E.2d 881, 884 (2001).  Count II adds nothing to the Complaint.

C.    Count III – Unfair Trade Practices

NFI asserts that Pro Emu violated NORTH CAROLINA §75-1.1, *et seq* "by reason of the acts and conduct described above" and then lists several accusatory conclusions.  The acts described above were expressly permitted by the Agreement and none of them could possibly qualify as unfair trade practices.

D.    Count IV – Tortious Interference

In Count IV, NFI claims Pro Emu tortiously interfered with NFI's contracts with its distributors and retailers by failing to deliver oil to NFI.  The Agreement provides that NFI's exclusive remedy for any failure by Pro Emu to deliver oil is to purchase the oil on the open market.  (Doc. No. 24, Counterclaim, Exh. A, § 2.2). Moreover, NFI has voluntarily dropped its lost profits claim, thereby admitting Pro Emu did not interfere with any business relationship.

E.    Count V – Declaratory Judgment – Intellectual Property Rights

NFI seeks a declaration that Pro Emu does not have any rights to the intellectual property associated with Blue Emu.  NFI's declaratory judgment count requests the mirror image relief that Pro Emu requested in its complaint.   NFI's Count V is duplicative and unnecessary.

## ARGUMENT

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  FED.R.CIV.P. 56. The moving party has the initial burden of showing the absence of a genuine issue as to any material fact.  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether this burden is met, the court must view the evidence "and all factual inferences arising from it in the light most favorable to the nonmoving party."  Id. quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

Once the movant's initial burden is met, "the burden shifts to the nonmovant to 'come forward with specific facts showing that there is a genuine issue for trial.'"  Id. quoting Matsushita Electric Industrial Co. v. Zenith Radio Corp.,475 U.S. 574, 587 (1986).  In meeting its burden, a "mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) citing Anderson, 477 U.S. at 242.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita, 575 U.S. at 587, 106 S.Ct. at 1356 (citation omitted).  Moreover, "the plain language of Rule 56(c)

mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

## II. COUNTS I – V FAIL TO STATE A CLAIM FOR WHICH RELIEF MAY BE GRANTED AND ARE DUE TO BE DISMISSED

### A. <u>Pro Emu Is Expressly Permitted to Sell Oil, Products or Fat to Any Third Party Other Than Those In the Mass Retail Market</u>

Counts I – V of NFI's counterclaim rely upon NFI's claim that Pro Emu breached the contract by selling oil to third parties. This is also one of the subjects of Pro Emu's declaratory judgment, Count II. The contracts expressly permit Pro Emu to sell oil to third parties. Amendment No. 1 dated January 1, 2004 provides:

> Notwithstanding anything to the contrary contained in this Section 3, [Pro Emu] shall have the right to develop, manufacture, distribute, market, advertise and sell products or to contract with others to develop, manufacture, distribute, market, advertise and sell products containing emu oil supplied by [Pro Emu] in markets other than the Mass Retail Market.[1]

(Doc. No. 24, Counterclaim, Exh. B, ¶ 1.) Pro Emu was required to provide NFI with a right of first refusal if it developed a product that it determined to

---

[1] "For purposes of this Section 3.1, the phrase "Mass Retail Market" shall mean all national drug store chains, national super market chains, mass market discount retailers and club retailers (e.g. Sam's Club, Price Club, Costco).

market to the Mass Retail Markets, but it was free to sell oil, fat or products to non-Mass Retail Market third parties.  Id.  In March 2008, the Agreement was amended again, however, Section 1 of the First Amendment expressly continued in full force and effect:

> Except as provided by Section 1 of the First Amendment, [Pro Emu] shall not market, sell, or distribute emu oil or emu fat to any third party without the express consent of NFI.

(Doc. No. 24, Counterclaim, Exh. E, ¶ 3) (emphasis supplied).

NFI's reliance upon Section 3.1 to alter Pro Emu's unambiguous right to sell to or contract with non-Mass Retail Market third parties is misplaced.  Amendment No. 1 expressly provides that Pro Emu's right to sell or contract to sell oil, fat or products to third parties trumps any contrary provisions contained in Section 3 of the Agreement, including 3.1, which related to already existing contracts.  (Id.) ("Notwithstanding anything to the contrary contained in this Section 3….").

In several filings before this Court and the North Carolina Court, NFI omits the phrase "Except as provided by Section 1 of the First Amendment…" when claiming Pro Emu allegedly agreed not to sell fat or oil to all third parties.  (See e.g. Doc. No. 9, NFI Motion to Dismiss or Transfer at p. 3).   This omission is misleading because the First Amendment grants Pro Emu authority to sell to non-Mass Retail Market third parties.

Although not yet argued before this Court, NFI appears to now have admitted that "Except as provided in Section 1 of the First Amendment" alters the granting clause, but now claims that Amendment No. 1 only permits Pro Emu to sell or contract to sell emu oil products, not emu oil. (Doc. No. 24, Case No. 12-2805, NFI Response to Pro Emu Motion to Dismiss at p. 22). This claim is manufactured. The recitals to Amendment No. 1 expressly provide that the purpose of the Amendment is to permit Pro Emu to sell emu oil to third parties. (Doc. No. 9, NFI Motion to Dismiss, Exh. B, Amendment No. 1, Recitals) ("The parties desire that the Agreement be amended to allow [Pro Emu] to sell emu oil to parties other than NFI...").

Similarly, if the parties did not contemplate that Amendment No. 1 permitted Pro Emu to sell emu oil or fat to third parties, there would have been no reason for the Fourth Amendment to carve out the sales permitted by Amendment 1 from the provision disallowing sales of emu oil or emu fat. (Doc. No. 9, NFI Motion to Dismiss, Exh. E, Fourth Amendment, ¶ 4). ("Except as provided by Section 1 of the First Amendment, [Pro Emu] shall not market, sell or distribute emu oil or emu fat to any third party without the express consent of NFI.")

Moreover, Pro Emu has not sold or contracted to sell oil to the Mass Retail Market.

> Q.    Has Johnson or Progressive Emu ever sold any product at any time to any retailer you would consider to be in the mass market?
>
> A.    No.

(App. 1, Martin Depo., p. 213).  Pro Emu has produced its customer lists.  NFI is well aware that Pro Emu has not sold to the Mass Market.  Additionally, NFI's speculative claim that "upon information and belief" Pro Emu is planning to sell to Mass Retail Markets is also due to be dismissed as a matter of law.

B.    <u>NFI's Only Remedy For Any Failure By Pro Emu to Fill NFI's Orders For Emu Oil Is To Purchase the Oil Elsewhere</u>

NFI's Counts I – V also rely upon NFI's claim that Pro Emu has failed to sell or deliver oil to NFI.  NFI expressly agreed, however, that it would not be entitled to assert a claim if Pro Emu were ever to fail to sell or deliver emu oil to NFI:

> In the event [Pro Emu] is unable to supply any order within sixty (60) days following the order date, NFI shall have the right, notwithstanding the terms of Section 1.4 of this Agreement[2], to order emu oil from a third party; provided, however, that at such time as [Pro Emu] provides reasonable evidence to NFI that it can supply NFI with its requirements, NFI shall have no further right to purchase emu oil from third parties unless [Pro Emu] shall again become unable to supply NFI's requirements…. <u>The remedies provided by this Section 2.2 shall be NFI's exclusive remedies for any failure by [Pro Emu] to provide the quantities of emu oil required by NFI hereunder.</u>

---

[2] In Section 1.4 NFI agreed not to purchase emu oil from any other party and agreed not to become affiliated with any other party that sells or produces emu oil.

(Doc. No. 24, Counterclaim Exh. A, § 2.2) (<u>emphasis supplied</u>). NFI's legal claims against Pro Emu for Pro Emu's failure to deliver NFI oil are due to be dismissed. The parties expressly contemplated that Pro Emu may not supply NFI's emu oil needs. <u>Id.</u> NFI unambiguously agreed that it would not have a claim for money damages for <u>any</u> <u>failure</u> by Pro Emu to provide the quantities of emu oil required by NFI.

Nonetheless, Pro Emu did not have any oil or any fat to sell in March 2012 when NFI ordered it and Pro Emu operated in the ordinary course of business and in accordance with the contract. The birds were not ready to process. In fact, Pro Emu was forced to process the birds early because NFI converted Pro Emu's royalties:

> Q. In paragraph 3, sir, you said that none of your processing birds will be 18 months old until August 2012?
>
> A. That's correct.
>
> Q. How did you manage to start the slaughter in July if they weren't 18 until August?
>
> A. We processed early. We were out of money.

(App. 1, Martin Depo., p. 274).

…. 

> Q. Nonetheless, it is possible to process or slaughter emu birds before they're 18 months old, isn't it?

A.     Not always. Sometimes birds are not of processing size until after 18 months. It's not a hard, fast rule. It's just based on the weight of the bird. So we're getting better at it. You know, it's possible that we can do it earlier, but in the past we've gone as long as two years, two-and-a-half years. So it's not a hard, fast rule.

Q.     So at least the birds you processed in 2012, it was possible to process them and slaughter them earlier than 18 months, right?

A.     We decided to process them because we could not afford to feed them.

Q.     And that was earlier than 18 months, right?

A.     It was about three weeks early.

Q.     And you didn't selectively choose which birds to process?

A.     Yes, we did.

Q.     How many of your available birds -- let me withdraw that. How many of your processing birds did you slaughter in 2012?

A.     Processed 1,750, but we started with the oldest ones. Some of the birds were not 18 months old, so we did not process them.

Q.     You slaughtered all of your processing birds in 2012, but you started with the oldest and moved to the youngest, right?

A.     Yes. Then we left 100 that were not of size.

(App. 1, Martin Depo., ,pp. 275-276);  *see also* (Case No. 12-02805, Doc. No. 22,

23, Pro Emu Motion to Reconsider, Exh. J, Martin Decl., ¶¶ 3, 4, 6).  NFI does not

dispute the fact that the birds are not ready to process until approximately18 months. (Case No. 12-02805, Doc. No. 12-1, L. Chriscoe Decl., ¶ 17). Pro Emu was unable to produce emu oil and NFI's remedy was to purchase oil from a third party. NFI has no claim for damages.

## C.    NFI Converted Pro Emu's Royalties

Pursuant to the Agreement, § 2.4(a), NFI is required to pay Pro Emu royalty payments of eight percent (8%) of NFI's total revenues, net of only discounts and refunds. (Doc. No. 9, NFI Motion to Dismiss, Exh. A, Jan. 1, 2003 Agreement, § 2.4(a)). The Agreement further provides that NFI shall be responsible for all expenses related to marketing or promotional activities. (Id. at § 1.5). NFI, however, has deducted advertising, marketing and promotional expenses from the amounts upon which it determined Pro Emu's eight percent (8%). (See Doc. No. 15, Pro Emu Response to Motion to Dismiss, Exh. D). Although NFI has improperly withheld production of its sales records, preventing Pro Emu from knowing the exact of amount of royalties withheld, NFI's own admissions establish that NFI has wrongfully deducted, at a minimum, over $2,000,000 from the total Blue Emu revenues.

Under the Agreement NFI's exclusive remedy was to purchase substitute oil on the open market until Pro Emu was able to supply oil. Rather than abide by the Agreement, NFI disputed Pro Emu's statement and claimed that it was entitled

to cease paying royalties to Pro Emu. The royalties that NFI refused to pay exceeded NFI's extra cost for the oil by, at a minimum, over $200,000. The inability of Pro Emu to supply oil from time to time was contemplated in the Agreement. The failure to do so was not a material breach. To the contrary, the cessation of royalty payments for sales that had occurred was a material beach.

### D.   NFI is Not Permitted to Re-Sell or Store Emu Oil

NFI is not permitted to purchase oil from Pro Emu for resale, to store, or for any purpose other than in the manufacture of products containing emu oil.

> NFI shall not place orders for emu oil in quantities greater than are reasonably expected to be needed to allow its contract manufacturer to maintain on hand an inventory of emu oil reasonably expected to be required to fulfill its requirements for sixty (60) days.

(Doc. No. 9, NFI Motion to Dismiss, Exh. A, § 2.2).

NFI produced a self-made chart of its inventory that shows negative inventory of oil (impossible for tangible items), oil that was not used for much more than 60 days and unexplained "adjustments." (See App. 2, NFI Inventory Sheet). Although Pro Emu needs discovery to conclusively establish that NFI has breached this term of the contract, the Agreement unambiguously prohibits NFI from ordering oil it does not need.

### E.   There is No Separate Cause of Action For A Breach of The Covenant of Good Faith and Fair Dealing

In Count II, NFI asserts the same allegations as in Count I, but sues for a breach of the implied covenant of good faith and fair dealing. The failure to act in good faith in performing a contract does not create an independent cause of action. See, e.g., Stuart Enterprises Int'l, Inc. v. Peykan, Inc., 555 S.E.2d 881, 884 (2001). This claim fails to state a claim for which relief can be granted.

      F.     NFI's Unfair Trade Practices Claim Fails To State A Claim For Which Relief May Be Granted

NFI's claim that Pro Emu's conduct violates North Carolina's Unfair Trade Practices Act is merely a collection of conclusory accusations barren of any supporting factual allegations. "To state a sufficient claim for relief under Rule 8(a)(2), the complaint must include only a 'short and plain statement ... showing that the pleader is entitled to relief.'" (quoting Fed.R.Civ.P. 8). Nevertheless, Rule 8 "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). Although when reviewing the sufficiency of a claim, courts assume that the factual allegations contained therein in are true, "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)); see also Ashcroft v. Iqbal, 556 U.S. 662 (2009). NFI asserted no factual claims in support of Count III. For this reason alone, NFI's Count III is due to be dismissed.

Additionally, the North Carolina statute regarding unfair and deceptive trade practices requires aggravating, egregious or deceptive conduct to support a claim for violation of the act. United Roasters, Inc. v. Colgate-Palmolive Co., 649 F.2d 985, 992 (4th Cir. 1981). A breach of contract alone, whether intentional or unintentional, does not constitute egregious or aggravating conduct sufficient to support a claim for unfair and deceptive trade practices. Id. Pro Emu's conduct with respect to the contracts at issue in this action was fair and forthcoming at all times. Pro Emu complied with the terms of its contracts with NFI and its actions were not egregious, fraudulent or deceptive.

G.    NFI's Tortious Interference Is Due To Be Dismissed As a Matter of Law

In Count IV, NFI claims Pro Emu tortiously interfered with NFI's contracts with its distributors and retailers by failing to deliver oil to NFI. As explained above, the Agreement provides that NFI's exclusive remedy for any failure by Pro Emu to deliver oil ordered is to purchase the oil on the open market. (Complaint, Exh. A, § 2.2) ("The remedies provided by this Section 2.2 shall be NFI's exclusive remedies for any failure by [Pro Emu] to provide the quantities of emu oil required by NFI hereunder."). NFI contractually agreed that it has no claim for tortious interference; it is simply permitted to purchase the oil elsewhere. This Count is due to be dismissed for failure to state a claim. In fact, NFI has admitted that it is not claiming lost profits.

WHEREFORE, Premises Considered, Pro Emu respectfully requests that this Court enter a declaratory ruling that the contracts between the parties are unambiguous and are interpreted and construed as set forth above and for such other and different relief that this Court deems appropriate.

Respectfully submitted,

/s/ Deanna L. Weidner
David B. Anderson
Deanna L. Weidner
Marvis L. Jenkins
Attorneys for Progressive Emu, Inc.

OF COUNSEL:

**ANDERSON WEIDNER, LLC**
505 20th Street North
1450 Financial Center
Birmingham, AL 35203
Tel:   205-324-1230
Fax:   205-322-3890
dbanderson@andersonweidner.com
dlweidner@andersonweidner.com
mjenkins@andersonweidner.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon all counsel of record by electronically filing same with the Clerk of the Court by using the Federal judicial e-filing system, on this the 26th day of April, 2013, which will send a notification of such filing to the following:

Charles A. Burke
Jacob S. Wharton
WOMBLE CARLYLE SANDRIDGE & RICE, LLP

One West Fourth Street
Winston-Salem, North Carolina 27101

/s/ Deanna L. Weidner
OF COUNSEL