
**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| PROGRESSIVE EMU, INC. | ) | |
| f/k/a JOHNSON EMU, INC. | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counterclaim Defendant, | ) | Civil Action No. |
| | ) | CV-12-AR-1079-S |
| v. | ) | |
| | ) | |
| NUTRITION & FITNESS, INC. | ) | |
| | ) | |
| Defendant and | ) | |
| Counter Claimant Plaintiff. | ) | |

## DEFENDANT/COUNTER CLAIMANT PLAINTIFF NUTRITION & FITNESS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF SUMMARY OF ADJUDICATION OF CONTRACT INTERPRETATION ISSUES

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     SUMMARY OF RELEVANT CONTRACT TERMS ........................................................ 2

III.    ARGUMENT ON CONTRACT INTERPRETATION ...................................................... 10

        A.      Contract Interpretation is Governed by the Plain Language of the Written

                Contract Combined with the Parties' Conduct in Contract Performance .............. 10

        B.      PEI's Duty to Supply Emu Oil to NFI ................................................................ 12

        C.      A Limitation Upon NFI's Remedy for PEI's Failure to Supply Emu Oil. ............ 14

        D.      The Parties' Responsibilities for Payment of Marketing and Promotional

                Expenses .................................................................................................... 18

        E.      The Proper Definition of "NFI's Total Revenue Received" ................................. 19

        F.      The Nature and Scope of NFIs Rights of Exclusivity ......................................... 24

        G.      The Nature of the Parties' Relationship: Independent Contractors or Joint

                Venture ....................................................................................................... 26

        H.      Claimed Contract Rights to Joint Ownership of the BLUE EMU

                Trademark ................................................................................................... 29

IV.     CONCLUSION .................................................................................................. 37

Defendant and Counterclaimant Nutrition & Fitness, Inc.'s ("NFI") submits the following in support of its Motion for Summary Adjudication of Contract Interpretation Issues:

## I.  INTRODUCTION

In this case, the parties' rights and duties depend almost entirely upon the terms of the written contracts that they signed. Indeed, when both representatives of plaintiff Progressive Emu, Inc. ("PEI") were deposed, they admitted that the parties' signed, written contracts accurately set forth the entire agreement reached between the parties.[1] Although the parties' claims of breach may ultimately be subject to some factual disputes, the clear and certain terms of the parties' contracts are undisputed. Thus, the Court can adjudicate the parties' rights and duties under their written contracts as a matter of law. The Court's rulings on the proper construction and meaning of contract terms will likely be helpful in guiding and limiting future discovery, and could potentially be dispositive on some claims. NFI therefore respectfully moves for summary adjudication as to the meaning of the contract terms at issue in this case, as permitted by the Court's March 28, 2013 order.

NFI asks the Court to construe the meaning of the parties' written contracts according to the plain, ordinary meaning of the words used. On certain issues, NFI also asks the Court to consider undisputed evidence of the parties' course of dealing over nine years of contract performance which proves that the parties' intended the words in their contracts to have their plain and ordinary meaning.

As set forth below, the parties appear to dispute the meaning of contract terms that fall into eight different categories.  These categories are:

- PEI's Duty to Supply Emu Oil to NFI

---

[1] **Ex. B** (Deposition of Chris Binkley) at 248:4-10; 257:20-258:17; 281:5-17; **Ex. C** (Deposition of Andrew Martin) at 164:16-165-9; 192:-9-16; 252:10-15; 254:4-8; 260:7-12.

- A Limitation Upon NFI's Remedy for PEI's Failure To Supply Emu Oil

- The Parties' Responsibilities for Payment of Marketing and Promotional Expenses

- The Proper Definition of "NFI's Total Revenue Received"

- The Nature and Scope of NFI's Rights of Exclusivity

- The Nature of the Parties' Relationship: Independent Contractors or Joint Venture

- Claimed Contract Rights to Joint Ownership of the BLUE EMU Trademark

- Disputes Regarding the Meaning of a "Barrel" of Emu Oil

For each of these eight disputes, NFI has set forth below a summary of the disputed contract terms, a summary of each side's position as to how the disputed terms should be construed, and an analysis of how the contract term should be construed in light of the plain meaning of those terms as well as the parties' nine year course of dealing in contract performance.

## II.     SUMMARY OF RELEVANT CONTRACT TERMS

1.      This case is a dispute over the parties' performance of their duties under a written Sale, Marketing and Operating Agreement (hereinafter "Agreement") effective January 1, 2003, as well as subsequent amendments thereto. A copy of the Agreement is attached as Exhibit A hereto.

2.      The Agreement is a supply contract which governs two aspects of emu oil. First, the Agreement specifies the terms under which PEI will be NFI's exclusive supplier of emu oil. Emu oil is a raw ingredient used in certain creams manufactured and sold by NFI. Second, the Agreement gives NFI the exclusive right to buy all emu oil that PEI has available for sale subject to very limited exceptions.

3.      The parties memorialized four recitals of fact on page 1 of the Agreement to explain why they were entering into the Agreement. Recital A states:

PEI is engaged in the business of manufacturing and selling emu oil and other emu products.

4.      As Recital A reflects, PEI runs an emu farm and sells emu oil from various sources including the slaughter of birds raised on its farm. On a limited basis, PEI also sells certain emu products like emu leather products, and products made with emu oil such as muscle and joint products and skin care products. Compl., ¶ 5 (ECF No. 1-1).

5.      PEI has two managing employees – Chris Binkley (the Chief Executive Officer) and Andrew Martin (the Chairman). Both witnesses have been deposed, and their testimony is cited herein to the extent that it relates to contract interpretation issues. *See* **Exs. B & C**.

6.      PEI is the successor in interest to Johnson's Emu, Inc., the party that entered into the original Agreement with NFI. Compl., ¶5.[2]

7.      NFI is a consumer products company located in Fayetteville, North Carolina that manufactures, markets, and distributes several of its own brands of nutritional supplements in the Health and Beauty Care Category. Declaration of Larry Chriscoe, **Ex. D**, ¶3.

8.      One of NFI's most successful products is the emu oil-based BLUE EMU® topical formula that is used to soothe aches and pains. *Id*. ¶4. Terms of the parties' contracts make clear that NFI sells these products to large, mass market retailers such as Sams Club and Costco. *See, e.g.,* Amendment No. 1 to Agreement, **Ex. E** at 1.

9.      Fact Recital B in the Agreement states:

NFI desires to have manufactured, sell, market, and promote certain products containing emu oil that will be manufactured by third parties selected by NFI (the "Emu Products") and to purchase emu oil from PEI for use in the Emu Products.

---

[2] For convenience and consistency, NFI in this Memorandum uses the term "PEI" to refer to both Progressive Emu, Inc and Johnson's Emu, Inc, and all quotes from contract documents to either company have been changed to read simply "PEI."

Recital B of the Agreement refers to NFI's various formulations of Blue Emu as "Emu Products." **Ex. A**, Recital B.

10. Recitals A and B to the Agreement make clear that the parties are in a supplier/manufacturer relationship. PEI is described as "selling emu oil," and NFI is described as the party that will "manufacture[], sell, market, and promote" Emu Products using oil supplied by PEI. **Ex. A**, Recitals A and B.

11. Recital C gives further detail about PEI's role in the Agreement as the supplier of one of the raw ingredients of NFI's Emu Products. Recital C states: "PEI desires to sell emu oil to NFI for use in the manufacture of the Emu Products." Thus, PEI confirmed its desire to assume a role under the Agreement of supplying emu oil for NFI's Emu Products. **Ex. A**, Recital C.

12. Recital D makes clear that the parties were already involved in an informal arrangement for PEI to supply emu oil for NFI's Emu Products. It states:

> NFI is currently purchasing emu oil from JEI for use in the manufacture of certain emu oil based products.

13. The only written contract between the parties prior to execution of the Agreement was a letter of intent ("Letter of Intent" or "LOI"). A copy of the LOI is attached hereto as **Ex. F**.

14. The Letter of Intent is a very short, one page document that was drafted without the involvement of legal counsel. **Ex. D**, ¶5; **Ex. F**.

15. The Letter of Intent gives only a very brief, thumbnail sketch of what the parties' contemplated that their business relationship might look like. **Ex. D**, ¶6; **Ex. F**.

16. The short terms of the Letter of Intent are not relevant to Court's determination of the parties' rights and duties because the parties expressly agreed that the terms of the

Agreement would supercede and replace the terms of the prior Letter of Intent. This is clear in Subsection 9.10 of the Agreement which states:

> Entire Agreement. This Agreement, together with the Exhibits attached hereto, constitutes the entire agreement between the parties and supersedes and cancels any and all prior agreements, written or oral, between them relating to the subject matter hereof, including, without limitation, that certain JEO-NFI Operating Agreement Letter of Intent between the parties dated May 10, 2002.

**Ex. A**, § 9.10.

17. Section 1 of the Agreement, entitled "Product and Marketing," sets forth certain details of NFI's Emu Products. Subsection 1.1 provides that:

> JEI agrees to sell emu oil to NFI under the terms of this Agreement for use by NFI in the manufacture of the Emu Products. Subject to the limitations set forth in Section 2 hereof, during the term of this Agreement, JEI will supply NFI's requirements for emu oil needed for the manufacture of Emu Products by NFI or its contract manufacturer.

**Ex. A**, §1.1. Thus, the initial subsection confirms the core purpose of the Agreement, which was to assure NFI a reliable supply of emu oil for its Emu Products.[3]

18. Subsection 1.4 introduces one of the exclusivity provisions of the Agreement, a point covered in more detail in Section 3 of the Agreement and in later amendments which are summarized below. Subsection 1.4 provides that, except as set forth elsewhere in the Agreement, "NFI shall use exclusively emu oil from PEI in all products that it manufactures or sells that contain emu oil." *Id.* at §1.4. In other words, subject to stated exceptions, PEI would be the only supplier of emu oil for NFI's Emu Products.

19. Subsection 1.5 confirms NFI's agreement that "all marketing or promotional activity undertaken by it in order to market and promote the Emu Products shall be at NFI's

---

[3] Subsection 1.2 deals with NFI's use of PEI trademarks, and subsection 1.3 deals with customer warranties. NFI is not aware of any claim in this litigation that is based upon either of these provisions.

expense." *Id.* at §1.5. This is the only provision of the Agreement that deals with responsibilities for advertising or promotional expenses for NFI's Emu Products.

20.     Section 2 of the Agreement is entitled "Orders and Payment." This section sets forth specifics of PEI's supply of emu oil to NFI and payments due to PEI. *Id.* at §2.

21.     Subsection 2.1 provides that NFI shall order emu oil according to PEI's "standard order placement and fulfillment procedures." *Id.* at §2.1.

22.     Subsection 2.2 provides details of PEI's duty to supply NFI's orders, and the consequences of any failure to do so. Under Subsection 2.2, PEI is required to "use its best efforts to fulfill all orders as quickly as reasonably possible." **Ex. A**, §2.2. "In the event that PEI is unable to supply any order within sixty (60) days following the order date," the Agreement specifies that NFI shall have the ability "to order emu oil from a third party." *Id*. This ability of NFI to purchase oil from a third party is stated to be "NFI's exclusive remedies for any failure of PEI to provide the quantities of emu oil required by NFI hereunder." *Id*.

23.     Subsection 2.3 of the Agreement describes the price that NFI pays for emu oil. These price provisions were modified several times during the parties' nine year relationship.

24.      In exchange for PEI's agreement to exclusivity for NFI which prohibited PEI from selling emu oil to any third party under most circumstances (as summarized more fully below), NFI agreed to pay PEI a royalty as a percentage of its total revenue from the sales of certain Blue Emu products. These royalty payments are summarized in subsection 2.4 of the Agreement. *Id.* at §2.4. Under subsection 2.4, NFI is to pay PEI a specified percentage of "NFI's total revenue received from the sale" of specified Blue Emu products, "net of discounts and refunds." *Id*. at §2.4.

25.     Beginning early in the relationship with PEI, and continuing throughout the business relationship, NFI sent monthly statements to PEI showing NFI's calculation of the "total revenue received" from the sale of BLUE EMU® products. In these statements, NFI set forth the total sales price, clearly showed the amount deducted based on various charges made by retailers, and showed the total percent royalty due based upon the total revenue received. These monthly statements included regular disclosures of retailer charges that were called "Billback" and "Monthly Billing." **Ex. D**, ¶7; **Ex. G**.

26.     PEI was fully informed of the details of methods that NFI would use under the Agreement for paying royalties on "total revenue received." **Ex. G**; **Ex. B** at 214:19-215:16; 218:9-17; 216:18-22; 218:9-23; 235:7-10.

27.     Representatives of PEI admitted in depositions that over a period of nine years they never objected to the manner in which NFI was calculating "total revenue received" and paying royalties from the sale of Blue Emu products. **Ex. B** at 217:11-22; 241:3-242:13; **Ex. C** at 288:18-269:9.

28.     Section 3 of the Agreement, "Exclusivity," describes PEI's obligations to sell emu oil exclusively to NFI and not to any other purchaser. These provisions were a critically important term of the Agreement to NFI, and are the reason that NFI agreed to make royalty payments to PEI above and beyond the price paid for emu oil. **Ex. D, ¶9**.

29.     Under Subsection 3.1, PEI "shall not market, sell, or distribute emu oil to any third party." In other words, NFI had an exclusive right to purchase PEI's emu oil, and that oil could not be sold to any third party. The only exception to NFI's exclusive right to PEI's emu oil is in Subsection 3.2, and includes certain pre-existing supply contracts that PEI was a party to.[4]

---

[4] In addition to providing NFI with the exclusive right to buy PEI's emu oil, the Agreement also provides that, subject to stated exceptions, NFI shall not buy emu oil "from any business or entity other than PEI." **Ex. A**, §1.4.

30.     NFI's exclusive right to purchase PEI's emu oil was further strengthened in a Fourth Amendment to the Agreement dated March 11, 2008. In that amendment, PEI agreed that it "would not market, sell or distribute emu oil or emu fat to any third party without the express consent of NFI." **Ex. H,** §3.

31.     The Fourth Amendment further provides that "… in the event NFI determines in its reasonable discretion that it cannot or will not use emu oil or emu fat PEI has available for purchase, NFI shall notify PEI and PEI shall then be free to sell such excess emu oil or emu fat to a third party." *Id.*

32.     In effect, these provisions gave NFI a right of first refusal with respect to PEI's sale of emu oil and fat. PEI cannot sell the oil or fat without NFI's consent, but if NFI refuses to buy any oil or fat that is available for sale then PEI is free in that circumstance to sell the oil or fat to another party in accordance with the other terms of the Agreement.

33.     Sections 4 and 5 of the Agreement set forth its term, termination provisions, and definitions of default. Subsection 4.1 provides that the contract continues until December 31, 2005 and is automatically renewed absent written notice of termination. **Ex. A** at §§4, 5.

34.     In or around late July or early August of 2005, NFI and PEI executed a second Addendum to the Agreement which extended the term of the Agreement until December 31, 2010, at which time NFI and PEI would then have the right to exercise an option to renew the Agreement for an additional five years. *See* **Ex. I**.

35.     On or about March 11, 2008, in the Fourth Amendment, the term of the Agreement was extended until December 31, 2015.  *See* **Ex. H.**

36.     The final section of the Agreement, Section 9, contains ten subsections under the heading "Miscellaneous."[5] Subsection 9.1 is entitled "Independent Contractor." Subsection 9.1 makes clear that the parties' relationship is solely one of independent contractors, and that no other relationship is created by the Agreement. It states:

> <u>Independent Contractor</u>:   The relationship of JEI and NFI is that of independent contractors. Nothing to this Agreement shall be construed to create any other type of relationship. NFI acknowledges that it has no power or authority to act on behalf of JEI as its agent and that its authority is limited to the activities specified hereunder as an independent contractor in accordance with the terms of this Agreement.

37.     On or about January 2, 2004, the parties executed an Amendment No. 1 to the Agreement which provides PEI with the option "to develop, manufacture, distribute, market, advertise and sell, or to contract with others to develop, manufacture, distribute, market, advertise and sell products containing emu oil supplied by [PEI] in markets other than the Mass Retail Market." **Ex. E**. "Mass Retailer Markets" is defined as "all national drug store chains, national supermarket chains, mass market discount retailers and club retailers (e.g., Sams Club, Price Club, Costco." *Id.* The rights granted to PEI under Amendment No. 1 to the Agreement are expressly limited to "products containing emu oil." These rights do not convey any right to sell the raw ingredient emu oil or emu fat from which the oil is derived.

38.     Under the First Amendment, PEI's sales of its own "products containing emu oil" are limited to, among other things, "(i) direct sales, whether through infomercials, telephone sales, direct mail marketing, e-mail or web sales or similar direct marketing, or (ii) sales to specialty stores (even if they are national chain specialty stores), health clubs, spas, local grocery

---

[5] Sections 6, 7 and 8 of the Agreement set forth the Parties' confidentiality obligations, details of the use of PEI trademarks and warranties to one another. NFI does not believe that any of these provisions are at issue in this litigation.

store and drug store chains, independent retailers or any other outlets outside the Mass Retail Market." **Ex. E**.

## III.   ARGUMENT ON CONTRACT INTERPRETATION

### A.   Contract Interpretation is Governed by the Plain Language of the Written Contract Combined with the Parties' Conduct in Contract Performance

The Agreement and amendments thereto are governed by Georgia law. **Ex. A**, § 9.4. Under Georgia law, if contract language is clear and unambiguous, the court enforces the contract according to its clear terms and generally the contract alone is looked to for its meaning. *See Blue Cross Blue Shield of Ga. v. Shirley*, 305 Ga.App. 434, 437, 699 S.E.2d 616, 619 (2010). The Agreement and its amendments in this case are clear, unambiguous, and can be interpreted by the Court based upon their plain language. Indeed, all parties had legal counsel in the drafting of all contracts at issue so those documents have the clarity that one would generally expect from competent lawyer drafting. **Ex. C** at 167:12-168:8; **Ex. D**, ¶10. "[N]o ambiguity exists where, examining the contract as a whole and affording the words used therein their plain and ordinary meaning, the contract is capable of only one reasonable interpretation." *Id.* (internal quotations and citation omitted); *see also* OCGA §13-2-2(2) (2012) ("Words generally bear their usual and common signification."). Georgia law recognizes that "words in a contract generally bear their usual and common meaning ... [and] [t]he usual and common meaning of a word may be supplied by common dictionaries." *Global Ship Sys., LLC v. Continental Cas. Co.*, 292 Ga.App. 214, 216, 292 S.E.2d 826, 828-29 (2008) (citations omitted). Contract construction also requires that the court give meaning to all provisions of a contract and to examine the "whole contract in arriving at the construction of any part." *DeKalb County School Dist. v. Gold*, 318 Ga. App. 633, 644, 734 S.E.2d 466, 476 (2012) (quotations and citation omitted); *accord South Point Retail Partners, LLC v. N. Am. Properties Atlanta, Ltd.*, 304 Ga.App. 419, 696 S.E.2d 136 (2010)

("The contract is to be considered as a whole, and each provision is to be given effect and interpreted so as to harmonize with the others.").

In addition to construing the parties' contracts according to their clear, plain meaning, the Court should also consider the parties' nine year history of contract performance in determining what they intend for their contracts to mean. Indeed, the manner in which the parties performed their contractual obligations is entitled to great weight in contract construction under Georgia law. OCGA §11-2-202 provides that a written contract "may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented: (a) [b]y course of dealing or usage of trade or by course of performance; and (b) [b]y evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." OCGA §11-2-202 (2012). This provision relaxes the "common law parol evidence rule to allow evidence of agreements outside the contract, without a prerequisite finding that the contract was ambiguous." *Golden Peanut Co. v. Bass*, 275 Ga. 145, 148, 563 S.E.2d 116, 119 (2002) (citation omitted); *accord Scovill Fasteners, Inc. v. Northern Metals, Inc.*, 303 Ga.App. 246, 250, 692 S.E.2d 840, 843 (2010) (stating that the "UCC's parol evidence rule makes admissible evidence of . . . course of performance to explain or supplement terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached."); *Allapattah Svcs, Inc. v. Exxon Corp.,* 333 F.3d 1248, 1261-62 (11th Cir. 2003) (stating that "[t]he UCC therefore rejects the common law rule that parol evidence is admissible only where the terms of a contract are ambiguous."). Similarly, OCGA §11-2-208 states that "[w]here the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of

performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." OCGA §11-2-208(1) (2012); *accord McKinley v. Coliseum Health Grp., LLC*, 308 Ga.App. 768, 771, 708 S.E.2d 682, 685 (2011) ("The construction placed upon a contract by the parties thereto, as shown by their acts and conduct, is entitled to much weight and may be conclusive upon them.").

**B.      PEI's Duty to Supply Emu Oil to NFI**

*__Disputed Issue__*:   The parties appear to have differing positions as to the standard of performance that PEI must meet in supplying NFI with emu oil under the Agreement. NFI seeks a ruling to specify the standard that will govern NFI's claim that PEI failed to make sufficient efforts to fulfill its orders for emu oil.

*__NFI's Position__*:   Subsection 2.2 of the Agreement requires PEI to "use its best efforts to fulfill all orders as quickly as reasonable possible." Thus, under the reported case law, PEI was required to use all reasonable efforts in good faith to supply NFI's orders for emu oil.

*__PEI's Position__*:   Counsel for PEI has suggested varying standards for determining the adequacy of PEI's efforts to supply emu oil, and therefore NFI is not certain exactly what standard PEI will now choose to advocate.

*__Analysis__*:   Subsection 1.1 of the Agreement requires PEI to supply NFI with emu oil "subject to the limitations set forth in Section 2 hereof." Subsection 2.2 of the Agreement sets forth the details of the parties' rights and duties in PEI's supply of emu oil. Under that provision, NFI is to provide at least thirty days notice prior to the required delivery date, but even if less notice is provided, PEI is required to use its best efforts to fulfill all orders as quickly as reasonably possible. The contract language states:

> NFI will provide PEI with at least thirty (30) days written notice prior to the required delivery date. Notwithstanding this thirty (30) day notice, PEI

will use its best efforts to fulfill all orders as quickly as reasonably possible.

**Ex. A**, § 2.2.

Under Georgia law, this contract language clearly imposes a best efforts standard of performance. "A best-efforts contract is a contract in which a party undertakes to use best efforts to fulfill the promises made . . . and the adequacy of that party's performance is measured by the party's ability to fulfill the specified obligations." *NAACP, Jacksonville Branch v. Duval County School*, 273 F.3d 960, 986 (11th Cir. 2001) (citing BLACK'S LAW DICTIONARY, 319 (1999)). The required measure of performance "necessarily takes its meaning from the circumstances." *First Union Nat. Bank v. Steele Software Systems Corp.*, 154 Md. App. 97, 138, 838 A.2d 404, 428 (2003) (citations omitted); *see also Triple-A Baseball Club Assocs. v. Northeastern Baseball, Inc.*, 832 F.2d 214, 225 (1st Cir. 1987) (best efforts "cannot be defined in terms of a fixed formula . . . but varies with the facts and the field of law involved.").

The best efforts standard has "diligence as its essence" and holds the "promisor to the standard of the diligence a reasonable person would use under the circumstances." *DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 171 (Tex.App.-Fort Worth 2012, no pet.); *see also Flynn v. Gold Kist, Inc.*, 181 Ga.App. 637, 638-39, 353 S.E.2d 537, 539 (1987) (noting that "best efforts" standard under OCGA §11-2-306, which pertains to output, requirements, and exclusive dealings contracts, holds the parties to a standard of "reasonable diligence as well as good faith in their performance of the contract."). A best efforts clause therefore "imposes an obligation to act with good faith in light of one's own capabilities" and "requires that [the promisor] pursue all reasonable methods" to perform its duties under the contract. *Maestro West Chelsea SPE LLC v. Pradera Realty, Inc.*, 38 Misc.3d 522, 530, N.Y.S.2d 819, 825 (2012) (citing *Robin Bay Assoc., LLC v. Merrill Lynch & Co.*, No. 07 Civ.

376, 2008 WL 22759092, at *7 (S.D.N.Y. June 3, 2008)); *Hoffman v. L & M Arts*, 774 F. Supp. 2d 826, 834 (N.D. Tex. 2011) (best efforts standard holds a party to an objective standard based on norms of reasonableness in the industry).

### C. A Limitation Upon NFI's Remedy for PEI's Failure to Supply Emu Oil.

***Disputed Issue***:  Subsection 2.2 of the Agreement contains a limitation upon NFI's remedy in the event that PEI fails to supply an order for emu oil. Pursuant to this contractual provision, NFI's remedy is limited to being given the right to purchase emu oil from a third party supplier other than PEI. The parties dispute the following two issues regarding this limited remedy: (i) under what circumstances does the limited remedy come into play, and (ii) what breach or breaches by PEI does the limited remedy apply to?

***NFI's Position***:  First, NFI contends that, under the plain language of the Agreement, the limited remedy in Subsection 2.2 comes into play only when PEI "is unable to supply any order within sixty (60) days." Thus, if PEI has the ability to supply an order for emu oil using its best efforts within sixty days but fails to do so for some reason, then this limited remedy would not come into play. Second, NFI contends that, under the plan language of the Agreement, this limited remedy applies only to "any failure by [PEI] to provide the quantities of emu oil required by NFI hereunder." Thus, if PEI breaches the parties' Agreement in ways other than failing to supply emu oil to NFI such as selling emu oil to prohibited third parties, this limited remedy would not apply to such other breaches.

***PEI's Position***:  First, PEI contends that the limited remedy of Subsection 2.2 applies in a broader array of circumstance other than just failure to timely supply an order for emu oil.[6]

---

[6] For example, in a brief in support of its unsuccessful motion to dismiss, PEI suggested that the limited remedy under Subsection 2.2 applies to all discretionary decisions to refuse to supply emu oil regardless of the ability of PEI to supply that oil. *See* Br. in Support of Mot. to Dismiss (ECF No. 27-1) at 10-11. However, PEI never explained

Second, PEI contends that the limited remedy of Subsection 2.2 applies not only to a failure to supply emu oil but also more broadly to other breaches of the Agreement that it is accused of and other causes of action.[7]

*Analysis*:  The limited remedy provision appears in Subsection 2.2 of the Agreement which deals with PEI's supply of emu oil to NFI. After providing that PEI must use its best efforts to fulfill all orders for emu oil as quickly as reasonably possible, Subsection 2.2 sets forth a limited remedy that comes into play in the event that PEI, despite its best efforts, is unable to supply an order for emu oil within sixty days.  That limited remedy is described as follows:

> In the event [PEI] is **unable to supply** any order within sixty (60) days following the order date, NFI shall have the right, notwithstanding the terms of Section 1.4 of this Agreement, to order emu oil from a third party; provided, however, that at such time as [PEI] provides reasonable evidence to NFI that it **can supply** NFI with its requirements, NFI shall have no further right to purchase emu oil from third parties unless PEI shall again become **unable to supply** NFI's requirements. . . . The remedies provided by this Subsection 2.2 shall be NFI's exclusive remedies for any failure by [PEI] to provide the quantities of emu oil required by NFI hereunder.  (emphasis added)

**Ex. A**, §2.2. As the highlighted language above clearly demonstrates, this limited remedy of purchasing oil from a third party comes into play only if PEI is "unable to supply" an order for emu oil. The limited remedy plainly does not come into play if PEI is able through its best efforts to supply an order for emu oil but in its discretion chooses not to do so.[8] This is the only possible construction that gives purpose and meaning to the contract language which ties the limited

---

how it could justify such a construction of the contract when the plain language of the Agreement limits the limited supply remedy to only those situations where PEI "is unable to supply any order."

[7] For example, in a brief in support of its unsuccessful motion to dismiss, PEI took the position that the limited remedy in Subsection 2.2 governed NFI's claim for tortious interference with contract. *See* Br. in Support of Mot. to Dismiss (ECF No. 27-1) at 14. However, PEI never explained how it could justify applying a limited remedy for failure to supply an order for emu oil to other claims that had nothing to do with PEI's ability to supply oil.

[8] This is exactly what NFI believes happened in this case. NFI believes that with additional discovery it can prove that PEI easily had the ability to supply NFI's orders for emu oil from a variety of sources, but PEI refused to even make an effort to supply those orders in order to try to gain leverage in the parties' business disputes. PEI was able to supply NFI's orders for emu oil, but it simply refused to do so. If NFI is ultimately able to prove these facts which it believes that it can, then PEI would not be entitled to rely upon Subsection 2.2's limited remedy to justify its refusal to supply orders for emu oil.

remedy to PEI being "unable to supply" orders. Moreover, any other construction would defeat the purposes of the Agreement. The Agreement was designed to provide NFI a stable source of emu oil and to provide PEI with a steady purchaser for its oil. **Ex. A**, Recitals B-D, §§2.2, 3.1. If PEI were permitted to refuse to fulfill orders for emu oil in its discretion, then NFI would not have a reliable source of emu oil. A construction of the Agreement that permitted PEI to refuse to supply NFI's orders when it had the ability to do so through its best efforts would totally deny NFI the benefit of the bargain that was agreed to.

PEI has previously claimed that, if this limited remedy is applicable, then it restricts NFI's remedies for every possible type of breach of the Agreement. *See* PEI's Br. in Support of Mot. to Dismiss (ECF No. 27-1) at 14. However, such a construction cannot be reasonably defended under the plain language of the Agreement. The limited remedy appears in Subsection 2.2 of the Agreement which deals with PEI's supply of emu oil to NFI, and the first phrase used in describing the limited remedy states that it comes into play only "in the event JEI is unable to supply any order within sixty (60) days." **Ex. A**, §2.2. Thus, the language could not be plainer that the limited remedy governs failures to supply emu oil. It has no application to PEI's breaches of other types of duties under the Agreement.

The last sentence of Subsection 2.2 further explains that this limited remedy only applies to PEI's failure to supply emu oil and not other types of breaches of the Agreement. That last sentence states: "The remedies provided by this Subsection 2.2 shall be NFI's exclusive remedies for any failure by [PEI] to provide the quantities of emu oil required by NFI hereunder." **Ex. A**, §2.2. The import of this language is clear: Subsection 2.2 restricts NFI's remedies only in the event that PEI fails to supply emu oil as required by the Agreement. The language is quite clear that such a failure to supply is the only circumstance in which Subsection 2.2 sets forth NFI's

exclusive remedies. If PEI breaches the Agreement in some other way that does not involve a failure to supply emu oil ordered by NFI, then the limited remedy of Subsection 2.2 plainly has no application to such a breach.

The broad scope of the limited remedy claimed by PEI, in addition to contradicting the plain language of the Agreement, would lead to absurd results. The Agreement imposes many obligations upon PEI other than merely supplying emu oil, and it would be irrational to hold that NFI is limited to ordering emu oil from a third party if these non-supply obligations were breached. For example, Subsection 1.2 of the Agreement requires PEI to review marketing materials and suggest changes within ten days of receipt. Under PEI's construction of the Agreement, if PEI breached the Agreement and took eleven days to submit changes to marketing materials instead of the allowed ten day maximum, then NFI's remedy would be to order emu oil from a third party. Such a result would be irrational since edits to marketing materials have nothing to do with the supply of emu oil. As another example, Subsection 6.2 of the Agreement requires PEI to maintain all NFI confidential information that it has access to in strict confidence. Under PEI's construction of the Agreement, if PEI publically disclosed some of NFI's confidential information, NFI's remedy would be to order emu oil from a third party. This result would be nonsensical. The Agreement was plainly structured to require PEI to use its best efforts to NFI's orders for emu oil, and to allow NFI to order emu oil from third parties if PEI was unable to timely supply NFI's needs. It would contravene the entire purpose and structure of the Agreement to suggest that NFI could order emu oil from third parties for various breaches of PEI's duties that have nothing to do with a failure to supply emu oil.

The parties' course of dealing further supports following the plain language of the Agreement. The limited remedy of Subsection 2.2 applies only to situations where PEI is unable

to supply emu oil despite its best efforts. Throughout the nine years that the parties did business under the Agreement, there were several disputes in which one of the parties claimed that the other was in breach of an obligation that did not involve any refusal or inability to supply of emu oil. These claimed breaches included, for example, claims by NFI that barrels of oil were too small and that NFI had not paid money due. **Ex. D**, ¶11. Throughout all of these disputes, no one at PEI ever claimed that NFI's remedy under the Agreement was to purchase oil from a third party. *Id*. at ¶12. Such an issue never came up because the Agreement ties the NFI's ability to purchase oil from third parties to PEI's obligation to supply emu oil and not to other contractual duties.  **Ex. A**, §2.2.

### D.     The Parties' Responsibilities for Payment of Marketing and Promotional Expenses

***Disputed Issue***:   The parties dispute the extent of their obligations for payment of expenses for marketing and promoting Blue Emu Products.

***NFI's Position***:   NFI contends that it was responsible for the payment of only its own advertising expenditures, and was not responsible for promotional expenditures by third party retailers.

***PEI's Position***:   PEI contends that NFI is responsible for the payment of all expenditures for the advertising and promotion of Blue Emu products, including any amounts spent by retailers that advertise the products.

***Analysis***:   When the Agreement was entered into, Blue Emu was a new product and likely required extensive advertising to become successful. One of the issues that confronted the parties in negotiating the Agreement was who would be responsible for such costs. The parties resolved this issue by agreeing that NFI would be responsible only for advertising and promotional expenditures that it undertook, and that NFI would not be responsible for such

expenditures by third parties like retailers. Subsection 1.5 of the Agreement contains the parties' agreement on responsibilities for such marketing and promotional activity. It states that:

> **NFI** agrees that all marketing or promotional activity **undertaken by it** in order to market or promote the Emu Products shall be at NFI's expense. (emphasis added)

**Ex. A**, §1.5. In this sentence, the word "it" clearly refers back to NFI. Thus, when NFI agreed to accept responsibility for "marketing or promotional activity undertaken by it," NFI was accepting responsibility only for the costs of marketing and promotion activities that NFI undertook. NFI is clearly therefore only responsible for its own advertising of Blue Emu products. There is no provision in the Agreement that in any way gives NFI full responsibility for the costs of any advertising or promotional expenditures undertaken by third parties like retailers. Any other interpretation would render the words "undertaken by it" superfluous and without purpose.

### E. The Proper Definition of "NFI's Total Revenue Received"

***Disputed Issue***:  The parties dispute the meaning of the phrase "NFI's total revenue received" which is the term used in Subsection 2.4 of the Agreement to describe the amount upon which NFI's royalty payments are to be calculated.

***NFI's Position***:  NFI contends that the common ordinary, meaning of "NFI's total revenue received" is the whole amount of money taken into NFI's possession.

***PEI's Position***:  PEI contends that various charges which retailers deducted from their payments to NFI must be added to the amounts paid to NFI in order to calculate "NFI's total revenue received."

_**Analysis**_:   Subsection 2.4 of the Agreement states that NFI would make a royalty payment consisting of a specified percentage[9] of "NFI's total revenue received" from product sales "net of discounts and refunds." **Ex. A**, §2.4. "NFI's total revenue received" is a clear and unambiguous phrase which obviously means the total amount of money received by NFI. This is the plain meaning of the words used. "Total" means "constituting or comprising the whole; entire."[10] "Revenue" means "an amount of money regularly coming in."[11] "Received" means "to take into one's possession."[12] Thus, "NFI's total revenue received" must mean the whole amount of money taken into NFI's possession. This is the plain, ordinary meaning of these words, and there is nothing in the Agreement to suggest any contrary or specialized meaning for these words. Indeed, PEI's own CEO witness agreed at his deposition with the fact that "total revenue received" means all money that NFI receives from retailers. **Ex. B** at 223:1 - 225:21.

Notwithstanding the plain meaning of these words, PEI contends that "NFI's total revenue received" includes much more than just the amount of money taken into NFI's possession. Under NFI's construction, if a retailer pays NFI $10,000 for a shipment of Blue Emu products, then the total revenue received from that sale was $10,000. However, PEI wants to dissect such transactions and add back into revenue some of the charges applied by the retailer, even though the amount of those charges was never received by NFI. For example, if the retailer who paid NFI $10,000 has charged NFI a $2,000 promotional fee and a $1,000 shelf slotting fee, PEI would claim that NFI's total revenue was actually $12,000 (adding in the promotional fee but not the slotting fee). In other words, PEI contends that "NFI's total revenue received" requires adding together two sums – the amount of money that NFI took into its possession from

---

[9] The percentage varied by product – 8% for Super Strength Blue Emu Cream and 5% for other products.
[10] http://dictionary.reference.com/browse/total?s=t&path=/
[11] http://dictionary.reference.com/browse/revenue?&path=/
[12] http://dictionary.reference.com/browse/received?s=t

retail sales plus amounts that retailer purchasers of Blue Emu products charged NFI for things like promotional and distribution charges. Whenever a company like NFI supplies product to large retailers like Walgreens or CVS, those retailers deduct various amounts from the agreed upon purchase price. These deductions are non-negotiable, and are claimed by the retailers to cover such things as product distribution, shelving, and other activities conducted solely by the retailers.[13] **Ex. D**, ¶13. PEI contends that some of these retailer charges were part of "NFI's total revenue received" even though these amounts were deducted by retailers and NFI never received any of these funds.

There is no language in the Agreement that would support adding retailer charges to NFI's revenue received in order to calculate NFI's total revenue received. To the contrary, Subsection 2.4 only refers to a royalty being calculated based upon "NFI's total revenue received" without the addition of any other amounts. The only contract language that PEI could conceivably try to cite to support its interpretation is the provision of Subsection 1.5 that requires NFI to pay for "marketing or promotional activity undertaken by it." **Ex. A**, §1.5. Because some of the retailer charges can arguably be characterized as charges for the retailers' advertising of Blue Emu products,[14] PEI apparently contends that those charges were NFI's responsibility and should have been added to revenue received to calculate "actual" total revenue received. However, as noted in the preceding section of this Memorandum, Subsection 1.5 does not

---

[13] These charges range from 10% to 14% of the purchase price, and are automatically deducted from the retailers' payments for product shipped to them. **Ex. D**, ¶ 14. The parties have a substantial factual dispute as to whether or not these retailer charges were actually used for the marketing or promotion of Blue Emu. NFI contends that these charges were almost never used for product marketing or promotion, whereas PEI presumably claims otherwise. *Id.* at ¶15. The Court cannot resolve such factual disputes on summary judgment, and therefore NFI has purposefully chosen not to ask the Court to adjudicate the nature of these retailer charges in this motion.

[14] NFI disputes that there were any retail purchasers of Blue Emu who charged NFI for actual promotions or advertisements of Blue Emu products. Many mass market retailers charge all of their customers these standard amounts, some of which may be described with a label that has a word like "advertising" or "promotion." In fact, however, in many (if not most or all) instances, there is no actual advertising being conducted and the charge is simply a cost of doing business with mass market retailers. However, it is not necessary for the Court to decide the nature of the retailer charges in the present motion. The only issue that NFI is moving for summary adjudication of is the scope of its duty to pay royalties on its total revenue received under the Agreement.

advance PEI's position because it only deals with the expenses of advertising and promotion "undertaken by" NFI. The alleged advertising charges that PEI contends should be added to calculate total revenue received are charges for advertising that was conducted (if by anyone) by retailers, and not by NFI. NFI's total revenue received from the sale of Blue Emu products was reduced by these retailer charges, and therefore these sums cannot be counted under the Agreement as a part of "NFI's total revenue received."

The parties' course of dealing in contract performance proves that this is the proper contract interpretation. Just a few months after the Agreement was signed, a representative of NFI wrote an email to explain to PEI that these retailer charges would not be included in the net sales report upon which royalties were calculated. The email stated in pertinent part:

> Obviously, this is a billing report and not a net sales report. There will be account advertising and promotional expenses, slotting expenses, product returns, product damage and any of a number of things that retailers can find to make deductions reduced from these numbers prior to reconciling your commissions. However, this will give you an idea of what to expect for monthly commissions.

**Ex. G**. Thus, NFI made it very clear at the outset of the parties' relationship that retailer charges, including any charges for advertising or promotion of Blue Emu, would be treated as a product expense that would be deducted from revenue received for purposes of paying royalties. PEI's CEO admitted at his deposition that he and the Company received this email. **Ex. B** at 214:19 - 215:16; 218:9-17. PEI's Chairman also admitted that PEI was informed in this email in 2003 that NFI would not be paying royalties on charges deducted by retailers from their payments to NFI. **Ex. C** at 266:17-267:12. Both PEI witnesses further admitted that PEI did not respond to this email in any way, and did not tell NFI that it was handling the accounting in the wrong way. **Ex.**

**B** at 216:18-22; 218:9-23; **Ex. C** at 268:18-269:9.[15]

Throughout the parties' nine year relationship, NFI provided a written statement every month that showed the total revenue received from all retailers from the sales of Blue Emu. These statements included a listing of the types and amounts of every deduction made by every retailer on every shipment. **Ex. D**, ¶7. Thus, beginning in 2003, PEI received monthly statements detailing all of the retailer charges that it now claims should have been added back in to calculate total revenue received. Indeed, PEI's CEO admitted at his deposition that, for all of the retailer charges that PEI contends that NFI should not have deducted in calculating total revenue received, PEI received a statement from NFI each month showing all of those charges. **Ex. B** at 235:7-10. PEI's Chairman also admitted that PEI received these monthly royalty statements showing retailer charges, and also admitted that PEI never objected at the time to any of these charges as being in any way improper. **Ex. C** at 268:18-269:16.

August 19, 2012 is the first time that PEI ever provided any notice to NFI about its objections to the fact that NFI was not adding retailer charges for purposes of calculating total revenue received and royalty payments. **Ex. S**; **Ex. B** at 245:6-14; **Ex. C** at 268:18-269:16. Thus, from the effective date of the Agreement (January 1, 2003), a period of more than nine and one-half years passed before PEI ever objected to the manner in which NFI was calculating and paying royalties on total revenue received. While PEI now claims that NFI's failure to add back in retailer deductions to calculate total revenue received is "suspicious," PEI admits that it has known of this "suspicious" behavior for many years, at least since 2004. **Ex. B** at 241:3-242:13.

---

[15] The witness thought it was a mistake for him not to respond to this email and object to the way that the accounting was being handled, and he agreed that in hindsight he absolutely should have responded and said that NFI's deductions of retailer charges was not acceptable. **Ex. B** at 216:18-217:7 ("It was a mistake for me to not tell him he was wrong"); *id.* at 11-22 ("I absolutely should have responded and told him that was absolutely unacceptable.").

23

Given the foregoing, if PEI really believed that the Agreement required NFI to add various retailer charges to the amounts that it was paid by retailers, why did PEI not object to the way that NFI was paying royalties throughout the parties' nine year relationship? PEI's CEO was asked this question at his deposition, and his only explanation was that he "wasn't sure how to deal with it at that time." **Ex. B** at 217:11-22. This "explanation" cannot even begin to justify or excuse PEI's acquiescence over a period of nine years to the method that NFI was employing to calculate "total revenue received" under the Agreement.

Further, PEI's claims are barred under the applicable statute of limitations. Under Georgia law, there is a six-year statute of limitations for written contracts. *See* OCGA §9-3-24. Georgia adopts the same arising and accrual methodology as Alabama. *See, e.g., Moore v. Dep't of Human Resources*, 220 Ga.App. 471, 472, 469 S.E.2d 511 (1996) ("[W]ith respect to a breach of contract claim, the statute of limitation runs from the time the contract is broken rather than from the time the actual damage results or is ascertained."); *Owen v. Mobley Constr. Co.*, 171 Ga. App. 462, 320 S.E.2d 255 (1984) ("The discovery rule is not applicable to a cause of action based on breach of contract."). Thus PEI's nine year delay in bringing suit bars its claim.

F.      **The Nature and Scope of NFIs Rights of Exclusivity**

**_Disputed Issue_**:    The parties dispute whether PEI may sell emu oil to third parties regardless of whether NFI's supply needs are met or without first receiving NFI's approval.

**_NFI's Position_**:    NFI's supply needs are to be met under the Agreement and all amendments thereto. Once NFI's supply needs are met, PEI may sell emu oil or emu fat to third parties only if NFI consents or NFI declines to buy the oil or fat itself. PEI may also sell products containing emu oil to certain third parties without NFI's consent.

**_PEI's Position_**:    PEI may sell emu oil, emu fat, and products containing emu oil to anyone as long as the buyer is not in the Mass Retail Market.

*__Analysis__*:  The plain language of the Agreement and all amendments thereto restricts PEI's ability to sell emu oil or emu fat to anyone, and restricts PEI's ability to sell products containing emu oil to only certain customers. PEI may sell products containing emu oil as long as the sales are outside of the Mass Retail Market, but PEI may not sell emu oil or emu fat unless NFI either consents or NFI declines to buy the oil or fat itself.

PEI takes the position that Amendment No. 1 to the Agreement provides it the right to sell *__oil__* to third parties outside of Mass Retail Market. This cannot be the case because Amendment No. 1 to the Agreement expressly granted PEI only the right to sell *__products__* and contract with others to sell *__products__* containing emu oil, but not to sell emu oil or emu fat:

> [PEI] shall have the right to develop, manufacture, distribute, market, advertise and sell *__products__*, or to contract with others to develop, manufacture, distribute, market, advertise and sell *__products containing emu oil__* supplied by [PEI] in markets other than the Mass Retail Market, or to *__contract__* with others to … sell *__products__* containing emu oil supplied by [PEI] other than the Mass Retail Market.

**Ex. E** (emphasis added). The only thing that the first amendment grants PEI is the right to sell "products containing emu oil," and those sales are limited to markets other than the Mass Retail Market. The first amendment does not authorize the sale of oil or fact.

The Fourth Amendment governs PEI's sale of emu oil and fat that are not part of a product. The Fourth Amendment specifies two the very limited circumstances in which PEI may sell emu oil or fat. First, it provides that PEI may not distribute emu oil or emu fat without first getting NFI's consent. *See* **Ex. H** at ¶3 ("Except as provided by Section 1 of the First Amendment, PEI shall not market, sell or distribute *__emu oil or emu fat__* to any third party without the express written consent of NFI.") (emphasis added).[16] Thus, PEI can sell emu oil or emu fat

---

[16] The amendment is very clear that NFI was given what amounts to a right of first refusal to purchase the emu fat or oil that PEI had available for sale. However, even if the Court believes that there is any ambiguity on this point and decided to consider other evidence, that evidence directly supports NFI's position. In fact, during the negotiations

if NFI consents. Second, the Fourth Amendment provides that if PEI has emu oil or emu fat available for sale and NFI declines to buy that oil or fat, then PEI may sell the oil or fat that NFI declines to buy. PEI has never had the unrestricted right to sell **emu oil** or **emu fat**, as opposed to "**products containing emu oil**" to third parties. The parties never contemplated PEI selling emu oil or emu fat to third parties, especially to NFI's detriment by depriving NFI of meeting its supply needs. *See* **Ex. A**, §3.1 ("Except as specifically set forth in Subsection 3.2, JEI shall not market, sell or distribute emu oil to any third party."). PEI's counsel interpreted the amendment in the same way that NFI does now. **Ex. S** (Aug. 19, 2011 Letter from D. Anderson to R. Springer) (interpreting the Fourth Amendment to the Agreement: "[PEI] agreed not to sell emu oil to any third party if it was required by NFI to manufacture Emu Products").

Accordingly, Amendments Nos. 1 and 4 should be interpreted according to their plain language. PEI may sell "products containing emu oil" or contract with others to develop and sell "products containing emu oil" so long as those sales of products are not made to the Mass Retail Market. However, PEI may not sell emu oil or emu fat unless either (i) NFI consents to those sales, or (ii) NFI declines to buy oil or fat that PEI has available for sale.

### G.     The Nature of the Parties' Relationship: Independent Contractors or Joint Venture

*Disputed Issue*:  The parties dispute whether or not the Agreement created a relationship of two independent contractors or a joint venture for the sale of emu oil-based products.

*NFI's Position*:   NFI contends that under the plain language of the Agreement the parties' relationship "is that of independent contractors," and "nothing in this Agreement shall be construed to create any other type of relationship." Further, the Agreement lacks the essential

---

over this amendment, PEI's CEO acknowledged in an email that NFI had a "safety net" under the present contract language because "it has the right to buy the oil first." **Ex. T**; **Ex. B** at 267:14-268:3.

elements of a joint venture such as joint control over a business enterprise and the sharing of profits.

***PEI's Position***:  PEI contends that the Agreement creates the relationship of a joint venture for the sale of Blue Emu between NFI and PEI instead of an independent contractor relationship. PEI alleges that the parties intended to form a joint venture and did form a joint venture by virtue of the Agreement. *See* Compl., ¶¶8, 9, 11-13, 23 (all describing the relationship as a "joint venture").

***Analysis***:  The Agreement expressly indicates that the parties are related to one another exclusively as independent contractors and not in any other way. At Subsection 9.1, the Agreement provides:

> **The relationship of [PEI] and NFI is that of *independent contractors*. Nothing in this Agreement shall be construed to create any other type of relationship.** NFI acknowledges that it has no power or authority to act on behalf of [PEI] as its agent and that its authority is limited to activities specified hereunder as an independent contractor in accordance with the terms of this Agreement. (emphasis added)

**Ex. A**, § 9.1. There is no ambiguity about this provision; the parties are independent contractors and not partners in a joint venture. This contract provision is definitive and should end the inquiry.

Even if the parties had not included Subsection 9.1 in the Agreement, however, the Court would still have to conclude that the Agreement does not create a joint venture relationship. Under Georgia law, "[a] joint venture 'arises where two or more parties combine their property or labor, or both, in a joint undertaking for profit, with rights of mutual control.' … *Without the element of mutual control, no joint venture can exist.*"  *Rossi v. Oxley*, 269 Ga. 82, 82-83, 495 S.E.2d 39, 40 (1998) (emphasis added) (quoting *Kissun v. Humana*, 267 Ga. 419, 420, 479 S.E.2d 751, 752 (1997) (additional citations omitted). "Thus, the essential elements of a joint

venture are (1) a pooling of action; (2) a joint undertaking for profit; and (3) rights of mutual control." *Hillis v. Equifax*, 237 F.R.D. 491, 508 (N.D. Ga. 2006) (citing *Kissun*, 267 Ga. at 420, 479 S.E.2d at 752).

Under Alabama law there are similar requirements:

> The burden of establishing the existence of a joint venture is upon the party asserting that the relation exists. The elements of a joint venture have been held to be: a contribution by the parties of money, property, effort, knowledge, skill, or other assets to a common undertaking; a joint property interest in the subject matter of the venture and ***a right to mutual control or management of the enterprise***; expectation of profits; a right to participate in the profits; and usually, a limitation of the objective to a single undertaking or ad hoc enterprise. While every element is not necessarily present in every case, it is generally agreed that in order to constitute a joint venture, there must be a community of interest and ***a right to joint control***. Thus, in order to avoid a directed verdict on this issue, [Plaintiff] must show evidence supporting the existence of these two elements."

*Moore v. Merchants & Planters Bank*, 434 So. 2d 751, 753 (Ala. 1983) (citing 46 AM. JUR. 2d, JOINT VENTURES, §69 (1969)) (emphasis added); *see also Fountain-Lowery Enter., Inc. v. Citicorp Acceptance Co.,* No. CV85-PT-1305-S, 1987 U.S. Dist. LEXIS 5212, at *3, n.3 (N.D. Ala. 1987) (Propst, J.) (quoting *Moore*, 434 So. 2d at 753). Additionally, Alabama courts have found that there can be no joint venture in instances where there is no agreement to share losses, no limit on the time period for the venture, and no limit on purpose of the venture. *See In re: Silicone Gel Breast Implants Prods. Liab. Litig.*, 887 F. Supp. 1455, 1462 (N.D. Ala. 1995) (Pointer, J., citing earlier finding in same case, 837 F. Supp. 1128, 1139 (N.D. Ala. 1993)).

The Agreement is totally lacking these essential elements of a joint venture. Under the Agreement, PEI lacks any control over NFI or its operations related to the sale of Blue Emu products, and NFI has no control over PEI's raising, slaughter and processing of emu birds for oil. PEI cannot control how, where or when NFI sells Blue Emu, it cannot control the ingredients or manufacture of the product, and it does not have any role in NFI's product manufacture,

advertising, or sale. Similarly, NFI has no role (and certainly no control) over how PEI raises emu birds, when it slaughters and processes emu birds, or how it obtains its supplies of emu oil in the market. The parties conduct their businesses totally separate and independent from one another. There is nothing in the Agreement giving either party control over any part of the other's operations, including those related to Blue Emu. Thus, there cannot be a joint venture. The Agreement simply creates an exclusive supply relationship for emu oil with related arrangements. There is manifestly no joint venture in which the parties have any type of joint control.

Further, the parties do not share in any way in one another's profits under the Agreement. NFI has no right to any of PEI's profits from selling emu oil, and PEI has no right to any of NFI's profits from selling Blue Emu products. Under the Agreement and the subsequent amendments, NFI only pays PEI a royalty based on sales, i.e., a portion of revenue received. *See* **Ex. A**, §2.4 (8% of "NFI's total revenue received …."). Revenue received is very different than profits. Revenue" means "an amount of money regularly coming in."[17] Profit is "the excess of the selling price of goods over their cost."[18] PEI was entitled to a share of NFI's revenue, i.e., a royalty payment, regardless of whether NFI made a profit or not. Thus, PEI did not share in the profits or share the risks associated with losses from NFI's operations. For this additional reason as well, the parties cannot be joint venturers. Instead, as Subsection 9.1 of the Agreement states, the parties are independent contractors and have no other relationship.

### H. Claimed Contract Rights to Joint Ownership of the BLUE EMU Trademark

*__Disputed Issue__*:  The parties dispute whether or not the Agreement gives NFI and PEI joint ownership of the BLUE EMU trademark.

---

[17] http://dictionary.reference.com/browse/revenue?&path=/
[18] WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY at 939 (1991).

*NFI's Position*:  NFI contends that it is and always has been the sole and exclusive owner of the BLUE EMU trademark, and that throughout the parties' nine year contractual relationship PEI agreed to NFI's ownership of the trademark. NFI also contends that PEI's claim to trademark ownership is barred because NFI has an incontestable federal trademark registration under federal law which precludes PEI from contesting NFI's ownership. Further, PEI waited over nine years to assert its claim to trademark ownership and it is therefore barred by the statute of limitations.

*PEI's Position*:  In the Complaint, PEI contends that the Blue Emu trademark was an asset of the parties' joint venture which was jointly owned by both NFI and PEI. *See* Compl., ¶11. PEI contends that the parties agreed in a letter of intent that this trademark would be jointly owned by both parties, and PEI contends that this joint ownership arrangement intent survived and became a part of the final Agreement.

*Analysis*:  PEI's Complaint alleges that the parties jointly own the intellectual property associated with Blue Emu, particularly the federally registered trademark BLUE EMU.[19] At their depositions, both of PEI's corporate witnesses testified that the BLUE EMU trademark was jointly owned between NFI and PEI as part of their alleged joint venture. **Ex. B** at 140:3-141:3; **Ex. C** at 188:5-13. However, the only basis for the witnesses' claim to joint trademark ownership is the language of the contract documents. **Ex. B** at 142:4-20. The contract documents are the only possible ground for the Plaintiff to assert joint ownership:

> Q. ... is there anything that's going to prove the truth of what you claim, which is that you had an agreement that NFI and Johnson would jointly own Blue Emu?
> A.  I would have to say the contracts speak for themselves.

---

[19] The Complaint does not attempt to identify any other type of intellectual property associated with the product, and neither corporate witnesses of PEI could identify any protectable aspect of the product other than this trademark. **Ex. B** at 139:7-140:2. Accordingly, the Court should consider that the trademark registration is the only intellectual property at dispute in this matter.

**Ex. B** at 143:15-20. PEI's witnesses have admitted that the only contract document that contains any reference to joint ownership of the trademark is the Letter of Intent. **Ex. B** at 141:4-16. The LOI states that "NFI and JEI will jointly own any current and future trademarks of products that contain Johnson's Emu Oil." *See* **Ex. F**, ¶2.

PEI's claim to joint trademark ownership is fatally defective because it is based solely upon the language of the Letter of Intent. The LOI, however, was replaced and superceded by the Agreement. The Agreement states:

> This Agreement … supersedes and cancels any and all prior agreements … including, without limitation, that certain JEO-NFI Operating Agreement Letter of Intent between the parties dated May 10, 2002.

**Ex. A**, §9.10. This language could not be clearer in providing that the Agreement replaces and supercedes the Letter of Intent. Moreover, under the "merger rule," an existing contract is superseded and discharged whenever the parties enter into a valid and inconsistent agreement, completely covering the subject matter which was embraced by the original contract." *Atlanta Integrity Mortg., Inc. v. Ben Hill United Methodist Church*, 286 Ga. App. 795, 797, 650 S.E.2d 359, 362 (2007) (citing *Hennessy v. Woodruff*, 210 Ga. 742, 744(1), 82 S.E.2d 859 (1954)) (internal citations and punctuation omitted). "The rational basis for the merger rule is that where parties enter into a final contract[,] all prior negotiations, understandings, and agreements on the same subject matter are merged into the final contract, and are accordingly extinguished." *Wallace v. Bock*, 279 Ga. 744, 745(1), 620 S.E.2d 820 (2005) (citations and punctuation omitted).

The reason why PEI tries to base its claim of joint trademark ownership upon the LOI is because there is no language in the Agreement or the amendments thereto that in any way suggest joint trademark ownership. In fact, there is not one word in the Agreement or its

amendments that references the BLUE EMU trademark in any way. PEI's CEO admitted this point in his depositions, conceding that the Agreement does not contain any detail about the claim of joint ownership of the BLUE EMU trademark. **Ex. B** at 196:19-197:3. The only explanation the witness could give for why the Agreement does not address the issue is that it was covered in the superseded Letter of Intent. *Id.* at 197:6-14. Of course, the witness contradicted himself on this point since he also testified that the Agreement and amendments contain the entire agreement between the parties even though they do not reference the alleged agreement to joint trademark ownership. **Ex. B** at 142:4-20.

The parties' course of conduct also disproves the claim of joint trademark ownership. NFI promptly asserted complete ownership of the BLUE EMU trademark shortly before the Agreement was entered into by filing with the federal government a trademark application listing itself as owner. **Ex. D**, ¶17; **Ex. K**. PEI knew in 2003 that NFI was applying for the BLUE EMU trademark. **Ex. B** at 288:11-18. NFI's trademark registration for BLUE EMU was granted on September 13, 2005, and NFI has owned and maintained that trademark registration in good standing through the present time. **Ex. D** at ¶18; **Ex. L**. NFI provided public notice of its claim to ownership of the BLUE EMU trademark not only by obtaining this federal trademark registration, but also by putting a trademark registration symbol on the reference to BLUE EMU on all product labels. *Id*. at ¶20. NFI also handled all aspects of protecting the trademark, including all of the expenses of defending against a trademark infringement lawsuit brought by the owner of the BLUE STUFF trademark. **Ex. C** at 187:8-20. Despite all of this public assertion of trademark ownership, for a period of over nine years (from 2003 through most of 2011), PEI never once objected to NFI's claim to ownership, and never asserted in any way that it had any type of ownership interest in the trademark. **Ex. D**, ¶20; **Ex. B** at 197:18 - 198:15. PEI also

never took any action to try and object to NFI obtaining its federal trademark registration for BLUE EMU. **Ex. B** at 289:1-5. This course of conduct throughout the nine years of contract performance further proves the fact that the parties had no intent for any type of joint trademark ownership.

Further, even if PEI could construct some basis to support a claim of trademark ownership under the contract documents, it would not matter because PEI's claim to any trademark ownership is absolutely barred under federal law. NFI has incontestable ownership rights in the federally registered trademark BLUE EMU that cannot be challenged. The Trademark Office's publically-accessible records clearly indicate NFI as the owner of all trademarks registrations and applications that contain the phrase "blue emu."[20] *See* **Ex. M**. Each of these records indicates that NFI is the sole owner of the mark (and has been the owner since 2002). *Id.* It is well settled that "registration of a trade-mark in accordance with federal or state law creates a prima facie, rebuttable presumption that the one registering the mark is its owner, and that the trade-mark is valid." *Persha v. Armour & Co.*, 239 F.2d 628, 630 (5th Cir. 1957).[21] *See also Z Prods. v. SNR Prods.*, No. 8:10-cv-966-T, 2011 U.S. Dist. LEXIS 95304, at *13-*14 (M.D. Fla. 2011) ("Registration creates a prima facie rebuttable presumption that the one registering the mark is its owner, and that the trademark is valid"), *Thoroughbred Legends, LLC v. Walt Disney Co.*, No. 1:07-cv-1275-BBM, 2008 U.S. Dist. LEXIS 19960 at *24 (N.D. Ga. Feb. 12, 2008). Indeed, the Lanham Act specifically states that "[a] certificate of registration of a mark upon the principal register provided by this Act shall be prima facie evidence of . . . the owner's ownership of the mark . . ." 15 U.S.C. §1057.

---

[20] The registration certificates for both U.S. Trademark Reg. No. 2,995,694 for BLUE-EMU and U.S. Trademark Reg. No. 3,088,521 for BLUE-EMU ICE clearly indicate NFI as the owner of these marks. *See* **Exs. L** and **N**.

[21] The Eleventh Circuit adopted as binding precedent all decisions from the former Fifth Circuit handed down prior to October 1, 1981. *See Bonner v. City of Pritchard Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981).

However, NFI's trademark ownership rights are not rebuttable, they are incontestable. NFI's registration for "BLUE-EMU" (U.S. Reg. No. 2,995,694) ("the '694 Registration") is incontestable under 15 U.S.C. §1065. NFI used the BLUE EMU mark for five consecutive years, beginning at least as early as June 3, 2002, and submitted the requisite "Declaration of Use and Incontestability Under Sections 8 & 15" (**Ex. O**) that was accepted by the United States Patent and Trademark Office (*see* **Ex. P**). As such, Pro Emu is precluded from challenging ownership as a matter of law. *See* 15 U.S.C. §1115(b) ("To the extent that the right to use the registered mark has become incontestable under Section 15 [15 U.S.C. §1065], the registration shall be ***conclusive evidence … of the registrant's ownership of the mark***, and of the registrant's exclusive right to use the registered mark in commerce.") (emphasis added).

Finally, even if PEI's claim to trademark ownership were not barred by contract and federal law, it is barred by Alabama's six-year statute of limitations set forth in ALA. CODE §6-2-34(9). As a general rule, an action for breach of contract comes into existence, or "arises," at the time the breach occurs, the same time it "accrues" triggering the six-year statute of limitations. *Ripps v. Powers*, No. 07-0832-CG-B, 2008 U.S. Dist. LEXIS 105274, at *12-*13 (S.D. Ala. Dec. 31, 2008) (citing *Stephens v. Creel*, 429 So. 2d 278 (Ala. 1983)). The Supreme Court of Alabama has made clear that the cause of action arises at the time of the breach regardless of whether the plaintiff had discovered the breach at that time. *Id.* at *13 n.3 (citations omitted).[22]

---

[22] It is not clear whether the claim to trademark ownership should be governed by Alabama or Georgia law. However, there is no practical difference between the two states' laws as Georgia sets a six-year statute of limitations for written contracts, *see* OCGA §9-3-24, and Georgia adopts the same arising and accrual methodology as Alabama. *See, e.g., Moore v. Dep't of Human Resources*, 220 Ga. App. 471, 472, 469 S.E.2d 511 (1996) ("[W]ith respect to a breach of contract claim, the statute of limitation runs from the time the contract is broken rather than from the time the actual damage results or is ascertained."); *Owen v. Mobley Constr. Co.*, 171 Ga. App. 462, 320 S.E.2d 255 (1984) ("The discovery rule is not applicable to a cause of action based on breach of contract."). Further, if the alleged agreement regarding intellectual property was oral, a mere four-year statute of limitations applies. See OCGA §9-3-24. Thus, regardless of whether Alabama or Georgia law applies, Pro Emu would have had to file suit within six or four years of when the alleged breach occurred.

PEI has previously sought to avoid the statute of limitations by arguing that its alleged rights are property rights, not contract rights. NFI does not contest the obvious fact that trademarks are property to their rightful owners. However, conveyances and agreements on the ownership of trademarks are handled by contracts, just like any other agreement to convey or divide property rights. Thus, the ownership of the BLUE EMU trademark is to be determined under contract law and as such, Pro Emu failed to bring it contract claim within the statute of limitations.[23]

**A. Disputes Regarding the Meaning of a "Barrel" of Emu Oil**

***Disputed Issue***:  The parties dispute the meaning of the term "barrel" in the fourth amendment.

***NFI's Position***:  A barrel means a container 55 gallon barrels of emu oil.

***PEI's Position***:  A barrel means a container with 52.65 gallons of emu oil.

***Analysis***:  The original Agreement specified a price per gallon for emu oil. *See* **Ex. A** at §2.3. The Fourth Amendment to the Agreement (**Ex. H**) changed the pricing to a per barrel price, but the amendment did not define what constitutes a barrel of emu oil. This issue became a matter of dispute after the fourth amendment was executed, with NFI claiming that a barrel was 55 gallons of oil and PEI claiming that a barrel was 52.65 gallons of oil. Ultimately, the parties resolved the dispute going forward by NFI agreeing in the future to accept barrels with only 52.65 gallons of oil in exchange for PEI agreeing to reduce the price of a barrel of oil to reflect the difference in contrast between a 55 and 52.65 gallon barrel. **Ex. D**, ¶21; **Ex. J**. A dispute

---

[23] Even assuming that the six year statute of limitations for contracts does not apply, the same time period applies to conversion of personal property or any trespass to personal property. *See* ALA. CODE §6-2-34. Thus, regardless of whether Pro Emu's claims are considered to rise *ex contractu*, or from the breach of a promise, or *ex delicto*, from the breach of a duty between the parties, the claim is barred by the statute of limitations. *See Edison v. Johns-Redout's* Chapels, 508 So. 2d 697, 702 (Ala. 1987) (quotation omitted); *see also Braswell v. Conagra, Inc.*, 936 F.2d 1169, 1173 (11th Cir. 1991) ("The Supreme Court of Alabama has long recognized that, while a defendant's failure . . . to perform the act promised in a contract may give rise to an action *ex delicto*, such failure also gives rise to an action *ex contractu* when there is a breach of promise." (citations omitted)).

remains, however, as to how the term "barrel" should be defined for the time period prior to when the parties reached this agreement to modify the fourth amendment.

The fourth amendment does not define what the parties' intended by their reference to a "barrel" of emu oil. However, the term "barrel" is a standard term with recognized meaning in the emu oil supply business. Indeed, the American Emu Association (AEA) has a Trade Rule (No. 105) which defines a barrel of emu oil. The court should refer to this industry standard in defining the term "barrel" under the fourth amendment. *See* OCGA §13-2-2(2) (In construing a contract, "technical words, words of art, or words used in a particular trade or business will be construed, generally, to used in reference to [their] particular meaning"); *State Farm Fire & Co. v. Am. Hardware Mut. Ins. Co.*, 224 Ga.App. 789, 792(3), 482 S.E.2d 714 (1997); *Henderson v. Henderson*, 152 Ga.App. 846, 847(1), 264 S.E.2d 299 (1979); *also see Asa G. Candler, Inc. v. Ga. Theater Co.*, 148 Ga. 188, 193(5), 96 S.E. 226 (1918) (terms of art or words connected to a particular trade are given the signification attached to them by experts in such art or trade as a rule of construction).

Under AEA Trade Rule 105, a barrel of emu oil is 55 gallons unless the parties express agree otherwise. Trade Rule 105 provides that emu oil is sold on a net weight basis in pounds and that unit weight is 7.6 lbs/gallon. **Ex. R** (Rule 105). The unit of sale may be by drum, barrel, or 5 gallon pails. *Id.* Unless the parties agree otherwise, a steel drum is said to weigh 418 lbs. *Id.* Therefore, a drum weighing 418 lbs. contains 55 gallons of emu oil.[24] The terms "drum" and "barrel" are used interchangeably. *See, e.g.,* definition of "drum" from Merriam-Webster "a cylindrical container; *specifically:* a large usually metal container for liquids <a 55-gallon *drum*>" (emphasis in original).[25]

---

[24] 418 lbs ÷ 7.6 lbs/gallon = 55 gallons.
[25] *See* http://www.merriam-webster.com/dictionary/drum?show=0&t=1366743648 (visited April 23, 2013).

Based on American Emu Association Trade Rule 105 and the fact that the parties did not change this default definition of a barrel, the Court should construe the term "barrel" in the Fourth Amendment to mean a container with 55 gallons of emu oil.

## IV. CONCLUSION

For all of the foregoing reasons, Defendant and Counterclaimant Nutrition & Fitness, Inc. respectfully requests that the Court issue an order construing the meaning and effect of the contract terms in dispute, and rule as follows:

1.      Subsection 2.2 of the Agreement requires PEI to use its best efforts to fulfill all of NFI's orders for emu oil as quickly as reasonably possible. This required PEI to use all reasonable efforts in good faith to supply NFI"s orders for emu oil.

2.      The limited remedy of subsection 2.2, which limits NFI to having the right to purchase emu oil from a third party supplier other than PEI, comes into play only when PEI is unable to supply any of NFI's orders for emu oil within sixty days of the order date. If PEI has the ability to supply an order for emu oil using its best efforts within sixty days but fails to do so, then this limited remedy would not come into play.

3.      The limited remedy of subsection 2.2, which limits NFI to having the right to purchase emu oil from a third party supplier other than PEI, applies only to "any failure by [PEI] to provide the quantities of emu oil required by NFI hereunder. It does not apply to other breaches, if any, of the Agreement.

4.      NFI is solely responsible for the payment of expenditures for advertising and promotion of Blue Emu products if those efforts are undertaken by NFI. NFI does not have this responsibility for advertising or promotion efforts undertaken by parties other than NFI such as retail purchasers.

5.      The phrase "NFI's total revenue received" in subsection 2.4 of the Agreement means the whole amount of money taken into NFI's possession from its sale of the specified products. "NFI's total revenue received" does not include charges deducted by retailers from the amounts that the retailers paid to NFI.

6.      Under Section 1 of the first amendment to the Agreement, PEI "has the right to develop, manufacture, distribute, market, advertise and sell products, or in contract with others to develop, manufacture, distribute, market, advertise and sell products containing emu oil supplied by PEI in markets other than the Mass Retail market." The definition of Mass Retail Market is set forth in the amendment and does not appear to be disputed by the parties. The first amendment does not give PEI the right to develop, manufacture, distribute, market, advertise and sell emu oil or emu fat as a raw ingredient. Instead, the amendment only gives PEI the right to develop, manufacture, distribute, market, advertise and sell products containing emu oil as one of the product's ingredients.

7.      Under the fourth amendment to the Agreement, PEI "shall not market, sell or distribute emu oil of emu fat to any third party without the express consent of NFI." However, "in the event NFI determines in its reasonable discretion that it cannot or will not use emu oil or emu fat PEI has available for purchase, NFI shall notify PEI and PEI shall then be free to sell such excess emu oil or emu fat to a third party." This contract language gives NFI a right of first refusal over emu oil/fat that PEI has available for purchase. PEI cannot sell or distribute emu oil/fat to any third party unless NFI either consents to the sale or unless NFI first decides that it cannot or will not purchase and use emu oil/fat the PEI has available for purchase.

8.      Pursuant to subsection 9.1, the Agreement creates the relationship between the parties "of independent contractors," and it does not "create any other type of relationship." The Agreement does not create a joint venture.

9.      NFI is the owner of the trademark BLUE EMU. Neither the Agreement nor the Letter of Intent creates any enforceable interest for PEI in ownership of that trademark.

10.      The term "barrel" of emu oil in the fourth amendment to the Agreement means a container with 55 gallons of emu oil.


Respectfully submitted,

*/s/ John David Collins*
John David Collins
*Attorney for Nutrition & Fitness, Inc.*

OF COUNSEL:

George G. Lynn
John David Collins
MAYNARD COOPER & GALE PC
1901 Sixth Avenue North
2400 Regions Harbert Plaza
Birmingham, Alabama
Telephone:  (205) 254-1000
E-mail:   glynn@maynardcooper.com
       jcollins@maynardcooper.com

Charles A. Burke (admitted *pro hac vice*)
Jacob S. Wharton (admitted *pro hac vice*)
WOMBLE CARLYLE SANDRIDGE & RICE, LLP
One West Fourth Street
Winston-Salem, North Carolina 27101
Telephone:  (336) 721-3600
E-mail:   cburke@wcsr.com
       jwharton@wcsr.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this the 26th day of April, 2013, served a copy of the foregoing pleading on all counsel of record via e-mail, to-wit:

> David B. Anderson, Esq.
> Deanna L. Weidner, Esq.
> Marvis L. Jenkins, Esq.
> ANDERSON WEIDNER, LLC
> 505 20th Street North
> 1450 Financial Center
> Birmingham, Alabama 35203
>
> *Attorneys for Progressive Emu, Inc.*

*/s/ John David Collins*
OF COUNSEL

WCSR 7719290v3