**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| PROGRESSIVE EMU, INC. | ) | |
| f/k/a JOHNSON EMU, INC. | ) | |
| | ) | |
|    Plaintiff and | ) | |
|    Counterclaim Defendant, | ) | Civil Action No. |
| | ) | CV-12-AR-1079-S |
| v. | ) | |
| | ) | |
| NUTRITION & FITNESS, INC. | ) | |
| | ) | |
|    Defendant and | ) | |
|    Counter Claimant Plaintiff. | ) | |

**<u>DEFENDANT/COUNTER CLAIMANT NUTRITION & FITNESS, INC.'S RESPONSE
AND OPPOSITION TO PLAINTIFF PROGRESSIVE EMU, INC.'S MOTION FOR
SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................................1

II.     CONTRACT INTERPRETATION ISSUES ......................................................................3

        A.      Limitation Upon NFI's Remedy for PEI's Failure to Supply Emu Oil. ..................3
        B.      The Parties' Responsibilities for Payment of Marketing and Promotional
                Expenses ............................................................................................................6
        C.      The Proper Definition of "NFI's Total Revenue Received"...................................7
        D.      The Proper Definition of "Discounts" ................................................................8
        E.      The Nature and Scope of NFIs Rights of Exclusivity...........................................9
        F.      The Nature of the Parties' Relationship: Independent Contractors or Joint
                Venture.............................................................................................................15
        G.      The Quantity of Emu Oil that NFI is Permitted to Order .....................................16

III.    PEI'S ARGUMENTS BEYOND CONTRACT INTERPRETATION............................18

        A.      NFI Has Produced All Responsive Documents....................................................18
        B.      None of NFI's Claims are Subject to Dismissal ..................................................19
        C.      PEI Has Not Proven Any Material Breach ...........................................................19

IV.     CONCLUSION...........................................................................................................21

## I.    INTRODUCTION

Nutrition & Fitness, Inc. ("NFI") submits this opposition to Pro Emu, Inc.'s ("PEI") "Partial Motion" for summary judgment. PEI's Brief in support of its motion demonstrates a profound lack of attention to detail and contains nothing that could support PEI's claimed construction of the parties' contracts. The deficiencies in PEI's Brief include at least the following:

1.      PEI concedes that the Court has asked for briefs on "the interpretation of the terms of the parties' contracts which control the parties' relationship …." Despite this acknowledgement, PEI spends the majority of its argument explaining its views as to why NFI's counterclaims allegedly should be dismissed for failing to state a claim. This argument has nothing whatsoever to do with the interpretation of the parties' contracts and the rehashing of dismissal arguments was clearly not what the Court had in mind in its March 28, 2013 Order (ECF No. 69).

2.      PEI has not even attempted to make any new arguments for dismissal. The vast majority of its brief is composed of a repeat of its prior brief in support of dismissal (ECF No. 27). For example, pages 3-5, 7-8, 10-13 and 18-19 of PEI's Brief are nearly verbatim recitations of entire paragraphs of arguments made months ago in support of dismissal. Also, most of the case law cited by PEI in support of summary judgment concerns Rule 12(b) motions to dismiss. PEI has gone so far in regurgitating its previous dismissal arguments that it is actually arguing for dismissal of a claim no longer in this lawsuit. At pages 17-18 of its brief, PEI argues for the dismissal of NFI's claim for breach of the covenant and fair dealing. However, on October 19, 2012, NFI filed amended counterclaims that deleted that particular cause of action. NFI pointed

out to the Court and to PEI that it filed this amendment (ECF No. 44 at 1) (identifying "Amended Counterclaims"), but yet PEI persists in arguing for dismissal of a non-existent claim.

3.      PEI's Brief also raises a number of other collateral matters that are irrelevant to the submissions contemplated by this Court's March 28, 2013 Order (ECF No. 69). For example, PEI complains on at least three occasions about NFI's alleged failure to produce documents in discovery. *See* PEI's Br. at 1, 16, and 17. Discovery disputes are not before the Court on motions dealing with contract interpretation. Further, PEI argues that NFI has allegedly breached various terms of the parties' contracts. *Id*. at 17. Such arguments have no bearing upon the Court's determination of the scope of the parties' rights and duties under their written contracts. Indeed, PEI admits that it "needs discovery" to prove breach, but inexplicably proceeds to set forth its arguments for breach even though the Court cannot adjudicate such issues when only very limited discovery has so far been conducted in this case. *Id*.

4.      To the extent that PEI's brief addresses contract interpretation issues, PEI ignores many of the numerous categories of disputed contract terms that are evident from the pleadings and discovery. Indeed, PEI takes a clear position on only a few of the parties' many disputed contract issues. To the limited extent that PEI addresses the parties' disputes as to the meaning or effect of certain contract terms, the analysis given is very superficial. As demonstrated more fully below, PEI rarely quotes from or uses the exact language of the parties' written contracts. PEI's contract construction arguments are based primarily upon its lawyer's paraphrasing of what the contracts allegedly say. This lawyer-drafted paraphrasing of the parties' contracts is highly deceptive because it omits key words and phrases that the parties used in their written agreements, and in several instances it directly contradicts the words that the parties used in the

written contracts. PEI's paraphrasing of what it believes the parties' contracts say is wholly insufficient to support the contract interpretations it advocates.

5.       In filing its brief, PEI blatantly violated the protective order entered by the Court in this case on December 7, 2012 (ECF No. 60). PEI filed with its brief copies of two documents that were properly designated as confidential by NFI and were required by the protective order to be filed, if at all, under seal. PEI made no effort to file any of these documents under seal, and instead they were filed publicly and freely available to all. This violation of the Court's protective order was particularly egregious because these confidential NFI documents contain highly sensitive commercial information like manufacturer identities and product costs. Such information is so commercially valuable that counsel for PEI refused for months in the discovery process to produce similar documents that reflect PEI's customers, and PEI agreed to produce similar documents from its own files only after entry of the Court's protective order. Further, there was absolutely no reason for the filing of any of these documents. NFI's confidential documents filed by PEI have no bearing upon the parties' rights and duties under their contract. Indeed, PEI barely makes reference to these documents at all in its supporting Brief except in one passing reference to support a claim that NFI is allegedly in breach of contract. In addition, counsel for PEI compounded this violation of the Court's Order by ignoring pleas from NFI to take immediate action to correct the inappropriate filing. NFI was forced to file its own motion to have the documents placed under seal after counsel for PEI refused to act.

## II.       CONTRACT INTERPRETATION ISSUES

### A.       Limitation Upon NFI's Remedy for PEI's Failure to Supply Emu Oil.

PEI claims that under the Agreement "NFI's exclusive remedy **for any failure** to fill NFI's purchase order is to purchase oil on the open market." PEI Br. at 7 (emphasis added). PEI repeats this manufactured version of the contract terms five different times, as if the words can

somehow be made true through repetition. *Id*. at 3, 7, 14, 16, and 19. However, Section 2.2 never imposes any limitation on remedies that would apply to every possible circumstance in which there is a failure or refusal to supply emu oil. To the contrary, the limited remedy of Section 2.2 only comes into play if PEI (i) first uses "its best efforts to fulfill all orders as quickly as reasonably possible," and (ii) after using its best efforts, "is unable to supply any order within sixty days." Ex. A, § 2.2.[1] The actual words used in the Agreement are therefore much more restrictive than PEI's purported summary of the contract terms. Only failures to supply after best efforts have been used are covered by the limited supply remedy.

Not only does PEI's construction of Section 2.2's limited remedy depend upon ignoring much of the contract language, but PEI's construction would lead to absurd results. Under PEI's claimed construction, it could deny an order for emu oil in bad faith, for fraudulent or other nefarious purposes, and NFI would have no recourse other than to find another supplier. Such a construction would completely eliminate PEI's duty "to use its best efforts to fulfill all orders as quickly as reasonably possible." Ex. A, § 2.2. PEI asks the Court to ignore this language and allow it to avoid its contractual duties even if it makes no effort to supply NFI's orders. Such a construction would defeat one of the primary purposes of the Agreement. The Agreement states as its core purpose that PEI "will supply NFI's requirements for emu oil needed for the manufacturing of Emu products," and that "NFI shall use exclusively emu oil from PEI in all products that it manufactures or sells that contain emu oil." Ex. A, §§1.1, 1.4. If PEI were able to arbitrarily refuse to supply NFI's orders for any reason, and if NFI's only recourse in every situation were to find a new supplier, then the exclusive supply relationship contemplated by the Agreement would be completely gutted. PEI's construction would give it complete control over

---

[1] References to exhibits, e.g., Ex. A, B, and E, are to exhibits filed with NFI's opening memorandum of law.

if, when, and how it ever supplied any of NFI's orders. Such a situation cannot be reconciled with the exclusive supply relationship that the Agreement was intended to create.[2]

PEI also misconstrues the limited remedy of Section 2.2 as applying to a wide array of alleged breaches that do not arise from an inability to supply NFI's orders for emu oil. PEI incorrectly assumes that every claim made by NFI is based upon the "claim that Pro Emu has failed to sell or deliver oil to NFI." PEI Br. at 13. Therefore, since Section 2.2's limited remedy is erroneously assumed to apply to every supply issue, and since NFI is erroneously assumed to base every claim upon a failure to supply emu oil, PEI erroneously concludes that the limited remedy applies to every claimed breach. However, NFI has asserted many claims that do not involve PEI's failure or refusal to supply NFI's orders. For example, NFI has sued PEI for such things as: (i) selling products containing emu oil in the prohibited mass market, (ii) selling emu oil/fat without NFI's consent and without providing NFI with a first opportunity to purchase that oil/fat, (iii) entering into or planning on entering into contracts with third parties regarding the marketing, distribution or advertisement of emu oil-based products other than NFI's products without NFI's consent, (iv) refusing to grant NFI access to PEI's information that would reveal any contracts between PEI and third parties for the sale, distribution or advertisement of emu oil-based products, and (v) improperly charging NFI per-barrel prices for emu oil in excess of the prices agreed upon by the parties. The limited remedy of utilizing a third party supplier clearly cannot apply to these breaches because these breaches have nothing to do with the inability to fill orders for emu oil.

---

[2] PEI also misconstrues the limited remedy in Section 2.2 when it claims that the remedy, when applicable, is "to temporarily suspend Pro Emu's exclusive right to sell emu oil to NFI." PEI Br. at 3. Neither the word "temporary" nor any similar phrase or concept, appears in the Agreement. To the contrary, if the limited remedy of Section 2.2 properly comes into play, then it could potentially be either temporary or permanent. The Agreement says that the key fact determining duration is whether (and if so when) PEI "can supply NFI with its requirements."

## B. The Parties' Responsibilities for Payment of Marketing and Promotional Expenses

PEI claims that under the Agreement, "NFI agreed to pay for all marketing and promotional expenses" for emu products. PEI Br. at 3, 16. This is a gross misstatement of the terms of the Agreement. The Agreement contains nothing that requires NFI "to pay for all" of these expenses. To the contrary, the Agreement says that "NFI agrees that all marketing or promotional activity **undertaken by it** in order to market or promote the Emu Products shall be at NFI's expense." Ex. A, § 1.5 (emphasis added). Thus, NFI's responsibility for marketing or advertising expenses is expressly limited to marketing or advertising undertaken by NFI.

PEI simply ignores the words "undertaken by it" in Section 1.5 as if ignoring the words makes them go away. PEI then claims that NFI acted improperly when it deducted retailer charges for the retailers' advertising of emu products. PEI Br. at 16-17. Leaving aside the question of whether or not these charges reflect any actual type of marketing or promotional efforts by retailers,[3] PEI ignores the fact that any such activities were undertaken by the retailers and not by NFI. NFI only agreed to accept responsibility for advertising "undertaken by it." This could not include advertising undertaken by third party retailers.

In addition to ignoring the plain language of the Agreement, PEI also ignores the nine year history of how the parties' treated retailer charges that allegedly involved some type of retailer marketing or promotion of emu products. As set forth in support of NFI's summary adjudication motion, for nine years the parties treated these retailer charges as a deduction from revenue. Never once during the entire nine year relationship did PEI complain that NFI was responsible for any of these third party retailer charges. PEI was provided monthly statements

---

[3] As noted in support of NFI's motion for summary adjudication of issues, in the vast majority (if not all) instances, there was no actual marketing or promotion efforts by retailers that underlies these charges. These charges are simply non-negotiable, standard costs of doing business with large mass market retailers that NFI was forced to pay on sales of emu products.

showing these alleged "advertising" charges as a deduction from revenue throughout the relationship, and PEI never once claimed that these charges were NFI's responsibility. The parties' course of dealing proves their intent: that NFI only be held responsible for the costs of promotional and marketing activity undertaken by NFI, and not the costs of promotional or marketing activity undertaken by third party retailers.

### C. The Proper Definition of "NFI's Total Revenue Received"

By ignoring key words of the Agreement, PEI also mistakes the basis for the calculation of royalty payments. PEI claims that royalty payments were a percentage of "NFI's total revenues." PEI Br. at 4, 16. However, this is not what the Agreement says. The Agreement states that royalty payments are a percentage of "NFI's total revenue received." Ex. A, §2.4. PEI ignores the word "received," and asks the Court to construe the Agreement as if the word "received" was not used. As set forth in NFI's summary adjudication memorandum, the common, ordinary meaning of "received" is "to take into one's possession." NFI's Mem. of Law in Support of Summary Adjudication of Contract Interpretation Issues at 20 (ECF No. 73). Thus, under Section 2.4 of the Agreement, the starting point for determining the royalty payable is the total amount of revenue that NFI takes into its possession from the sale of specified products.

PEI's claimed construction would require NFI to pay royalties on revenue that it did not "receive." In particular, PEI contends that NFI did not pay royalties on advertising, marketing and promotional expenses charged by third party retailers. As evidence, PEI cites Exhibit D to its response to NFI's motion to dismiss (ECF No. 15-5) which is an example of a monthly statement that NFI sent to PEI detailing its payment of royalties. As shown on this report, the amounts that PEI complains about are charges that NFI's retail customers deducted from their payments to NFI. These charges were deducted from retailer payments to NFI and were never received by NFI.

PEI claims that these charges should be added to the retailers' payments to NFI to calculate an adjusted net revenue number. However, nowhere does PEI address the issue of how such charges can rationally be construed as having been "received" by NFI. PEI does not even acknowledge this issue. Plainly, charges that retailers deducted from NFI's payments cannot be part of "NFI's total revenue received" because those monies were never received by NFI.

### D. The Proper Definition of "Discounts"

In arguing that NFI should have added retailer advertising charges to its revenue received for purposes of calculating royalties, PEI also ignores the language of Section 2.4 of the Agreement which provides that royalties are payable on NFI's total revenue received "net of discounts and refunds." Ex. A, § 2.4. In other words, NFI was required to pay royalties on the total revenue that it received after deducting the amount of all discounts and refunds. As discussed below, retailers' advertising and promotional charges to NFI clearly constitutes "discounts" which should be deducted from total revenue in calculating royalty payments.

"Discount" is defined in the dictionary as "an amount deducted from the usual list price" (dictionary.com) and "a reduction made from the gross amount or value of something." WEBSTERS NINTH NEW COLLEGIATE DICTIONARY 361 (1983). The Court should assume that the parties' intended to use this ordinary meaning of the term "discounts" since there is nothing in the Agreement that would suggest any other type of intended meaning. Under this ordinary meaning, retailer charges for advertising or promotion would unquestionably constitute "discounts." The parties agree that these charges were deducted by retailers from the amount that would otherwise have been due or owing to NFI. Such a deduction from amounts otherwise due and payable is at the heart of the concept of a "discount."

### E.     The Nature and Scope of NFIs Rights of Exclusivity

PEI takes the erroneous position that the Agreement, and Amendments 1 and 4 thereto, allow PEI wide discretion to sell emu oil to an array of third parties other than NFI. *See* PEI's Br. at 10-13. This is not what the contract documents provide. The contract documents state that PEI can sell "products containing emu oil" outside of the Mass Retail Market but PEI cannot sell emu oil or emu fat to any party other than NFI unless (i) "NFI determines in its reasonable discretion that it cannot or will not use emu oil or fat PEI has available or purchase," or (ii) with "the express consent of NFI."

To fully understand the interplay of the original agreement and the amendments on these points, one must first start with the original Agreement and then walk through the amendments. Under the Agreement, NFI agreed to purchase emu oil exclusively from PEI. Specifically, NFI agreed:

> not to acquire, contract with or otherwise become affiliated with or purchase emu oil or products containing emu oil from any business or entity other than [PEI] that sells or produces emu oil or products containing emu oil and agrees not to compete with [PEI] in the production or manufacture of emu oil [and] NFI shall use exclusively emu oil from [PEI] in all products that it manufactures or sells that contain emu oil.

Ex. A, §1.4(a), (b). The exclusivity was reciprocal. PEI could not sell emu oil to anyone making products containing emu oil because NFI had "exclusive worldwide marketing, distribution and advertising rights for *__all__* products containing emu oil supplied by [PEI]." *Id.* at §3.1 (emphasis added). But the Agreement went further and explicitly stated that "[e]xcept as specifically set forth in Section 3.2, [PEI] shall not market, sell or distribute *__emu oil__* to any third party." *Id.* (emphasis added). Section 3.2 of the Agreement recognizes that PEI was, at that time, party to certain agreements with third parties that were purchasing PEI's emu oil. Section 3.2 allowed PEI to wind-down those contracts and renew them only with the joint approval of NFI and PEI.

Likewise, Section 3.2 requires the joint approval of NFI and PEI if PEI desires to enter into any new contracts to provide emu oil to any third party. Thus, before any amendments, the initial Agreement restricted PEI's sales of emu oil to only two outlets: (1) NFI, and (2) PEI's then-existing customers with a winding-down to take place so that NFI was PEI's sole customer for PEI's emu oil. The scope and intent of this language is clear: NFI and PEI were to have an exclusive supply arrangement.

After the Agreement was executed, PEI wanted to sell products containing emu oil. Such sales would have violated the terms of the Agreement which gave NFI exclusive rights to products containing PEI's oil, but NFI was nonetheless amenable to these sales as long as the products being sold did not compete with NFI's products at mass market retailers. So the parties executed the First Amendment to the Agreement to delineate the circumstances in which PEI could sell products containing emu oil. The Recitals to the First Amendment state the background that led to execution of the Amendment. It recites that PEI "has entered into discussions with certain marketing, sales and distribution companies about the possibility of selling products containing emu oil," and that under the Agreement "NFI shall have the exclusive worldwide marketing, distribution and advertising rights for all products containing emu oil supplied" by PEI. Ex. E (ECF No. 73-6).

In light of these facts, the terms set forth in the First Amendment are simple and straightforward. It provides that:

> Notwithstanding anything to the contrary contained in this Section 3, [PEI] shall have the right to develop, manufacture, distribute, market, advertise and sell ***products*** or to contract with others to develop, manufacture, distribute, market, advertise ***and*** sell ***products containing emu oil*** supplied by [PEI] in markets other than the Mass Retail Market. (emphasis added)

Ex. E at 1 (ECF No. 73-5). Thus, PEI was granted the right to sell products containing emu oil, and to contract with others to sell products containing emu oil, so long as those product sales were made and sold outside of the Mass Retail Market.

PEI contends that the First Amendment gives it the right to sell "emu oil" outside of the Mass Retail Market. PEI Br. at 4. However, this is not what the First Amendment says. The First Amendment only permits the sale of "products containing emu oil." This phrase "products containing emu oil" is used twice in the body of the First Amendment to describe the scope of the rights being afforded to PEI. Nowhere in the "Agreement" section of the First Amendment is there any reference to permitting PEI to sell emu oil or emu fat. Moreover, the recitals to the First Amendment also use the phrase "products containing emu oil" four times in describing the types of sales that would be permitted under the First Amendment. Thus, the First Amendment is clear; it was designed to only permit the sale of "products containing emu oil," and not emu oil or emu fat.

A construction of the First Amendment that permits PEI to sell emu oil or fat (rather than products containing emu oil) would also contradict other terms of the First Amendment. The First Amendment limits sales of "products containing emu oil" to only retailers outside of the "Mass Retail Market," which is defined as "all national drug stores chains, national supermarket chains, mass market discount retailers and club retailers (e.g. Sam's Club, Price Club, Costco)." Big retailers like Sam's Club and Costco sometimes sell products containing emu oil like creams and lotions, so it made sense to clarify in the First Amendment that PEI could not sell "products containing emu oil" to these type of stores which were NFI's primary customers. However, big retailers like Sam's Club and Costco do not sell the raw ingredient emu oil. Emu oil is simply a raw ingredient used to make creams and lotions that mass retailers sell. Thus, it would have

made no sense to provide in the First Amendment that PEI could not sell emu oil to mass market retailers because such retailers would never sell the raw ingredient emu oil. Yet, that is exactly what PEI claims. PEI claims that it is allowed to sell emu oil or fat "to non-Mass Retail Market third parties." PEI Br. 11. Such a construction makes no sense. No "Mass Market Retailer" sells emu oil or emu fat, so why would the parties have needed to make clear that such non-sensical sales were prohibited? By prohibiting sales to the "Mass Retail Market," the parties further made clear that the First Amendment was addressing sales of "products containing emu oil" and not the emu oil or fat itself.

There is only one reference in the language of the First Amendment that PEI cites to support its alleged right to sell emu oil rather than "products containing emu oil." This reference appears only in the fact recitals and not in the "Agreement" section of the Amendment. The last sentence of the Recitals states that: "The parties desire that the Agreement be amended to allow [PEI] to sell emu oil to parties other than NFI who will market, distribute and sell products containing such emu oil in markets other than the mass market retailing establishments targeted by NFI." Amendment No. 1, Ex. E (ECF No. 73-5). This type of language, which seems to contemplate limited sales of emu oil rather than just products containing emu oil, does not appear in the "Agreement" section of the First Amendment. The "Agreement" section of the First Amendment only permits the sale of "products containing emu oil." *Id.* Therefore, since this language only appears in the fact recitals, it is not legally considered to be a part of the parties' agreement. Georgia courts have established that a contract's recitals as to why the parties are entering into an agreement do not control the operative language in the contract. *See Mun. Gas Auth. of Ga. v. Teton Fuels Mid-Ga., LLC*, No. 1:06-CV-186, 2008 WL 6690030, at *10 n.11 (N.D. Ga. Mar. 26, 2008) (citing *Rosenburg v. Rosenburg*, 232 Ga. 725, 726 (1974)); *see also*

*Sugarman v. Shaginaw*, 151 Ga. App. 621, 624, 260 S.E.2d 731, 733 (1979) (stating that a recital will not control the operative part of a contract or agreement). Similarly, Alabama courts have held that where recitals and operative clauses are in conflict and cannot be reconciled, the operative clauses prevail. *See Gwaltney v. Russell*, 984 So.2d 1125, 1132-33 (Ala. 2007) (citations omitted). Thus, to the extent there is a conflict between the recitals and the operative language in the First Amendment, the operative language controls.

However, even if this last sentence of the Recitals section were considered to be a part of the First Amendment that triumphed over contrary language of the "Agreement" section of the First Amendment, the circumstances in which PEI would be permitted to sell emu oil would still be extremely limited. Under this last sentence of the Recitals, PEI would only be able to sell emu oil to a third party if that third party were going to use that oil to "market, distribute and sell products containing such emu oil" outside of the Mass Retail Market. Thus, the clear intent of the parties was that all of the emu oil and fat sold by PEI would never find its way into any products sold in the Mass Retail Market. If PEI were to ever sell its oil or fat to a party that could later use that oil in a product sold in the Mass Retail Market, then there would be a clear violation of the Agreement.

As the parties' relationship progressed, PEI raised a concern about NFI's exclusive right to PEI's emu oil. PEI was concerned that it might have emu oil or fat that NFI did not want and that it was prohibited from selling to any third party under the Agreement. To address this potential situation, and along with modifications to product pricing and royalty payments due, the parties executed the Fourth Amendment. The Fourth Amendment solidified NFI's rights of exclusivity by stating that "PEI shall not market, sell or distribute emu oil or emu fat to any third party without the express consent of NFI." Ex. H, §3 (ECF No. 73-8). Two exceptions were then

set forth to address PEI's concerns. It was agreed that PEI could sell emu oil or fat to a party other than NFI with (i) "the express consent of NFI," or (ii) "in the event NFI determines in its reasonable discretion that it cannot or will not use emu oil or emu fat PEI has available for purchase." *Id.* In this event, "NFI shall notify PEI and PEI shall then be free to sell such excess emu oil or emu fat to a third party." *Id.* This language created a right of first refusal for NFI to purchase all of PEI's emu oil and fat. PEI was required to first offer all such oil or fat to NFI for purchase according to the contract terms, but if NFI decided that it could not or would not use that emu oil or emu fat, then PEI was free to sell it to any third party.

PEI emphasizes the fact that the terms of the Fourth Amendment are prefaced by the language "Except as provided by Section 1 of the First Amendment." According to PEI, this language must mean that the First Amendment permitted it to sell emu oil even though the operative language of the First Amendment only permits certain sales of "products containing emu oil." There is no basis for such an expansive construction of such a relatively innocuous phrase. This language is not indicative of the parties' intent in the sale of emu oil other than to make clear that the parties did not intend to abrogate any of the terms of the First Amendment. Certainly this phrase does not indicate, as PEI suggests, that PEI had some type of broad rights to sell emu oil or fat pursuant to the First Amendment. In fact, this phrase says nothing about the terms of the First Amendment, and those terms remained unchanged. PEI was free to sell products containing emu oil outside of the Mass Retail Market as provided in the First Amendment and nothing in the Fourth Amendment was intended to change those terms.

NFI specifically bargained for and received exclusivity to PEI's emu oil and fat. Any alternative interpretation of the Agreement would render the value of the consideration exchanged meaningless. That cannot be what the parties contemplated nor is it how the parties

operated for approximately nine years. As discussed above, under the initial agreement and all amendments, NFI agreed to purchase emu oil exclusively from PEI. Ex. A, §1.4(a), (b). Subject to the limited exceptions discussed above, the exclusivity was reciprocal; PEI could not sell emu oil or emu fat to any third party. In exchange for this exclusivity, NFI agreed to pay PEI a set price ***plus*** a commission on sales of certain products containing emu oil. NFI would have never entered into a contract with PEI that would have allowed PEI to freely sell emu oil or emu fat to third parties. *See* Chriscoe Decl., (ECF No. 73-4), ¶9 ("The provisions … that obligated [PEI] to sell emu oil exclusively to NFI and not any other purchaser were critically important terms of the agreement to NFI, and are the reason that NFI agree[d] to make royalty payments to [PEI] above and beyond the price paid for emu oil."). PEI confirmed this understanding of the parties' relationship by expressly stating that "NFI's safety should be that it has the right to buy the oil first." *Id.* at ¶39, Ex. T (Feb. 14, 2008 Email from Chris Binkley (PEI) to Larry Chriscoe (NFI)) (ECF No. 73-20). Thus the parties conduct and communications confirms the highly limited nature of the exclusivity.

**F.    The Nature of the Parties' Relationship: Independent Contractors or Joint Venture**

PEI presents only two very limited arguments to support its position that the Agreement created a joint venture relationship. First, citing to deposition testimony of Andy Martin, PEI's chairman, PEI claims that the parties' intention was "that Pro Emu would be the manufacturing arm… of a joint venture to sell Blue Emu." PEI Br. at 2. However, there is not one word in the Agreement that characterizes PEI as having anything to do with the manufacture of Blue Emu products. The Agreement actually states the exact opposite. For example, Recital B of the Agreement states that products containing emu oil "will be manufactured by third parties selected by NFI." Similarly, Section 1.1 of the Agreement refers to "the manufacture of Emu

Products by NFI." Thus, the Agreement expressly contemplated that NFI is the manufacturer of emu products, and any understanding that Mr. Martin claims to the contrary is both baseless and irrelevant. In contrast, PEI's role in the Agreement is to supply NFI with emu oil that NFI can then use in product manufacture. Ex. A, §1.1. The Agreement also does not support Mr. Martin's claim that PEI was the manufacturer in "a joint venture to sell Blue Emu." The Agreement contradicts this claim because it states that the relationship of the parties is that of "independent contractors" and not any other type of relationship. Ex. A, § 9.1.

Second, PEI claims that the 2002 Letter of Intent was "a joint venture agreement." PEI Br. at 2. However, PEI ignores the legal standards governing the features of a joint venture agreement which are set forth at pages 27-28 of NFI's summary adjudication memorandum. The Letter of Intent does not give the parties any type of joint control or management of any business enterprise. The Letter of Intent also lacks any sharing of profits. The Letter of Intent is merely a general outline of a few terms of a possible business arrangement and not any type of joint venture arrangement. Further, the Letter of Intent is irrelevant to the parties' current legal rights and duties. The Agreement expressly "supersedes and cancels any and all prior agreements... including, without limitation, that certain JEO-NFI Operating Agreement Letter of Intent between the parties dated May 10, 2002." Ex. A, § 9.10. Thus, the Letter of Intent has no current bearing on the nature of the parties' contractual relationship, and instead that relationship is governed by the terms of the Agreement.

### G. The Quantity of Emu Oil that NFI is Permitted to Order

PEI raises a contract term that deals with the quantity of emu oil that NFI is permitted to order. PEI apparently claims that NFI ordered emu oil beyond what it reasonably needed to support product manufacture. PEI Br. at 17. NFI did not raise this issue in its own motion because NFI was not aware that such contract terms were in dispute. Neither PEI's original or

amended complaint, nor its written interrogatory responses, reference any claim being made that NFI ordered emu oil that it was not entitled to order. Nonetheless, if the Court decides to address this issue, it should note that PEI's analysis of the issue is deficient because PEI does not address all relevant terms of the parties' contracts.

PEI claims that NFI "is not permitted to purchase oil from Pro Emu for resale, to store, or for any purpose other than in the manufacture of products containing emu oil." PEI Br. at 17. This statement is only a rough approximation of the actual terms of the Agreement. Section 2.2 of the Agreement provides that:

> NFI shall not place orders for emu oil in quantities greater than are reasonably expected to be needed to allow its contract manufacturer to maintain on hand an inventory of emu oil reasonably expected to be required to fulfill its requirements for sixty (60) days.

Ex. A, §2.2. The key flaw in PEI's argument is that it ignores the critical terms of the parties' amendments to the Agreement. In particular, in the Fourth Amendment, the parties significantly expanded NFI's rights to purchase emu oil. Whereas under the Agreement NFI only had the right to purchase emu oil in a quantity to sufficient to provide a sixty day inventory of reasonably expected requirements, in the Fourth Amendment NFI received the discretionary right to buy all emu oil that PEI had available for purchase. Section 2 of the Fourth Amendment specifies the prices at which NFI can buy emu oil. Section 3 of the Fourth Amendment then states that:

> Except as provided by Section 1 of the First Amendment, PEI shall not market, sell or distribute emu oil or emu fat to any third party without the express consent of NFI. Notwithstanding the foregoing, in the event NFI determines in its reasonable discretion that it cannot or will not use emu oil or emu fat PEI has available for purchase, NFI shall notify PEI and PEI shall then be free to sell such excess emu oil or emu fat to a third party.

The effect of this language is to give NFI a right of first refusal to acquire any emu oil that PEI has available for purchase at the stated prices. Indeed, PEI is prohibited from selling emu oil to any third party with NFI's express consent unless "NFI determines in its reasonable discretion

that it cannot or will not use emu oil or emu fat PEI has available for purchase." NFI is thus given the right to determine if it can or will use any emu oil or fat that PEI has available for purchase, and if NFI's decision is affirmative, then PEI must sell the oil/fat to NFI and cannot sell to any other party. This language gives NFI rights to acquire PEI's emu oil/fat that go beyond those circumstances described in the Agreement. Under the Fourth Amendment, there are no restrictions upon the amount of emu oil/fat that NFI can acquire. The only requirement is that there be "emu oil or emu fat [that] PEI has available for purchase." If PEI has such oil/fat available for purchase, then NFI is given the right to buy that oil/fat "unless NFI determines in its reasonable discretion that it cannot or will not use" the oil/fat that is available.

## III. PEI'S ARGUMENTS BEYOND CONTRACT INTERPRETATION

### A. NFI Has Produced All Responsive Documents

PEI argues that some perceived deficiency in NFI's discovery responses hinders its ability to properly brief and advance this case. PEI Br. at 1, 17. This claim is without merit for two reasons. First, NFI has fully and completed responded to all of PEI's discovery requests. NFI has produced 3,798 pages of materials, including detailed financial documents regarding NFI's sales of products containing emu oil. PEI's allegations of discovery deficiencies stem more from the fact that PEI failed to take any depositions in this matter and thus fails to understand the business records supplied by NFI.

Second, the sufficiency of NFI's discovery requests has no bearing on PEI's ability to address the meaning of contractual terms and phrases. PEI cannot identify any discovery it allegedly needs that would bear on the meaning of any contractual term. Further, counsel for PEI agreed to the Court deciding the parties' rights and duties under their contracts with no further need for discovery. Accordingly, PEI's complaints about alleged discovery deficiencies are baseless and irrelevant.

**B.      None of NFI's Claims are Subject to Dismissal**

PEI exceeds the Court's order requesting summary judgment briefing on contract terms by requesting that this Court dismiss all of NFI's claims. PEI's Br. at 1 ("[PEI] also requests this Court dismiss all of NFI's claims."). The Court did not request or contemplate dismissal motions, which is understandable since both sides pursued dismissal motions at the earlier pleadings stage of this case. *See* Order at 1 (ECF No. 69) (setting briefing schedule on "issues of contract interpretation"). Summary judgment briefing is not the proper forum or mechanism for PEI to yet again raise a motion to dismiss.

Throughout PEI's Brief, PEI indicates that NFI's claims are "due to be dismissed." However, the arguments made for dismissal are the exact same arguments that PEI previously asserted at the pleadings stage of this case. *See* ECF No. 27-1. In fact, PEI has gone so far as to repeat verbatim large portions of the argument that it previously made in support of dismissal. As noted above, PEI has repeated its previous arguments for dismissal to such a degree that it is now arguing for the dismissal of claims that NFI deleted in its Amended Answer and Counterclaims. *See, e.g.,* PEI Br. at 7-8 (arguing for dismissal of NFI's claim for breach of good faith and fair dealing that has already been deleted in NFI's amended counterclaims). NFI previously filed a response to all of PEI's dismissal arguments. *See* ECF No. 32. NFI will not repeat those arguments again here.

**C.      PEI Has Not Proven Any Material Breach**

PEI makes several statements in its Brief as to its claims of breach of contract.  However, the Court cannot adjudicate issues of breach at this stage of the case when there has been so little discovery conducted in the case. Indeed, the parties were only instructed to file motions addressing contract interpretation disputes and the resulting rights and duties of the parties'

under their contracts. In any event, PEI's statements as to alleged breach have little if any factual support behind them, and the matters cited are subject to substantial factual dispute.

For example, PEI claims that "NFI is well aware that Pro Emu has not sold to Mass Markets." PEI Memo at 7, 13. As evidence, PEI "cites" the fact that it has produced its customer lists. *Id.* at 13. However, PEI has not presented its customer lists to the Court on its motion, and NFI has not been afforded any opportunity to explore those customer lists in discovery since they were withheld from production until after the depositions of PEI's two witnesses. On their face, NFI believes that there are several customers shown on these lists who appear to be active in sales to the mass market although NFI needs discovery in order to evaluate this issue in more detail. Such issues of breach cannot be adjudicated at this stage of the case until both sides have been permitted an opportunity to complete discovery.

PEI claims that "NFI has voluntarily dropped its lost profits claim, thereby admitting Pro Emu did not interfere with any business relationship." PEI Br. at 8. Nothing is cited to support this claim, and NFI has never made any such admission. NFI cannot provide all of the factual detail to support all of its claims at the present time because, like PEI, it has so far had only a very limited opportunity to conduct discovery. However, NFI has not voluntarily withdrawn its claim for interference with business relationships.

PEI claims that in March, 2012 it could not supply orders for emu oil because its "birds were not ready to process." PEI Br. at 14. This argument falsely suggests that PEI's only source of emu oil to supply NFI's orders was the slaughter of its own birds. However, the limited discovery conducted so far in this case demonstrates that PEI had several other sources of emu oil that it could and should have utilized to supply NFI's orders. For example, emu oil is available in both the U.S. and foreign markets from a variety of suppliers, and PEI previously

utilized those other sources of oil (rather than the slaughter of its own birds) to supply NFI's orders for emu oil. Ex. B (Binkley Dep. Tr.) at 155:20-156:7; 159:8-23 (ECF No. 73-2). PEI offers no explanation for why it did not pursue these other avenues of supply in March 2012 when it claims that it was unable to fill NFI's orders.

PEI claims that inventory reports might show that NFI was ordering emu oil that it did not need. PEI Br. at 17. However, the reports cited contain nothing to support this assertion, and once PEI conducts discovery it will ascertain that it has misunderstood the reports. Indeed, in its Brief, PEI concedes that it "needs discovery" to evaluate and prove this claim. *Id.* The Court cannot summarily adjudicate such fact intensive breach issues, particularly when there has been so little discovery conducted so far in this case.

## IV.    CONCLUSION

For all of the foregoing reasons, Defendant and Counterclaimant Nutrition & Fitness, Inc. respectfully requests that the Court issue an order construing the meaning and effect of the contract terms in dispute, and rule as follows:

1.      Subsection 2.2 of the Agreement requires PEI to "use its best efforts to fulfill all orders as quickly as reasonably possible." This requires PEI to use all reasonable efforts in good faith to supply NFI's orders for emu oil.

2.      The limited remedy of subsection 2.2, which limits NFI to having the right to purchase emu oil from a third party supplier other than PEI, comes into play only when PEI is "unable to supply any orders within sixty days following the order date." If PEI has the ability to supply an order for emu oil using its best efforts within sixty days but fails to do so, then this limited remedy would not come into play.

3.      The limited remedy of subsection 2.2, which limits NFI to having the right to purchase emu oil from a third party supplier other than PEI, applies only to a "failure by [PEI] to

provide the quantities of emu oil required by NFI hereunder." It does not apply to other breaches, if any, of the Agreement.

4.      NFI is solely responsible for the payment of expenditures for advertising and promotion of Blue Emu products only if those efforts are undertaken by NFI. NFI does not have this responsibility for advertising or promotion efforts undertaken by parties other than NFI such as retail purchasers.

5.      Under Section 2.4 of the Agreement, royalty payments were due as a percentage "of NFI's total revenue received" of specified products "net of discounts and refunds." NFI's "total revenue received" as used in this Section means the amount of money taken into NFI's possession from its sale of the specified products." NFI's total revenue received" does not include charges deducted by retailers from the amounts that the retailers paid to NFI. As used in this section, "discounts" means amounts of money lawfully deducted from the amount otherwise due and payable. Lawful charges deducted by retailer customers from those retailer's payments due to NFI for emu oil products constitute "discounts" under this section.

6.      Under Section 1 of the First Amendment to the Agreement, PEI "has the right to develop, manufacture, distribute, market, advertise and sell products, or in contract with others to develop, manufacture, distribute, market, advertise and sell products containing emu oil supplied by PEI in markets other than the Mass Retail market." The definition of Mass Retail Market is set forth in the Amendment and does not appear to be disputed by the parties. The First Amendment does not give PEI the right to develop, manufacture, distribute, market, advertise and sell emu oil or emu fat as a raw ingredient. Instead, the amendment only gives PEI the right to develop, manufacture, distribute, market, advertise and sell products containing emu oil as one of the product's ingredients.

7.     Under the Fourth Amendment to the Agreement, PEI "shall not market, sell or distribute emu oil of emu fat to any third party without the express consent of NFI." However, "in the event NFI determines in its reasonable discretion that it cannot or will not use emu oil or emu fat PEI has available for purchase, NFI shall notify PEI and PEI shall then be free to sell such excess emu oil or emu fat to a third party." This contract language gives NFI a right of first refusal over emu oil or fat that PEI has available for purchase. PEI cannot sell or distribute emu oil or fat to any third party unless NFI either consents to the sale or unless NFI first decides that it cannot or will not purchase and use emu oil or fat the PEI has available for purchase.

8.     Pursuant to subsection 9.1, the Agreement creates the relationship between the parties "of independent contractors," and it does not "create any other type of relationship." The Agreement does not create a joint venture.

9.     NFI is the owner of the trademark BLUE EMU. Neither the Agreement nor the Letter of Intent creates any enforceable interest for PEI in ownership of that trademark.

10.     The term "barrel" of emu oil in the Fourth Amendment to the Agreement means a container with 55 gallons of emu oil.


        Respectfully submitted,

                                        */s/ John David Collins*
                                        John David Collins
                                        *Attorney for Nutrition & Fitness, Inc.*

OF COUNSEL:

George G. Lynn
John David Collins
MAYNARD COOPER & GALE PC
1901 Sixth Avenue North
2400 Regions Harbert Plaza
Birmingham, Alabama

Telephone:  (205) 254-1000
E-mail:   glynn@maynardcooper.com
          jcollins@maynardcooper.com

Charles A. Burke (admitted *pro hac vice*)
Jacob S. Wharton (admitted *pro hac vice*)
WOMBLE CARLYLE SANDRIDGE & RICE, LLP
One West Fourth Street
Winston-Salem, North Carolina 27101
Telephone:  (336) 721-3600
E-mail:   cburke@wcsr.com
          jwharton@wcsr.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this the 14th day of May, 2013, served a copy of the foregoing pleading on all counsel of record via e-mail, to-wit:

David B. Anderson, Esq.
Deanna L. Weidner, Esq.
Marvis L. Jenkins, Esq.
ANDERSON WEIDNER, LLC
505 20th Street North
1450 Financial Center
Birmingham, Alabama 35203

*Attorneys for Progressive Emu, Inc.*

*/s/ John David Collins*
OF COUNSEL