IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

PROGRESSIVE EMU, INC., f/k/a          }
JOHNSON EMU, INC.,                    }
                                      }
        Plaintiff and                 }     CIVIL ACTION NO.
        Counterclaim Defendant,       }
                                      }     2:12-CV-01079-WMA
v.                                    }
                                      }
NUTRITION & FITNESS, INC.,            }
                                      }
        Defendant and                 }
        Counterclaim Plaintiff.       }


**<u>MEMORANDUM OPINION AND ORDER</u>**

Before the court are cross-motions for summary adjudication of disputed contract interpretation issues in the above-entitled case. Although Progressive Emu, Inc., f/k/a Johnson Emu, Inc., ("Pro Emu") concedes that the court only asked for briefs on "the interpretation of the terms of the [Agreement that] control[s] the parties' relationship," it spends a substantial amount of its time addressing the merits of the counterclaims of Nutrition & Fitness, Inc. ("NFI") and complaining that NFI wrongly withheld documents during discovery thus far.  It gets ahead of the court by arguing that NFI breached various terms of the as yet imprecisely defined contract.  This is not what the court had in mind.  The court's March 28, 2013 order is clear.  The court instructed the parties to file briefs and supporting documents on "the issues of contract interpretation." The parties agreed that no further discovery was needed on these issues, so the purpose of the March 28, 2013 order

was to provide a procedure for determining, as a final matter, the meaning of the contract, after which the parties can go at each other to obtain whatever evidence they deem necessary for a jury determination of which party breached which provisions of the now understood contract, and what, if any, damages resulted.

The court is taking the parties at their word when they both represent that the contract documents, together with undisputed evidence on the course of dealings, are unambiguous. In other words, the parties have willingly asked this court to establish, as a binding matter, their intent even while they disagree as to what that intent was. NFI asserts that "the Court can adjudicate the parties' rights and duties under their written contracts as a matter of law." (Doc. 73 at 1). Pro Emu says: "The parties agree that the Agreement is unambiguous." (Doc. 80 at 1). The parties are granting the court the authority to decide which of their disputed interpretations of an "unambiguous" contract are correct. They are calling upon the court to assume a unique judicial undertaking. When both parties agree that their contract is "unambiguous," does it become unambiguous as a matter of law? Any ambiguity arguably is transmogrified into the unambiguous. The parties, in effect, have waived their right to a jury trial as to the meaning of their contract. The correct interpretation of the contract is the only task now before the court.

NFI's motion for leave to file a limited reply, (Doc. 81), is

DENIED because it does the same thing that Pro Emu does, i.e., address issues beyond the interpretation of the contract. NFI may file such a brief if and when the court reaches issues beyond what is now undertakes to resolve.

## Background

There is little that the parties don't dispute in this case except that the contract is unambiguous. Some background is necessary in order to understand the parties' differing views. Pro Emu, an Alabama corporation, is in the business of raising emus. Pro Emu runs an emu farm and sells emu oil that it acquires from various sources, including the slaughter of birds raised on its farm. NFI, a North Carolina corporation, manufactures, markets, and distributes various consumer health products, including products made with emu oil, the main emu-based product being Blue Emu.

In early 2003, Pro Emu and NFI entered into a Sales, Marketing, and Operating Agreement ("2003 Sales Agreement" or "Agreement"), effective January 1, 2003. This contract, as subsequently amended, is the subject of this litigation. Under the Agreement, NFI agreed to purchase emu oil from Pro Emu on certain terms and conditions. NFI undertook, either itself or through third parties, to manufacture, sell, market, and promote certain products containing the emu oil it was to purchase from Pro Emu. The Agreement was amended on several occasions during the parties'

relationship.[1]   The parties agree that their rights and obligations at issue in this case depend entirely upon the terms of the Agreement.   The parties further agree that, although their claims of breach may ultimately involve factual disputes that cannot be resolved at this stage, the terms of the Agreement itself are sufficiently clear for the court to adjudicate the rights and obligations of the parties.   It is the court's intent that its findings on the construction and meaning of terms of the Agreement will channel future discovery so as to expedite a final disposition of the controversy.

## Discussion of the Contract Terms

Under Article 2 of the Georgia Commercial Code,[2] contract interpretation can involve as many as three steps.   First, the

---

[1] The 2003 Sales Agreement was first amended on January 1, 2004, by an agreement captioned "Amendment No. 1 to Sales, Marketing, and Operating Agreement" ("First Amendment") and again on August 1, 2005, with an agreement captioned "Addendum to Sale, Marketing, and Operating Agreement" ("Second Amendment") and again on April 18, 2006, with an agreement captioned "Addendum to Sales, Marketing, and Operating Agreement" ("Third Amendment") and again on March 11, 2008, with an agreement captioned "Fourth Amendment to Sales, Marketing, and Operating Agreement" ("Fourth Amendment").   The 2003 Sales Agreements and the amendments thereto are collectively referred to as the "Agreement."

[2] It is conceded that Georgia law governs the Agreement. (Nov. 5, 2012 Order, Doc. 45); *see* Agreement ¶ 9.4. Specifically, because the Agreement relates predominately to the sale of goods, emu oil, emu fat, and products containing emu oil, the agreement is governed by Article 2 of the Georgia Commercial Code. *Heart of Texas Dodge, Inc. v. Star Coach, LLC*, 567 S.E.2d 61, 63 (Ga. Ct. App. 2002) ("When the predominant element of a contact is the sale of goods, the contract is viewed as a sales contract and the UCC applies . . . .").

court must determine whether the contract language is unambiguous and complete. If contract language is unambiguous and complete, as the parties here claim, the court must enforce the contract according to its terms. GA. CODE ANN. § 11-2-202; *Sage Tech., Inc. v. NationsBank N.A. South*, 509 S.E.2d 694, 697 (Ga. Ct. App. 1998). If there are no ambiguities and no missing necessary terms, the contract alone is looked to for its meaning. *Golden Peanut Co. v. Hunt*, 416 S.E.2d 896, 898 (Ga. Ct. App. 1992) ("[W]hile . . . § 11-2-202 does allow for a written contract to be explained or supplemented by usage of trade evidence, it does **not** allow the use of such parol evidence to alter or vary the terms of the contract."). Georgia law explains that "[w]here the language of the contract is plain, unambiguous, and capable of only one reasonable interpretation, no other construction is permissible." *Golden Peanut Co.*, 416 S.E.2d at 899.

Only when a contract is ambiguous or incomplete in some material respect, will the court take the second step and apply rules of contract construction, looking beyond the four corners of the contract. GA. CODE ANN. § 11-2-202; *see Golden Peanut Co.*, 416 S.E.2d at 899 (explaining that a party may not use parol evidence to contradict clear, unambiguous contract language). The Georgia Commercial Code provides that a final, written contract, such as this Agreement,

may be ***explained*** or ***supplemented***:

5

(a) By course of dealing or usage of trade (Code Section 11-1-205) or by course of performance (Code Section 22-1-208); and

(b) By evidence of consistent additional terms unless the court finds the writing to have been intended as a complete and exclusive statement of the terms of the agreement.

GA. CODE ANN. § 11-2-202 (emphasis added). Extrinsic evidence of the parties' course of dealing, usage of trade, or course of performance may be used to explain or supplement a contract. *See Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) (examining this concept under the Uniform Commercial Code). Finally, if, after applying the rules of contract interpretation, some ambiguity remains, a jury must decide what the parties intended, that is, assuming that the parties reached a meeting of the minds, something both of these parties concede. *Cf. Shirley*, 699 S.E.2d at 619. The parties here take away the possibility that there was no meeting of the minds.

## 1. Pro Emu's Duty to Supply Emu Oil to NFI

NFI asks the court to find that the Agreement requires Pro Emu to use all reasonable efforts in good faith to supply NFI's orders for emu oil. Pro Emu does not argue with this proposed construction of the provision of the Agreement that describes Pro Emu's duty in this regard, but reminds the court that the Agreement is an "exclusive dealings" contract as defined in Article 2 of the Georgia Commercial Code. NFI does not quarrel with the Pro Emu's concept of exclusivity. Unless contracting parties otherwise

6

agree, "exclusive dealings" sales contracts always impose "an obligation by the seller to use best efforts to supply the [contracted for] goods." GA. CODE ANN. § 11-2-306(2). This "best efforts" standard is unambiguously memorialized in the parties' following contract language:

> NFI will provide [Pro Emu] with at least thirty (30) days written notice prior to the required delivery date. Notwithstanding the thirty (30) day notice, [Pro Emu] will use its **best efforts to fulfill all orders as quickly and as reasonably as possible**. . . .

Agreement ¶ 2.2 (emphasis added). Under this provision, NFI must provide Pro Emu with at least thirty days notice prior to a proposed delivery date. But, even if less notice is provided, Pro Emu is nevertheless required to use its **best efforts to fulfill NFI's orders as quickly and as reasonably as possible**. **There is no doubt over the parties' intent to impose a "best efforts" standard on Pro Emu to fulfill NFI's orders.** The Agreement, however, requires NFI to give Pro Emu thirty days notice prior to an expected delivery. Even if NFI notifies Pro Emu of a need one day before, instead of thirty days before, a hoped-for expected delivery date, Pro Emu must do its "best" to fill the order, whatever its "best" may be. Disputes over what constitutes "best efforts" under differing circumstances will inevitably present a jury question if the litigation goes the distance.

The "best efforts" standard requires that Pro Emu "use **reasonable diligence** as well as **good faith** in [its] performance of

the contract." *Flynn v. Gold Kist, Inc.*, 353 S.E.2d 537, 339 (Ga. Ct. App. 1987) (quoting GA. CODE ANN. § 11-2-306 Official Comments) (emphasis added). "Diligence" is defined as "a continual effort to accomplish something." BLACK'S LAW DICTIONARY (9th ed. 2009). Pro Emu was therefore required to **use all reasonable efforts in good faith to fulfill NFI's orders for emu oil**.

### 2. NFI's Remedy for Any Failure by Pro Emu to Supply Emu Oil

Section 2.2 of the Agreement contains a limitation upon NFI's remedy in the event of a failure by Pro Emu to fulfill an order. This section provides, in part:

> In the event that [Pro Emu] is unable to supply any order within sixty days (60) days following the order date, NFI shall have the right, notwithstanding the terms of Section 1.4 of this Agreement, to order emu oil from a third party; provided, however, that at such time as [Pro Emu] provides reasonable evidence to NFI that it can supply NFI with its requirements, NFI shall have no further right to purchase emu oil from third parties unless [Pro Emu] shall again become unable to supply NFI's requirements. NFI shall not place orders for emu oil in quantities greater than are reasonably expected to be needed to allow its contract manufacturer to maintain on hand an inventory of emu oil reasonably expected to be required to fulfill its requirements for sixty (60) days. **The remedies provided by this Section 2.2 shall be NFI's exclusive remedies for any failure by [Pro Emu] to provide the quantities of emu oil required by NFI hereunder.**

(emphasis added). This section recognizes that, under limited circumstances, NFI will have the right to purchase emu oil from a supplier other than Pro Emu, despite the Agreement's "exclusivity" feature. The parties disagree about (1) what circumstances can

8

trigger this limitation on NFI's remedies, and (2) what breaches by Pro Emu are not subject to the limitation on NFI's remedies.

Pro Emu argues that the contract language makes NFI's only remedy for **any** failure by Pro Emu to fulfill NFI's purchase orders to be for NFI to purchase oil in the open market. This interpretation of ¶ 2.2 is overly broad and self-contradicting. The last sentence in ¶ 2.2 cannot be read in isolation to impose a limitation on remedies that would apply to every possible circumstance in which there is a failure by Pro Emu to supply emu oil. As discussed *supra,* ¶ 2.2 requires that Pro Emu use "its best efforts to fulfill all orders as quickly and as reasonably as possible." Therefore, only failures to supply emu oil after Pro Emu has given its best efforts and has been unsuccessful in meeting NFI's need are covered by the remedy restriction.

Pro Emu's proposed construction would lead to incongruent results. As Pro Emu would have it, Pro Emu, as seller, would be permitted to refuse to supply any order, even in bad faith, and NFI's only remedy would be to find another supplier. This construction would effectually eliminate Pro Emu's duty "to use best efforts to fulfill all orders as quickly and as reasonably as possible." Furthermore, the Agreement states that Pro Emu "will supply NFI's requirements for emu oil needed for the manufacturing of Emu products," and that "NFI shall use exclusively emu oil from [Pro Emu] in all products that it manufactures or sells that

contain emu oil." Agreement ¶¶ 1.1, 1.4.  To interpret ¶ 2.2 as Pro Emu proposes would negate the exclusive dealings relationship that serves as a core reason for the Agreement in the first place.

Contracts are to be interpreted "as a whole, and each provision is to be given effect and interpreted so a to harmonize with the others." *S. Point Retail Partners, LLC v. N. Amer. Properties Atlanta, Ltd.*, 696 S.E.2d 136, 139 (Ga. Ct. App. 2010). Pro Emu's proposed construction would frustrate this first tenant of contract construction.  Considering the Agreement as a whole, its plain language requires that **the limitation on NFI's remedy in ¶ 2.2 applies only when Pro Emu, after using its "best efforts," is unable to supply an order within sixty days**.  Therefore, if Pro Emu has the ability to supply an order for emu oil within sixty days after employing its best efforts, but does not do so, the limitation on NFI's remedy would not apply.  The limitation **does apply to any failure by Pro Emu to provide the quantities of emu oil required by NFI under ¶ 2.2.  The limitation on NFI's remedy does not apply to any breaches of the Agreement that do not involve fulfilling orders for emu oil**.

**3.   The Parties' Responsibility for Payment of Marketing and Promotional Expenses**

The parties dispute the extent of NFI's obligations for the payment of expenses related to the marketing and promoting of Blue Emu products manufactured by NFI using Pro Emu's oil.  NFI contends

that it is responsible only for the payment of **its own advertising expenditures**, and is not responsible for any of the promotional expenditures of third-party retailers. Pro Emu contends that NFI is responsible for the payment of all expenditures related to the marketing and promotion of emu oil-based products, **including amounts spent by third-party retailers**. This disagreement stems from the following language in the Agreement:

> Paragraph 1.5 of the Agreement states:

> NFI agrees that all marketing or promotional activity **undertaken by it** in order to market or promote the Emu Products shall be at NFI's expense. . . .

(emphasis added). NFI points out that the word "**it**" can only refer to NFI, and, therefore that the Agreement limits its financial obligation for marketing and promotional activity to those that NFI itself "undertakes." There is no provision in the Agreement that expressly addresses whether either party is responsible for the costs of advertising, marketing, or other promotional activities undertaken by third-party retailers. Whether marketing and promotional efforts that result from agreements between NFI and its mass market retailers is covered by the language "all marketing or promotional activity undertaken by [NFI]" would be unclear but for the fact that both parties say that it is clear. The court cannot amend the parties' contract to place an obligation on NFI that both parties knew would call for expenditures of promotional money if their contract was to generate a profit.

11

Pro Emu explains that mass market retailers control how advertising is done, and that they routinely pass along advertising expenses to their suppliers, such as NFI, as a deduction from gross revenue.[3]  On this basis, Pro Emu contends that whether NFI pays an advertising agency or a mass market retailer for marketing and promotion makes no difference, and that NFI is ultimately responsible for all advertising.  In isolation, Pro Emu's position makes sense and is not unreasonable.  This, however, is not how the parties have treated the obligation.

If, *arguendo*, the Agreement is unclear on this item, the court can and will consider undisputed parol evidence to explain its meaning.  GA. CODE ANN. ¶ 11-2-202.  The most persuasive type of parol evidence is the parties' "course of performance," that is, the parties' conduct pertinent to the contract term in question. On "course of performance," the Georgia Commercial Code provides:

> Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced without objection shall be relevant to determine the meaning of the agreement.

GA. CODE ANN. § 11-2-208(1).  NFI points out that over the course of eight years Pro Emu did not call upon NFI to pay for marketing and

---

[3] NFI contends that, most of the time (if not all of the time), there were no actual marketing or promotional efforts by retailers underlying these charges.  Instead, NFI characterizes these charges as non-negotiable, standard costs of doing business with large mass market retailers.

promotional efforts performed by third-parties retailers, and instead has treated the charges as deductions from revenue. NFI further points out that over the course of the parties' eight year relationship Pro Emu has never complained about this practice.

The express terms of a contract and any parol evidence used in its interpretation must be construed so as to be consistent with each other. *Id.* at § 11-2-208(2). When the express terms of the contract and parol evidence are not consistent, the express terms of the contract control. *Id.* The course of performance here is consistent with the language of the contract, and certainly is not contradictory to it. If the course of performance is used to explain or supplement the contract, such course of performance will control both over course of dealings (prior dealings between the parties) and usage of trade (standard practices or methods in the same industry). *Id.* at §§ 11-2-208(2) and 11-1-205.

Over the course of eight years, these parties treated third-party retailer charges as deductions from revenue (or as "discounts," discussed *infra*). Pro Emu has never claimed that the alleged "advertising" deductions on the monthly statements were NFI's responsibility under the Agreement. Pro Emu contends that the court cannot consider course of performance to modify the Agreement. The court is not in any way "modifying" the Agreement. "Course of performance" may be used to **explain** the meaning of a contract term, so long as it does not contradict the contract's

express provisions.  GA. CODE ANN. § 11-2-202(a).  That is precisely the situation here.

Under ¶ 1.5 of the Agreement, NFI is financially responsible only for **marketing or promotional activity that NFI itself undertakes in order to market or promote the Blue Emu products.** Based on the literal language of the Agreement, even without using the parties' course of performance, this obligation **does not include** marketing or promotional efforts undertaken by third-party retailers or any standard cost of doing business with mass market retailers.  The marketplace will have to be the place where it is decided what entity or entities bear the costs of any advertising not directly contracted for by NFI.

**4.  The Definition of NFI's "Total Revenues Received" and "Discounts"**

The parties dispute the meaning of the terms "NFI's total revenue received" and "discounts," which are used in ¶ 2.4 of the Agreement to describe amounts necessary for the calculation of NFI's royalty payments to Pro Emu.  Subparagraph 2.4(a) states that NFI will make a royalty payment of a specified percentage of "NFI's total revenue received" from product sales, "net discounts and refunds."  In relevant part, § 2.4 provides:

> In addition to the purchase price of the emu oil provided for in Section 2.3, NFI shall pay [Pro Emu] an overriding royalty payment as follows:
>
> (a) *Super Strength Blue Emu Cream*.  Eight percent (8%) of **NFI's total revenue received** from the sale of Super Blue

14

Emu Cream or any similar product, **net of discounts and refunds** ("Net Revenues");

(b)*Other Products*.  Five percent (5%) of **NFI's Net Revenues** from sales of all products other than Super Strength Blue Emu Cream sold by NFI containing emu oil.

(emphasis added).

Pro Emu argues that NFI's "total revenue received" includes third-party retailer promotional and advertising expenses and that such expenses are not to be deducted from "total revenue received" as "discounts" in order to calculate royalty payments.  Under Pro Emu's proposed construction, these charges would be included in the "net revenues" from which the royalty is calculated.  NFI contends that the plain language of the Agreement, plus the parties' course of performance, require (1) that third-party promotional and advertising expenses not be included in "total revenue received" because they are not "received;" and/or (2) that such expenses should be deducted as "discounts" because they fit the ordinary definition of the word "discount."

It is clear from the plain language of the Agreement that **third-party retailer marketing and promotional charges are not part of "net revenue."**  It is not facially clear, however, whether these charges are to be excluded from "total revenue received" or are to be deducted from "total revenue received" as a "discount."

NFI argues that these charges are not "received," so that they cannot be included in the calculation of "total revenue received."

15

As Pro Emu points out, however, "discounts" are not "received," but are included in "total revenue received" before they are later deducted. While the court sees why the parties could have wanted to treat different types of "discounts" or "deductions" differently, there is no language or extrinsic evidence to support treating these retailer charges differently.

From the beginning of the parties' over eight year relationship, it is undisputed that third-party retailer marketing and promotional charges were treated as deductions or "discounts" from the "total revenue received." These charges were treated the same way as slotting expenses, product returns, and any number of non-negotiable charges that third-party retailers imposed. This is firmly evidenced by a July 2003 email that a NFI representative sent to Pro Emu explaining how it was calculating royalty payments. The email stated, in part:

> Obviously, this is a billing report and not a net sales report. There will be account advertising and promotional expenses, slotting expenses, product returns, product damage and any of a number of things that retailers can find to make deductions reduced from these numbers prior to reconciling your commissions. However, this will give you an idea of what to expect for monthly commissions.

Pro Emu admits that it received this email and did not respond to it or otherwise inform NFI that it was handling the account incorrectly.

Furthermore, since the Agreement was executed in 2003, NFI has provided Pro Emu with monthly written statements that included the

"total revenue received" from all retailers for sales of emu oil-based products.  The monthly statements also listed the type and amount of each deduction made by retailers and the total amount of deductions.  These monthly reports included retailer charges for "coupons," "advertising," and "promotion," among other things.  Pro Emu did not object to how NFI was calculating royalty payments until August 19, 2011, eight and a half years after the effective date of the Agreement.

Neither the language of the Agreement nor the parties' course of performance supports treating third-party retailer charges for marketing and promotion differently from other deductions or "discounts."  "Discount" is defined as "a reduction made from the gross amount or value of something."  WEBSTERS NINTH COLLEGIATE DICTIONARY 361 (1983).  The parties have treated the third-party retailer marketing and promotion charges in precisely this way.  Under the Agreement, as explained by the parties' over eight year course of performance, **third-party retailer charges for advertising and promotions are "discounts" as used in ¶ 2.4.**  This construction is also consistent with the construction of the obligation for promotional expenses discussed *supra*, finding that NFI shall bear only *its* advertising expenses.

5. **Nature and Scope of NFI's Rights of Exclusivity**

The parties dispute whether the Agreement permits Pro Emu to sell emu oil, emu fat, or products containing emu oil to parties

other than NFI not in the "Mass Retail Market."[4]  Pro Emu's position is that it can sell emu oil, emu fat, and products containing emu oil to anyone so long as the buyer is not in the Mass Retail Market.  NFI argues, to the contrary, that the Agreement, including its amendments, requires Pro Emu first and foremost to meet NFI's supply needs.  NFI contends that only after NFI's supply needs are met, can Pro Emu sell emu oil or emu fat to third parties, that is, if NFI consents to such sale or declines to buy the excess oil or fat itself.  NFI concedes that Pro Emu can sell "products containing emu oil" (as contrasted to emu oil or emu fat) to certain third parties without NFI's consent.

Under the original Agreement, NFI agreed to purchase *emu oil* exclusively from Pro Emu.  2003 Agreement at ¶ 1.4(a)(b).  This exclusivity is reciprocal.  Pro Emu was not permitted to sell *emu oil* to any third party, except for purposes of winding down certain contracts under which Pro Emu was providing emu oil to third-parties and to renew such contracts only with approval from NFI.  *Id.* at ¶¶ 3.1, 3.2.  With certain exceptions to be discussed *infra*,

---

[4] The Agreement defines "Mass Retail Market" as "all national drug store chains, national supermarket chains, mass market discount retailers and club retailers (e.g., Sams Club, Price Club, Costco).  The Mass Retail Market shall not include (I) direct sales . . . (ii) sales to specialty stores (even if they are national chain specialty stores), health clubs, spas, local grocery store and drug store chains, independent retailers or any other outlet outside the Mass Retail Market. . . .  First Agreement at ¶ 3.1.

approval from NFI is also required if Pro Emu wants to enter into any new contracts to sell emu oil to any third party. Under the original Agreement, Pro Emu could only sell emu oil (1) to NFI, and (2) to Pro Emu's then-existing customers with a winding-down to take place so that NFI would shortly thereafter become Pro Emu's sole customer.

A year after the original agreement was executed, the parties amended it. Pro Emu takes the position that ¶ 3.1 of the First Amendment to the Sales Agreement now permits Pro Emu to sell *emu oil* to third parties. Paragraph 3.1 provides:

> Notwithstanding anything to the contrary contained in this section 3, [Pro Emu] shall have the right to develop, manufacture, distribute, market, advertise and sell **products**, or to contract with others to develop, manufacture, distribute, market, advertise and sell **products containing emu oil** supplied by [Pro Emu] in markets other than the Mass Retail Market. . . .

First Amendment at ¶ 3.1 (emphasis added). Pro Emu's expansive interpretation of this provision is contrary to common sense. This section is only meant to address Pro Emu's right to sell **"products containing emu oil."** Pro Emu's right to engage in a business that only involves **products that do not contain emu oil** did not need and does not need protecting. Pro Emu can manufacture and sell widgets if it wants to, without NFI's consent, and even in the Mass Retail Market. This provision precludes Pro Emu and its contractors from selling emu oil-based products to the "Mass Retail Market," an action that would be in direct competition with NFI. "Mass Retail

Market" is a term well understood by the parties.  Pro Emu concedes

that it must provide NFI with the right of first refusal if Pro Emu

develops an emu-based **product** that it believes to be appropriate

for the Mass Retail Market.  Paragraph 3.1 continues:

> If [Pro Emu] or any party it contracts with develops a
> **product** that the owner of the **product** believes is
> appropriate for distribution in the Mass Retail Market,
> NFI will be offered a right of first refusal to
> distribute such **product** in the Mass Retail Market. . . .

(emphasis added).  Simply put, this paragraph addresses the nature

and scope of the parties' rights regarding **products containing emu**

**oil.**  The First Amendment does not authorize Pro Emu to sell to

third parties emu oil or fat, as distinguished from a product made

from emu oil or fat.  How Pro Emu can control third parties who may

develop an emu oil-based product appropriate for the Mass Retail

Market and can guarantee NFI first refusal on the marketing of such

a third-party produced product is not a question before the court.

It is a provocative question that will have to await another

lawsuit, hopefully assigned to another judge.

Pro Emu is suggesting that the court ignore the plain language

of ¶ 3.1, and instead, should rely on the **recitals** to the First

Amendment, which provide, in part, that "[t]he parties desire that

the Agreement be amended to allow [Pro Emu] to sell **emu oil** to

parties other than NFI who will, market, distribute and sell

products containing emu oil in markets other than the mass market

retaining establishments targeted by NFI."   First Amendment

(Recitals).

The court cannot overlook or avoid the overriding language of the **operative** provisions of the Agreement that specifically limit Pro Emu's rights to **products containing emu oil** based on the one phrase in the contract's recitals, which also includes multiple references to "products containing emu oil." Parties' recitals as to why they are entering into a contract **do not control or alter** the **operative** language of the contract. *See Mun. Gas Auth. of Ga. V. Teton Fuels Mid-Ga., LLC.*, No. 1:06-cv-186, 2008 WL 6690030, at *10 n.11 (N.D. Ga. Mar. 26, 2008) (citing *Rosenberg v. Rosenberg*, 208 S.E.2d 824, 825 (Ga. 1974)).

The Fourth Amendment to the Agreement supports the court's construction by specifically addressing the parties' rights in regards to emu oil and emu fat. The relevant part states:

> Except as provided by Section 1 of the First Amendment, [Pro Emu] shall not market, sell or distribute **emu oil or emu fat** to any third party without the express consent of NFI. Notwithstanding the forgoing, in the event NFI determines in its reasonable discretion that it cannot or will not use **emu oil or emu fat** [Pro Emu] has available for purchase, NFI shall notify [Pro Emu] and [Pro Emu] shall then be free to sell such excess **emu oil or emu fat** to a third party.

Fourth Amendment at ¶ 3 (emphasis added). The opening phrase "[e]xcept as provided by Section 1 of the First Amendment," is referring to the exception to exclusivity that allows Pro Emu to sell **products containing emu oil**, discussed *supra*. The above quoted language, then, provides that Pro Emu may not market, sell,

21

or distribute emu oil or emu fat to third-parties, with two exceptions: (1) that Pro Emu can sell **emu oil** and **emu fat** to a third-party either with the express consent of NFI, or (2) "in the event NFI determines in its reasonable discretion that it cannot or will not use emu oil or emu fat that [Pro Emu] has available for purchase." Under the second exception, "NFI shall notify [Pro Emu] and [Pro Emu] shall then be free to sell such excess emu oil or fat to a third party." *Id.* Of course, what constitutes "reasonable discretion" is as loosy goosey as what constitutes "best efforts." NFi is obligated to be "reasonable" in its demands.

There would have been no need to carve out these exceptions if Pro Emu were permitted to sell emu oil or emu fat to third parties prior to the execution of the Fourth Amendment or after the Fourth Amendment without any restriction. Any other interpretation ignores the unambiguous language of the Agreement and ignores the bargained-for exclusivity of the arrangement. ***Under the First Amendment, Pro Emu can sell products containing emu oil (as contrasted to emu oil or emu fat) to third party retailers not in the Mass Retail Market without NFI's consent. The Agreement, as amended, requires Pro Emu to first meet NFI's supply needs for emu oil and emu fat. Once NFI's supply needs are met, Pro Emu can sell emu oil or emu fats to third parties if (1) NFI consents or (2) NFI declines to buy the oil or fat itself. Pro Emu is not obligated to***

*scale down its operations so as to meet only the needs of NFI.*

### 6. The Nature of the Parties' Relationship: Independent Contractors or Joint Ventures

Under the Agreement, Pro Emu and NFI are independent contractors. Paragraph 9.1 provides:

> The relationship of [Pro Emu] and NFI is that of ***independent contractors***. Nothing in this Agreement shall be construed to create any other type of relationship. . . .

(emphasis added). It does not take the parties' mutual agreement that no ambiguity exists for the court to find that there is no ambiguity in this provision. Pro Emu and NFI are independent contractors, not partners in a joint venture. Any reference to the parties' relationship as a joint venture in their Letter of Intent is irrelevant. The Letter of Intent was expressly cancelled and superseded by the Agreement.[5] 2003 Sales Agreement at ¶ 9.10.

Even if the parties had not included ¶ 9.1 in the Agreement, the court's conclusion would be the same. Under Georgia law, "[a] joint venture 'arises where two or more parties combine their property or labor, or both, in a joint undertaking for profit, with rights of mutual control." *Rossi v. Oxley*, 495 S.E.2d 39, 40 (Ga. 1998) (quoting *Kissun v. Humana*, 479 S.E.2d 751 (Ga. 1997)). The

---

[5] Pro Emu repeatedly refers to the 2002 Operating Agreement Letter of Intent as the "2002 Operating Agreement." This is misleading. By their nature letters of intent are temporary and, as is the case here, are routinely cancelled and superseded by the official contract, here the 2003 Sales Agreement.

essential elements of a joint venture are "(1) a pooling of action; (2) a joint undertaking for profit; and (3) rights of mutual control." *Hillis v. Equifax Consumer Servs., Inc.*, 237 F.R.D. 491, 508 (Ga. 2006) (quoting *Kissun*, 479 S.E.2d at 752). The relationship between Pro Emu and NFI lacks these elements.

Under the Agreement, Pro Emu and NFI retain control over their respective operations. Pro Emu lacks control over NFI or its operations related to the sale of Blue Emu products, and NFI has no control over Pro Emu's raising, slaughtering, and processing of emu birds for oil. The parties conduct their businesses totally separately and independently from one another. Nothing in the Agreement gives either party control over any part of the other party's internal operations. Further, the Agreement does not provide for the parties to share in each other's profits. To the contrary, the Agreement, as amended, specifically provides that NFI is to pay Pro Emu a royalty based on sales as opposed to a share of the profits. The payment of a royalty is not the same as sharing profits.

The express terms of the Agreement and the relationship of the parties in operation prove that Pro Emu and NFI were **independent contractors, not parties in a joint venture**.

**7. The Meaning of a Barrel of Emu Oil**

NFI asks the court to give definition to the term "barrel" as used in the Fourth Amendment to the Agreement. The 2003 Sales

Agreement set the price of emu oil at a fixed **per gallon** price.  In March 2008, the Fourth Amendment changed the pricing from **per gallon** to **per barrel**, but did not define "barrel."  According to NFI, this issue became a matter of disagreement after the Fourth Amendment was executed.  NFI claimed at that time that a barrel was 55 gallons of emu oil while Pro Emu claimed that a barrel was 52.65 gallons of emu oil.  The parties thereupon agreed that going forward NFI would accept barrels with only 52.65 gallons of emu oil in exchange for Pro Emu's agreeing to reduce the price of a barrel of emu oil to reflect the difference between 55 gallons and 52.65 gallons.  The parties did not agree as to how the term "barrel" should be defined for the period of time after the Fourth Amendment was executed, or for the time before the interim oral mutual concession was reached.

The Agreement does not disclose what the parties meant by a "barrel" of emu oil.  NFI proposes the usage of the trade as defining evidence that "barrel" means 55 gallons.  Admittedly, the term "barrel" is a standard term in the emu oil supply business.  The American Emu Association (AEA) has a Trade Rule which defines a barrel of emu oil.  This rule, No. 105, provides that a barrel of emu oil is 55 gallons unless the parties expressly agree otherwise.  There is no such express agreement  here.  The standard rule provides that emu oil is sold on a net weight basis in pounds and that the unit weight is 7.6 lbs./gallon.  The unit of sale may be

a drum, a barrel, or a five gallon pail.  Unless the parties agree
otherwise, a steel drum is said to weigh 418 lbs.  Therefore, a
drum weighing 418 lbs. contains 55 gallons of emu oil.  (418 lbs /
7.6 lbs per gallon = 55 gallons).  The terms "drum" and "barrel"
are used interchangeably.

Pro Emu does not offer any argument in support of its
assertion that the contract calls for a barrel of emu oil to be
52.65 gallons or to contradict the usage in the trade as
demonstrated by NFI.  For the time periods in question, a ***"barrel"
of emu oil is 55 gallons***.

**8.   The Quantity of Emu Oil that NFI is Permitted to Order**

Pro Emu asks the court to find that "NFI is not permitted to
purchase emu oil from Pro Emu for resale, to store, or for any
purpose other than in the manufacture of products containing emu
oil."  The court grants this request from Pro Emu because its
interpretation only paraphrases ¶ 2.2 of the 2003 Sales Agreement,
which provides:

> NFI shall not place orders for emu oil in quantities
> greater than are reasonably expected to be needed to
> allow its contract manufacturer to maintain on hand an
> inventory of emu oil reasonably expected to be required
> to fulfill its requirements for sixty (60) days.

Whereas under ¶ 2.2 of the original Agreement NFI only had the
right to purchase emu oil in a quantity sufficient to provide a
sixty day inventory for its reasonably expected requirements, NFI
argues that the Fourth Amendment expanded its right to purchase emu

oil.  Section 3 of the Fourth Amendment provides in relevant part:

> Notwithstanding the foregoing, in the event NFI
> determines in its reasonable discretion that it cannot or
> will not use emu oil or emu fat [Pro Emu] has available
> for purchase, NFI shall notify [Pro Emu] and [Pro Emu]
> shall then be free to sell such excess emu oil or emu fat
> to a third party.

NFI argues that this language gives it the right of first refusal to buy any and all emu oil from Pro Emu that Pro Emu has available for sale before Pro Emu can sell it to third-parties.  NFI further contends that this right necessarily implies that it is permitted to demand emu oil and emu fat from Pro Emu beyond the amounts anticipated in the 2003 Agreement.

There is no history reflecting how the parties have treated ¶ 3.  For instance, there is no evidence, disputed or not, about whether NFI has ever informed Pro Emu that it will not need emu oil or emu fat that Pro Emu has available for sale, and what Pro Emu's response was to any such notice.  The issue apparently has not come up.  This does not mean, of course, that it will never come up.

There is no evidence as to which party drafted the contract language under consideration, so that *contra proferentem* is not available as a rule of construction.  But drafting a "right of first refusal" does not call for Professor Williston's fine hand. If the parties had intended to give NFI a right to purchase any and all of Pro Emu's emu oil before Pro Emu can sell it to another, the parties could easily have said so, and would surely have said so. After all, they employed the words "right of first refusal"

elsewhere in the Agreement. Pro Emu is not chain-bound to NFI. Only if NFI notifies Pro Emu that it wants to purchase a particular amount of Pro Emu's excess oil before Pro Emu sells it to another is Pro Emu prohibited from selling it to others. The burden of taking action to stop Pro Emu from selling to another is on NFI. Put another way, as long as Pro Emu has not received an order from NFI to purchase more than its guaranteed regular order, Pro Emu can sell to a third-party any oil that would not interfere with its obligation to supply NFI's regular orders. Pro Emu is not required to maintain an inventory subject to all possible future demands of NFI.

NFI's proposed construction of this provision goes beyond reason. Pro Emu's contention that ¶ 3 leaves it free to sell its emu oil and fat to third parties if it produces more than it takes to fulfill NFI's needs makes sense. Accordingly*, from January 1, 2003 until March 10, 2008, NFI was not permitted to place orders for emu oil in quantities greater than could reasonably be expected to be needed to fulfill its requirements for sixty days. From March 11, 2008 to the present, Pro Emu was free and is now free to sell its emu oil and emu fat to third parties unless NFI, in an exercise of its reasonable discretion, first notifies Pro Emu in writing that it will not use emu oil and emu fat beyond the amount expressly contemplated in the 2003 Agreement. The burden of taking this action to obligate itself in order to stop Pro Emu from*

28

*selling to others is on NFI.*

### 9. Claimed Contract Rights to Joint Ownership of the BLUE EMU Trademark

The parties dispute whether the Agreement gives Pro Emu and NFI joint ownership in the BLUE EMU trademark. Pro Emu points out that the 2002 Letter of Intent[6] which preceded the 2003 Agreement provides that the parties would jointly own the BLUE EMU trademark and contends that this joint ownership arrangement became an integral part of the Agreement. NFI contends, to the contrary, that it is the sole owner of the BLUE EMU trademark because the Agreement is silent on the issue and because NFI properly registered the BLUE EMU trademark without objection by Pro Emu.

Paragraph 2 of the parties' 2002 Letter of Intent provides that "NFI and [Pro Emu] will jointly own any current and future trademarks of products that contain [Pro] Emu Oil." This Letter of Intent, however, was replaced and superceded by the 2003 Sales Agreement, which states:

> This Agreement . . . constitutes the entire agreement between the parties and ***supersedes and cancels any and all prior agreements***, written or oral, between them relating to the subject matter hereof, including, without limitation, that certain ***[Pro Emu]-NFI Operating***

---

[6] As it has done throughout its briefing, Pro Emu refers to the parties' "2002 Operating Agreement Letter of Intent" as the "2002 Operating Agreement." It is undisputable that this agreement is the Letter of Intent that preceded, and was explicitly superseded by, the 2003 Sales Agreement. Pro Emu's attempt to restyle this agreement does not change its nature and effect.

> **Agreement Letter of Intent** between the parties dated May
> 10, 2002.

¶ 9.10 (emphasis added).  Pro Emu's claim to partial ownership of
the BLUE EMU trademark is ineffectual because the Letter of Intent
was superseded in 2003.  Pro Emu could have insisted otherwise.  If
it had done so, no one knows whether its insistence upon joint
ownership would have created an insurmountable obstacle to the
Agreement or the Agreement would have contained the language Pro
Emu wants the court now to insert.  If there were any doubt about
the parties' intent on this subject, Pro Emu has never objected to
NFI's claim of ownership of the trademark or asserted that it had
any type of ownership interest during the parties' eight year
course of performance.  **Neither the Agreement nor any other
agreement between the parties provides for joint ownership of the
BLUE EMU trademark.**

## Conclusion

The court will briefly recapitulate its foregoing findings and
determinations with respect to the intent of the parties in the
2003 Sales Agreement and its amendments, as follows:

1. Paragraph 2.2, imposes a "best efforts" standard.  Pro Emu
is required to use all reasonable efforts in good faith to fulfill
NFI's orders for emu oil.  This leaves a wide open door for
disagreement between the parties that will not end until after a
prolonged jury trial in which NFI will have the burden of proving

that Pro Emu did not use its best efforts. The dispute has, thus far, been heated enough even to predict an eventual trip to Atlanta.

2. The limitation on NFI's remedy in ¶ 2.2 applies only when Pro Emu, after using its "best efforts," is unable to supply an NFI order within sixty days. Also, this limitation applies only if Pro Emu fails to provide the quantities of emu oil actually needed by NFI. It does not apply to any breaches of the Agreement that do not involve supplying emu oil.

3. NFI is only responsible for the marketing and promotional activity that it undertakes in the marketing and promoting of Blue Emu products. In other words, it can decide how much to spend out of its pocket. Marketing and promotional activity undertaken by third-party retailers is only implicated to the extent that it is a factor in computing "net revenue" as "discounts."

4. Third-party retailer marketing and promotional charges are not part of "net revenue" but rather are "discounts" as the said terms are used in ¶ 2.4

5. Pro Emu can sell products containing emu oil to retailers outside of the Mass Retail Market. Pro Emu must supply NFI's legitimate needs for emu oil and emu fat. Once NFI's needs are met, Pro Emu can sell emu oil and emu fat to third parties (1) if NFI consents, or (2) if NFI does not notify Pro Emu that it will buy Pro Emu's excess emu oil or emu fat itself.

6. Pro Emu and NFI are independent contractors.

7. A "barrel" of emu oil is 55 gallons.

8. From January 1, 2003 until March 10, 2008, NFI was not permitted to place orders with Pro Emu for emu oil in quantities greater than it could reasonably be expected to fulfill its requirements for sixty days.  From March 11, 2008 until the present, NFI could order, and can now order, any amount of emu oil and emu fat that Pro Emu has available for sale if it gives Pro Emu notice of its desire before the excess is sold by Pro Emu to others.

9. The Agreement between the parties does not diminish NFI's sole ownership of the Blue Emu trademark.

* * *

The court does not expect the parties to lay down their arms and embrace each other in view of these findings and conclusions about their Agreement's meaning, but the court does suggest that another stab at mediation might now be the order of the day.  It was the dispute over the rights and obligations of the parties that was the biggest stumbling block to the prior unsuccessful mediation.  Unless the parties agree to mediation within fourteen (14) days, they will be free to engage in discovery of the evidence they will need to prove alleged breaches and the remedies for any such breaches.  Unless the parties can agree to mediate and on deadlines to complete discovery and filing dispositive motions, the

court will fix a new schedule.

DONE this 7th day of June 2013.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE