IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

PROGRESSIVE EMU, INC., f/k/a     }
JOHNSON EMU, INC.                }
                                 }
     Plaintiff and               }
     Counterclaim Defendant,     }     CIVIL ACTION NO.
                                 }     2:12-cv-01079-WMA
v.                               }
                                 }
NUTRITION & FITNESS, INC.        }
                                 }
     Defendant and               }
     Counterclaim Plaintiff.     }


**<u>MEMORANDUM OPINION</u>**

This case arises out of an exclusive dealings contract between Progressive Emu, Inc. ("Pro Emu"), a company that raises emus and sells emu oil and related products, and Nutrition & Fitness, Inc. ("NFI"), a seller of health products. The parties dispute the meaning and status of their contract and the ownership of the intellectual property associated with their relationship. Before the court are the parties' cross-motions for summary judgment. Both motions will be granted in part and denied in part, as will be hereinafter explained.

**Background**

An emu is an exotic, flightless, six-foot-tall Australian bird. The learned historian Wikipedia recounts that, in centuries gone by, the aboriginal Australians rubbed their bodies with emu fat as "bush medicine" and as body adornment for

ceremonial occasions. *See* Wikipedia, *Emu,* http://en.wikipedia.org/wiki/emu (last visited June 18, 2014).

The more things change, the more they stay the same. In the late 20th century, there came to be an Alabama company called Johnson Emu, Inc., more recently known as Progressive Emu, Inc., ("Pro Emu"), devoted to the business of raising emus, slaughtering them, and processing their fat for people to rub on their bodies. *See* Compl. ¶ 5. According to Pro Emu, it added blue coloring to the processed fat on its own initiative in the early 2000s, Compl. ¶ 6, and thus birthed "Blue Emu," the now-staple drugstore sports rub/foot therapy cream/pain relief spray/lip balm, *see* Blue Emu, http://www.blue-emu.com (last visited June 18, 2014).

With a potential commercial behemoth now in hand, it was time for Pro Emu to take its product to the people. In 2001, Pro Emu was introduced to Nutrition & Fitness, Inc. ("NFI"), a North Carolina company specializing in marketing health products on a large scale. Pl.'s Facts ¶ 2. Over the next few years, the two companies hammered out a number of agreements, including a 2001 "Confidentiality Agreement," Pl.'s Facts ¶ 3, a 2002 "Operating Agreement Letter of Intent," Pl.'s Facts ¶ 7, and finally, a 2003 "Sales, Marketing, and Operating Agreement," Pl.'s Facts ¶ 9.

2

The result was a contractual relationship in which, in short, Pro Emu would supply emu oil to NFI, and NFI would produce and sell Blue Emu and related products.

The relationship between the parties appears to have been undermined from the beginning, as are so many relationships, by disagreement as to the exact meaning of "exclusivity."  The 2003 agreement underwent substantive modifications in 2004 and 2008,[1] with both modifications seeking to clarify when and what Pro Emu could sell to third parties.  These modifications did not bring lasting peace.  In August, 2011, the parties began to trade letters in which they alternately accused each other of contract breaches, with each ineffectively reassuring the other that no such breaches were occuring.  NFI's main concerns, real or imagined, were that Pro Emu was selling oil to third parties and that Pro Emu was providing barrels that contained less oil than they were supposed to contain.  Pro Emu's main concerns, real or imagined, were that NFI was purposely ordering more oil than it needed, thus preventing Pro Emu from selling at a higher price on the market and damaging Pro Emu's business; that NFI was calling

---

[1]The 2003 Agreement, the two substantive agreements, and two other minor modification documents are collectively referred to as "the contract."  But citations to the contract will be made to the precise document at issue: "2003 Agreement at __"; "2004 Amendment at __"; and "2008 Amendment at __."

third parties and sabotaging Pro Emu's relationship with them; and that NFI was underpaying Pro Emu.

These disputes came to a head in March, 2012. Pro Emu wrote NFI to say that Pro Emu had no birds ready to "process" and thus could not fill any of NFI's recent orders, and furthermore that Pro Emu had filed suit in an Alabama state court to resolve the parties' differences. NFI responded with a civil action of its own, in federal court in North Carolina, and with a letter declaring that it would not be paying Pro Emu any more money.

The resulting litigation has been ongoing for more than two years, and the court has not been entirely idle during that time. To wit:

- The Alabama action was remanded to this court, and the North Carolina action was transferred to this court. All of the parties' claims against each other are now consolidated in this action.

- The court has defined the scope of the claims through opinions on a motion to dismiss by NFI and a motion to amend the complaint by Pro Emu. *See* (Docs. 22, 96).

- The court has ruled, (Doc. 45), that Georgia law applies to all breach-of-contract claims, Alabama law to Pro Emu's declaratory intellectual property claims, and North Carolina law

4

to NFI's unfair trade practices and tortious interference with business relations claims.

- The court has entered partial summary judgment (Doc. 82) resolving all disputes concerning the meaning of the contract terms.

- The parties have completed discovery.

What remains is a final summary judgment phase with which to knock out any non-viable claims before proceeding to trial. The parties have filed cross-motions for summary judgment, and the motions are fully briefed. The issues under consideration are these:

(I) Is the contract between the parties still viable and active? The court finds that the contract was abandoned by the parties at around the time this lawsuit was filed. This finding resolves two of the parties' breach of contract claims: Pro Emu's claim for continuing royalty payments, and NFI's claim for lost profits.

(II) With the contract between the parties out of the way, who owns the intellectual property associated with the Blue Emu product going forward? The court finds that NFI possesses sole ownership of the Blue Emu trademark.

(III) With all the parties' obligations to each other established, or disestablished, does either party owe the other damages for past contract breaches or other harms? The court finds that neither party is entitled to damages, and that both actions are due to be dismissed.

## I. Abandonment; Royalties; Lost Profits

### A. Pro Emu's Claim for Continuing Royalty Payments

Under the contract, NFI was required to pay Pro Emu royalties for sales of Blue Emu. 2003 Agreement, NFI's Mem. Ex. D, § 2.4. One of Pro Emu's primary arguments bearing on the instant cross-motions is that NFI jumped the gun by suspending the royalty payments in spring 2012, at the time this action began. *See* Pro Emu's Mem. at 8-13. According to Pro Emu, the contract was still in effect in 2012, and, in fact, is still in effect, so that NFI had and still has an ongoing obligation to pay royalties for sales of Blue Emu and related products.

NFI defends with the argument that the contract between the parties is no longer binding because, among other things, "the parties have consented to and agreed to the termination of the contract." NFI's Opp'n at 13. This argument is well taken. In Georgia, a "suit on contract for damages on account of a breach thereof cannot be maintained except by affirmance of [the

contract's] continuing validity." *Allen Housemovers, Inc. v. Allen*, 135 Ga. App. 837, 839 (1975) (quoting *Kelly v. Morris*, 46 Ga. App. 353, 355 (1933)). In *Allen*, plaintiff had contracted to sell his business, including its equipment and certifications, to defendant under an installment payment plan. When defendant missed a payment, plaintiff decided that "he knew defendant was not going to make any more payments on the contract," cancelled the transfer of his business certifications, and retook control of the property. *Id.* at 838-39. He subsequently sued for breach of contract, and the jury awarded him damages. The Georgia Court of Appeals reversed. As a matter of law, the court held, "[p]laintiff's acts and conduct were inconsistent with any rights under the contract, and he was debarred from any right to sue on the contract." *Id.* at 839; *see also Holloway v. Giddens*, 239 Ga. 195, 197 (1977) ("Parties may by mutual consent abandon an existing contract between them so as to make it not thereafter binding and the contract may be rescinded by conduct as well as by words.") (citations omitted).

Pro Emu's conduct since spring 2012 is similarly inconsistent with its having any rights under the contract. Pro Emu is correct that NFI's royalty payments were a significant and indisputable part of the contract. *See* 2003 Agreement § 2.4. So

too was Pro Emu's obligation to "not market, sell, or distribute emu oil or emu fat to any third party without the express consent of NFI." *Id.* § 3.1. At the time Pro Emu made its claim to continuing royalties, it had already long since stopped performing its own obligations under the contract. As NFI points out, Pro Emu "has not supplied NFI with one drop of emu oil since the month before this lawsuit was filed," NFI's Mem. at 24, and instead has been selling its emu oil to LB Processors, a third party, *see* Martin Dep., NFI's Mem. Ex. H, at 174-81. This type of have-its-cake-and-eat-it-too behavior by Pro Emu is precisely the kind disallowed by *Allen*. By going their own separate ways, the parties have successfully disavowed their obligations to each other.

Pro Emu very briefly argues, in its reply brief, that under the contract as previously interpreted by the court, "Pro Emu was not required to supply oil to NFI if NFI did not order oil, and . . . was free to sell any oil not ordered by NFI on the open market." Pro Emu's Reply at 23 (citing Opinion of June 7, 2013 (Doc. 82), at 31). Thus, according to Pro Emu, it did not shirk any obligations under the contract because it had no obligations that could be shirked. This argument is not persuasive. Pro Emu ignores the contract provisions that require that, even when Pro

Emu is permitted to sell to third parties, NFI first must either give "express consent," or notify Pro Emu that "it cannot or will not use emu oil or emu fat [Pro Emu] has available." 2004 Amendment ¶ 1. There is no evidence that Pro Emu sought or received NFI's consent before any of its sales to third parties. Indeed, there is no evidence of any business communications of any kind, as opposed to litigation communications, since spring 2012. Under these circumstances, Pro Emu's conduct cannot be said to demonstrate "affirmation of [the contract's] continuing validity." *Allen Housemovers, Inc.*, 135 Ga. App. at 839.

Importantly, the court's holding of abandonment has temporally limited effect. The *Allen* rule applies when a plaintiff's abandonment-type conduct occurs **before** the plaintiff's action for breach of contract is filed. Once the action is brought, any subsequent or continuing abandonment of the contract can only influence claims of subsequent breaches. In this case, Pro Emu's original complaint, brought in spring, 2012, alleged breaches of contract that occurred the previous year, while performance under the contract was still ongoing. *See* Compl. ¶¶ 28-38. These claims are not prejudiced by Pro Emu's subsequent abandonment of the contract. Pro Emu's claim to continuing royalties, however, is different. This claim was not

presented in the original complaint, *see id.*, nor did it deal with behavior that occurred prior to the filing of the original complaint.  Instead, it was first disclosed to NFI during the discovery process, at least six months after the original complaint was filed, and dealt exclusively with behavior that occurred in the interim.  The claim thus arose after the parties had abandoned the contract by ceasing all performance under it. NFI's motion for summary judgment will therefore be granted as to this issue.

**B.  NFI's Lost Profits Claim**

It should go without saying that the court's above abandonment holding bars NFI's claims to the same extent it bars Pro Emu's.  Abandonment, like other types of contract modification, requires mutuality.  "The consideration on the part of each [party]," in the abandonment context, "is the other's renunciation."  *Holloway*, 239 Ga. at 197.

Among NFI's claims as plaintiff is a claim for breach of contract seeking damages in the form of lost profits related to lost third party contracts.  The root of this claim is the fall 2012 decision of Sam's Club, a mass retailer, to replace all the Blue Emu in its stores with "Blue Stop Max," a product manufactured by Clavel, one of NFI's chief rivals.  NFI attempts

to recover the resulting lost profits by pinning them, through a rather extravagant chain of causation, on Pro Emu. NFI alleges that Pro Emu sold to LB Processors, that LB Processors then sold to Clavel, that Clavel then increased its production of emu cream by a certain amount, and that this amount of increase was the difference-maker in Sam's Club's decision to sign an exclusive contract with Clavel instead of NFI. *See* NFI's Opp'n at 26-27.

In light of the court's above abandonment holding, NFI cannot recover on this claim even if it is able to prove this elaborate, Palsgraffian chain of causation. The emu sales from Pro Emu to LB Processors that bother NFI were made in late 2012 and throughout 2013. *See id.* at 26. The sales thus began approximately six months after the start of this litigation and six months after NFI ceased paying royalties, heeding the contract's exclusivity requirement, and otherwise performing under the contract. It is ironic that NFI's main complaint is that Pro Emu was doing business with a third party, LB Processors, when NFI was simultaneously doing business with the same third party. *See* Pro Emu's Mem., Ex. 8 (invoices of sales from LB Processors to NFI throughout 2012). NFI's claim is barred for the same reason that Pro Emu's claim for continuing royalties is barred: that the contract was abandoned prior to the

alleged breaches.  Pro Emu's motion for summary judgment will be granted as to this issue.

## II.  Intellectual Property

### A.  The Nature of Pro Emu's Claim

With the contract gone, the question remains of what the parties' respective rights are concerning Blue Emu, the valuable commerical product that spurred the contract in the first place. The background of this case, as Pro Emu describes it, is that Pro Emu invented on its own the product called Blue Emu, and brought NFI on board only to market and sell the product.  But in the process of marketing and selling the product, NFI long ago registered a trademark acquiring the "Blue Emu" name with the U.S. Patent and Trademark Office (USPTO), and has held that registration, unchallenged, since 2002.  Can it be that, because the contract has now evaporated and because NFI holds the official trademark registration, Pro Emu has lost all rights to the product that it created itself just 15 short years ago?  Pro Emu hopes the answer is "no," and so a crucial part of its complaint, as amended, is a request for declaratory judgment that Pro Emu retains intellectual property rights to the Blue Emu name and product.

Pro Emu's original theory of trademark ownership was that the contract between the parties gave Pro Emu 50% ownership of the Blue Emu mark. *See* Compl. ¶ 55. This argument was unavailing. As the court held in an earlier opinion, the contract makes no mention of any 50% ownership interest, and is explicit that the parties would have a relationship of independent contractors, not as joint venturers. *See* (Doc. 82) at 29-30.

Pro Emu subsequently amended its complaint to state its claim under a different theory: that NFI's trademark registration with the USPTO must be cancelled, presumably so that rights to the Blue Emu mark can revert to or be acquired by Pro Emu. *See* Am. Compl. ¶¶ 27-9 to 27-17; 65 to 71. Under the Lanham Act, 15 U.S.C. §§ 1051-1127 (2006), a party may file with the USPTO a "petition to cancel a registration of a mark" for a number of reasons, including, as relevant here, that the "registration was obtained fraudulently." *Id.* § 1064. And though § 1064 technically creates only a cancellation procedure before the USPTO, another section of the statute, § 1119, gives courts the power to "determine the right to registration" and "order the cancellation of registrations" in civil actions involving registered marks. Pro Emu argues that NFI's registration was

13

obtained fraudulently because, as part of the registration application, NFI was required to sign and did sign a declaration swearing that it "believes the applicant to be the owner of the trademark/service mark sought to be registered" and that "to the best of [its] knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce." Am. Compl. ¶ 27-16. In Pro Emu's view, this was blatantly untrue because NFI was well aware that Pro Emu also had an ownership interest in the Blue Emu trademark. After all, the declaration was signed directly after, and indeed as a consequence of, negotiations with Pro Emu about the Blue Emu name and product.

Whether Pro Emu ought to have been allowed to assert this belated claim at all is a reasonable question. Pro Emu did not move to amend its complaint to add this claim until August 2013, approximately 16 months after the litigation began, and indeed only added the claim immediately following, and probably as a direct reaction to, an unfavorable ruling by the court on motions for partial summary judgment. Furthermore, even allowing for the lateness of the amended complaint, the cancellation claim comes more than 10 years after NFI's initial registration of the Blue Emu mark, with continuous use by NFI in the interim, raising

14

questions of whether a statute of limitations or the equitable doctrine of laches should bar the claim. Nevertheless, for the reasons expressed in an earlier opinion, the court has allowed Pro Emu to amend its complaint and ruled that the new cancellation claim is not barred. *See* (Doc. 96) at 9-17. The court therefore now proceeds to the merits of the cancellation claim.

### B. Legal Standards

NFI is incredulous that a cancellation claim of this type could ever work. Its arguments are various, but all convey the general sense that Pro Emu's claim is virtually impossible to assert for a procedural reason. For example, in addition to the statute of limitations and laches arguments, NFI argues, *e.g.*, that "the Blue Emu trademark is incontestable under federal law and this incontestability precludes [Pro Emu] from challenging NFI's trademark ownership," NFI's Mem. at 27; that "[a]s a practical matter it is next to impossible to invalidate a trademark, as [Pro Emu] seeks to do, based solely upon the assertion that representations made in a trademark application were fraudulent," *id.* at 33; and that "the evidentiary burden to sustain a claim for cancellation under 15 U.S.C. § 1064(3) is also notoriously high," *id.* at 34.

NFI is overly bogged down in the weeds of the federal statute. The Lanham Act allows for registration of trademarks in the federal register and provides various rights associated with registration, but registration itself is not what creates the trademark. Actual creation can only occur by the common law method--by use in the marketplace. *See Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 979 (9th Cir. 2006) ("Registration does not create a mark or confer ownership; only use in the marketplace can establish a mark."); *see also* 3 McCarthy on Trademarks and Unfair Competition § 19:3 (4th ed.). Pro Emu's cancellation claim is built upon this premise. The idea is that Pro Emu, not NFI, was the one with common law trademark rights to the Blue Emu name, and therefore that NFI had nothing to register.

A similar claim was presented in *Country Fare LLC v. Lucerne Farms*, 3:11-CV-722-VLB, 2011 WL 2222315 (D. Conn. June 7, 2011). In that case, plaintiff Country Fare was the creator of a proprietary mulch composition called "Mainely Mulch." *Id.* at *1. It contracted with Lucerne, a larger company, for the latter to "manufacture, package, and ship" the mulch. *Id.* at *2. While this business relationship was still ongoing, Lucerne registered a trademark on the Mainely Mulch name. *Id.* at *3. Years later,

when the parties' relationship soured, Country Fare challenged Lucerne's trademark on the same grounds that Pro Emu invokes here--that the trademark must be cancelled because Lucerne obtained it by fraudulently holding itself out as the sole owner of the mark. Lucerne defended with the same defense that NFI offers here--that the burden of showing intentional fraud was too high for Country Fare to overcome. The court found that Country Fare had shown likely success on the merits and granted a preliminary injunction in its favor. *See id.* at *6-*9.

*Country Fare* thus indicates that, notwithstanding NFI's incredulity, Pro Emu's cancellation claim presents a viable theory of recovery. However, this does not mean that Pro Emu wins on this claim. The crucial fact to the *Country Fare* court's analysis was that "Country Fare had superior ownership of the mark."[2]  *Id.* at *7; *see also Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1220 *as modified*, 97 F.3d 1460 (9th Cir. 1996) ("[A] non-registrant can rebut [a registrant's presumption of ownership] by showing that the registrant had not established

---

[2]Though not part of the court's legal analysis, other indicia of fraud were noted by the court and were probably relevant to its decision. *See id.* at *3 (indicating that Lucerne filed its appliction for registration only after it "anticipat[ed] a breakdown in the parties' business relationship," and disguised in its application all references to Country Fare that appeared on the original mulch packaging). Such other indicia are not present in this case.

valid ownership rights in the mark at the time of the registration--in other words, if the non-registrant can show that he used the mark in commerce first, then the registration may be invalidated."). If Pro Emu is to win here, it must similarly show that it has superior ownership, **through use in commerce**, of the Blue Emu trademark. Pro Emu cannot do so.

"It is axiomatic in trademark law that the standard test of ownership is priority of use." *Sengoku Works Ltd.*, 96 F.3d at 1219; *see Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 599 (S.D.N.Y. 2001) ("It is well established that the standard test of ownership is priority of use.") (citing McCarthy, § 16.1). Neither party appears to fully understand the importance of this foundational principle. Pro Emu believes the key fact is that "Pro Emu developed the formula for Blue Emu and, through corroboration with people other than NFI, came up with the name 'Blue Emu.'" Am. Compl. ¶ 27-9. NFI, meanwhile, believes the key fact is that NFI is the one that registered the trademark. But "[t]o acquire ownership of a trademark, it is not enough to have invented the mark first or even to have registered it first." *Sengoku Works Ltd.*, 96 F.3d at 1219. "[T]he party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Id.*

Neither NFI nor Pro Emu has presented any evidence of sales of a product called "Blue Emu" in the marketplace prior to the beginning of the parties' business relationship. Pro Emu has provided evidence of sales to NFI of something described in the invoice as "Super Strength Blue-Emu," *see* Pro Emu's Mem., App. 1, at 29-32 (pages marked "NFI 00012" to "NFI 00015"), but these sales were part of a collaborative effort to put Blue Emu into the market. They were not themselves a marketing operation by Pro Emu. The question of who owns a trademark for a product that is sold through such a collaborative effort is neither new nor unsettled. *See Sengoku Works Ltd.*, 96 F.3d at 1220 ("Disputes over trademark ownership often arise when the mark is used on goods that are manufactured by one company, but are marketed by another pursuant to an exclusive distributorship agreement."). The standards governing this question, as explained by the *Sengoku* court, collecting cases from across the country, are these:

First, the court looks to whether any agreement between the parties governs the trademark rights. *Id.* In this case, as the court has already explained, the contract between the parties does not grant trademark rights to either party. *See* (Doc. 82) at 29-30. The question is a close one, and worth revisiting.

The "Letter of Intent" that preceded the contract did provide that the parties would "jointly own any current and future trademarks of products." Letter of Intent, NFI's Mem., Ex. O. But the Letter of Intent, as the court has explained, was superseded in whole by the 2003 Agreement, and any provisions in the former that did not make it into the latter, did not make it into the latter. The 2003 Agreement, meanwhile, provided that "any . . . trademarks associated with the business of [Pro Emu], . . . shall be the sole property of [Pro Emu]." 2003 Agreement § 7.1. But this language begs the question. Any trademarks associated with Pro Emu will belong to Pro Emu, but is the Blue Emu trademark associated with Pro Emu or with NFI? Indeed, just as § 7.1 of the Agreement preserves Pro Emu's trademark rights, § 2.1 of the Agreement accomplishes the same effect for NFI. 2003 Agreement § 2.1 ("Nothing in [the] Agreement shall be construed as granting to [Pro Emu] any express or implied license to any NFI trademarks or other NFI intellectual property.").

So, the contract does not conclusively determine ownership of any trademark, present or future. The court therefore must proceed to the second stage of the analysis, in which it applies a presumption that the manufacturer owns the trademark. *See Sengoku Works Ltd.*, 96 F.3d at 1220. In this case, NFI is more

deserving of this presumption. At the very outset of the parties' relationship, in spring, 2002, it appears that Pro Emu sold fully formed Blue Emu cream to NFI for distribution. *See* Pro Emu's Mem., App. 1, at 29-32 (pages marked "NFI 00012" to "NFI 00015") (invoices describing sales of "Super Strength Blue-Emu" from Pro Emu to NFI). But by June, 2002, Pro Emu's sales to NFI had taken the form of of emu oil, rather than "Blue Emu." *See* Pro Emu's Opp'n, Ex. 5, at 15 (page marked "NFI 02950") (invoice describing sales of "Emu Oil - Gallon"). When the contract between the parties was finally signed in 2003, it provided purchase prices for emu oil, not "Blue Emu." *See* 2003 Agreement § 2.3. And the contract further provided that "NFI will be responsible for designing and paying for labels for the Emu Products," including, presumably, the manufacturer of the Blue Emu packaging. *Id.* § 1.4. The court therefore concludes that NFI has a substantially greater claim to the "manufacturer" presumption of ownership.

The third and final step is to determine whether the presumption in favor of the manufacturer can be overcome. The court must balance a variety of factors, including: "(1) which party invented and first affixed the mark onto the product; (2) which party's name appeared with the trademark; (3) which party

maintained the quality and uniformity of the product; and (4) with which party the public identified the product and to whom purchasers made complaints." *Sengoku Works Ltd.*, 96 F.3d at 1220 (citation omitted). "Furthermore, courts will also consider which party possesses the goodwill associated with the product, or which party the public believes stands behind the product." *Id.* (citation omitted). Of these factors, only the first (invention of the name) weighs in Pro Emu's favor. As to the second and fourth factors, NFI is the company whose name and contact information is printed on Blue Emu bottles. As to the third factor, Pro Emu's participation in "maintaining the quality and uniformity" of Blue Emu appears to be limited to providing one ingredient, the emu oil. Finally, the contract required NFI, not Pro Emu, to "be responsible for any representations or warranties . . . to any customer," 2003 Agreement § 1.3; to "be responsible for designing and paying for labels," *id.*; and to undertake "all marketing or promotional activity," *id.* § 1.5. It is thus much more likely that the public associates NFI, not Pro Emu, with Blue Emu, and that NFI is the party possessing any goodwill associated with the product.

To succeed on its cancellation claim, Pro Emu not only must prove fraud, but the fraud "must be proven to the 'hilt.'" *E.*

*Gluck Corp. v. Rothenhaus*, 585 F. Supp. 2d 505, 513 (S.D.N.Y. 2008) (citing McCarthy, § 31:68). Because the evidence in this case shows that NFI has the superior claim to ownership, Pro cannot carry this heavy burden. NFI's motion for summary judgment will therefore be granted on this issue.

**III. Equity**

In equity and good conscience, this court cannot, and will not, force these parties, who, except for this lawsuit which both are so fond of, have walked away from each other, to reconstitute an unworkable business relationship that would not fit their current objectives and would only get in their way, not to mention invite further litigation.

**IV. Other Claims**

With the major, complicated disputes resolved, the lay of the land is much clearer. The contract between the parties is abandoned, and the parties have no further obligations to each other. Pro Emu can sell its emu oil to whomever it wants, or use the oil itself. NFI can buy emu oil from whomever it wants. NFI will have an exclusive right to the Blue Emu trademark.

What remains are a number of more finite claims to damages for breaches of the contract that occurred while the contract was

more or less still alive, i.e., from 2003-2012.  These claims are
resolved as follows:

**A.  Claims Related to the Amount of Oil Per Barrel**

The parties' original agreement, as signed in 2003, provided
that NFI would buy emu oil from Pro Emu by the gallon.  On March
11, 2008, however, the parties amended the agreement to list emu
oil prices by the barrel.  The 2008 Amendment did not define the
word "barrel," so naturally a disagreement between the parties
promptly arose.  NFI felt that it should get 55 gallons of oil in
every barrel, while Pro Emu felt that only 52.65 gallons were
required.

This dispute gave rise to a second dispute.  While
investigating the amount of oil that a "barrel" should contain
under the 2008 Amendment, NFI discovered that Pro Emu had already
switched to 52.65 gallons of oil per barrel in 2007, despite the
fact that Pro Emu's sales invoices specifically reflected sales
of 55 gallons of oil.  *See* NFI's Mem. at 46.  Pro Emu admits that
its barrels started containing only 52.65 gallons in 2007, but it
explains that this is not as bad as it seems.  Pro Emu's barrels
are filled by a third party emu processor, and that processor
changed the amount of oil per barrel, pursuant to a change in
industry practice, in 2007.  *See* Pro Emu's Opp'n at 11; Compl. ¶

32 ("Barrels of oil can only hold 52.63 gallons of oil due to expansion."). Pro Emu claims that it only learned about change at the same time as did NFI, and that it was just as surprised to learn about the change as NFI was. *See id.*

The court need not decide whether either of these two issues amounted to a breach of contract by either side. This dispute arose in 2008, and if the parties had brought actions against each other then, this dispute would have been featured. Instead, the parties chose to resolve their dispute without court involvement. NFI agreed to allow Pro Emu to provide barrels containing only 52.65 gallons, and Pro Emu agreed to accept a slightly lower price for them.[3] *See* (Doc. 82) at 25. "Under Georgia law, a written agreement may be modified by a subsequent parol agreement between the parties, provided the modification is supported by consideration." *Coffee v. Gen. Motors Acceptance Corp.*, 5 F. Supp. 2d 1365, 1376 (S.D. Ga. 1998). This is

---

[3]Pro Emu briefly argues that NFI provided no consideration for this compromise solution, and indeed achieved it by duress: "NFI knew that Pro Emu was struggling financially and would have great difficulty feeding the birds without [the contract payments]." Pro Emu's Opp'n at 13. This argument is not persuasive. The consideration provided by NFI was that it agreed to accept the barrels containing less emu oil, and "the mere fact that a person enters into a contract as a result of the nature of business circumstances, financial embarrassment, or economic necessity is not sufficient [for a claim of duress]." *A-T-O, Inc. v. Stratton & Co., Inc.*, 486 F. Supp. 1323, 1325 (N.D. Ga. 1980).

precisely the type of modification that occurred here. The parties happily performed under their compromise arrangement for three years before the instant case arose. They cannot now go back, in light of their newer disagreements, and say that, had they known litigation was going to occur anyway, they would have sought damages against each other for the 2008 breaches. If any such breaches occurred, the parties agreed to settle them on their own terms, and that agreement will not now be disturbed. Pro Emu's motion for summary judgment will therefore be granted as to NFI's claim for overpayments, and NFI's motion for summary judgment will be granted as to Pro Emu's claim for recovery for NFI's reduced price-per-barrel payments.

## B. Royalties for Off-the-Books Sales

Pro Emu's amended complaint added, in addition to the trademark cancellation claim, a claim that NFI shortchanged it on royalty payments for sales made even prior to the dissolution of the parties' relationship. The allegations that underlie this claim are quite serious. Pro Emu argues, in short, that NFI has falsified its financial records, both in its business dealings with Pro Emu and before this court, in order to disguise some percentage of its sales so as to avoid royalty payments on them.

Pro Emu has not alleged or shown facts sufficient to proceed beyond summary judgment on this claim.  The sum of Pro Emu's evidence is this: Pro Emu sold NFI 207 barrels of emu oil, and 207 barrels can produce 5,120,372 units of Blue Emu, but NFI reported (and paid royalties on) sales of only about 3,900,000 units of Blue Emu.  *See* Pro Emu's Opp'n at 17-20.  The discrepancy alleged by Pro Emu might have countless causes.  NFI suggests a few: that perfect production efficiency is impossible, and there is a certain amount of unavoidable waste in the production process; that NFI gives away large amounts of emu oil and Blue Emu for promotional purposes; and that NFI sells Blue Emu in various bottle sizes and so Pro Emu's math is speculation and/or overly simple.  *See* NFI's Mem. at 14-16.  Other explanations, not suggested by NFI, are also possible.  For example, perhaps a few barrels fell out of the back of NFI's truck, or NFI failed to properly refrigerate them, or the like.  None of these explanations would create liability for NFI.  NFI had no obligation under the contract to meet a certain sales figure; it was simply required to pay royalties for the sales it actually made.  2003 Agreement § 2.4.

Of the countless explanations for the sales discrepancy, the only one that would entitle Pro Emu to recovery is that NFI

actually did make more sales than reported and lied to Pro Emu about them. A jury might select this explanation among all the others, but only if Pro Emu were to first put forward some evidence on which the jury could rely for its selection. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (holding summary judgment against a party appropriate when the party fails to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Pro Emu has put forward no evidence of concealed sales other than its conjectural, best-case-scenario mathematical calculation. NFI, on the other hand, has produced all of its sales records, compiled by computer during the ordinary course of business, and has further retained an expert witness, an accountant, who has reviewed all of NFI's records and found that they appear to be correctly compiled and maintained. Pro Emu has therefore failed to carry its *Celotex* burden, and NFI's motion for summary judgment will be granted as to this issue.

**C. NFI's Claims for Unfair Trade Practices and Tortious Interference with Contract**

NFI also claims damages for unfair trade practices and tortious interference with its contracts. Both of these claims require conduct that goes well beyond a normal breach of

contract.  Unfair trade practices claims require a "practice [that] offends established public policy and [that] is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  *Miller v. Nationwide Mut. Ins. Co.*, 112 N.C. App. 295, 301 (1993).  These claims are often construed to "provide a remedy in the nature of a private action" for violations of other statutes.  *Id.* (using the unfair trade practices theory to provide recovery for violation of insurance law) (citation omitted).  Tortious interference with contract requires proof that the defendant "prevent[ed] people by force, threats, or intimidation from trading with" the plaintiff.  *Mkt. Am., Inc. v. Christman-Orth*, 135 N.C. App. 143, 157-58 (1999).

The behavior relied on by NFI in this case does not rise to this level.  A jury could possibly find, as NFI believes, that Pro Emu breached the contract by failing to fill NFI's March, 2012 orders, and that Pro Emu was simultaneously selling to third parties at a higher price.  But such conduct, even if it occurred, was not illegal or "substantially injurious to consumers," *Miller*, 112 N.C. App at 301, and did not involve force or intimidation, *see Mkt. Am., Inc.*, 135 N.C. App at 158. Any harm that occurred was harm to NFI, not harm to the public. These harms should thus be addressed by contract claims, not by

unfair trade practices nor tortious interference claims. Pro Emu's motion for summary judgment will therefore be granted as to these claims.

### D.  Other

To the extent the parties may believe the following other claims from the cross-complaints to be active:

- Pro Emu's claim for improper deductions for advertising was dealt with in a previous opinion. *See* (Doc. 82) at 10-17. For the reasons expressed in that opinion, NFI's motion for summary judgment on this claim will be granted.

- NFI's claims for breach of the covenant of good faith has been conceded.

- All other claims are not briefed, and are deemed abandoned.

## Conclusion

For all the foregoing reasons, the parties' motions for summary judgment will both be granted in part and denied in part. The contract between the parties is deemed abandoned, and ownership of the Blue Emu trademark rests with NFI.  All claims of both parties for damages will be dismissed with prejudice.

The court will contemporaneously issue an order consistent with this opinion.

DONE this 25th day of June, 2014.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE