FILED
2017 Aug-09 PM 02:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| PROGRESSIVE EMU INC., | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Civil Action Number ) 2:12-cv-1079-AKK |
| NUTRITION & FITNESS INC., | ) ) ) |
| Defendant. | ) ) |

# MEMORANDUM OPINION AND ORDER

This action originated with a breach of contract claim by Progressive Emu, Inc. ("Pro Emu") against Nutrition & Fitness, Inc. ("NFI"). *See generally* doc. 1-1. Along with its answer, NFI asserted contract and intellectual property counterclaims. *See generally* doc. 24. Both parties subsequently moved for summary judgment. *See* docs. 71 & 73. After Judge William Acker disposed of all claims in his ruling, doc. 120, the parties appealed, doc. 122. The Circuit reversed in part and remanded the case for further proceedings. Doc. 136. Presently before the court are cross motions for partial summary judgment—NFI has moved on Pro Emu's breach of contract claims, doc. 140, and Pro Emu has moved on the issue of

1

the royalty payments, doc. 146.[1] For the reasons stated below, the motions are due to be granted in part.

## I. SUMMARY JUDGMENT STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[1] The court also has for consideration NFI's motion to strike Pro Emu's response in opposition, doc. 145, which is **DENIED**, and Pro Emu's Motion to Accept late filing of Pro Emu's Response and Brief in Opposition, doc. 149, which is **GRANTED**.

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing ***Bald Mountain Park, Ltd. v. Oliver***, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252)).

## II.  FACTUAL BACKGROUND[2]

Pro Emu raises emus and sells oil and other emu related products. Doc. 116-1 at 3. NFI, which specializes in marketing health products, entered into a contract with

---

[2] A more detailed description of the relevant facts is contained in Judge Acker's memorandum opinion, doc. 120, and the Eleventh Circuit's opinion, doc. 136.

Pro Emu in 2002 in which Pro Emu agreed to supply NFI with emu oil and NFI also agreed to pay royalties to Pro Emu on the sale of NFI's Blue Emu products. *See* doc. 116-5 at 10. The next year, the parties entered into a Sales, Marketing, and Operating Agreement (the "Agreement"), which superseded the initial 2002 agreement and outlined the terms and conditions of their joint venture. Doc. 107-4. Relevant here, the Agreement describes the termination procedure in the event of a default and the method for calculating the royalties NFI owed Pro Emu from the sales of jointly created emu oil based products. Doc. 107-4 at 4–5. In 2008, the parties executed a Fourth Amendment, which provided, in relevant part, that Pro Emu needed permission from NFI to sell its oil to third parties and that NFI only owed Pro Emu royalties from the sale of the Original Blue Emu product. Doc. 107-5. Finally, the Fourth Amendment extended the Agreement to December 31, 2015. *Id.*

The parties' relationship began to deteriorate in 2011. That August, Pro Emu informed NFI that NFI had purportedly breached the Agreement by ordering an excessive amount of oil, failing to pay the full amount of royalties due, and improperly reducing the price per gallon of oil. Doc. 141-2 at 2–3. After NFI disputed this contention, *see generally* doc. 141-3, the parties continued with the status quo until March 2012, when Pro Emu informed NFI that it would be unable to fulfil NFI's order, and authorized NFI to procure oil from another source, doc.

107-13 at 2. Pro Emu also informed NFI that it had filed a lawsuit in the Circuit Court of Jefferson County, Alabama against NFI. *Id.* at 3. NFI, in turn, informed Pro Emu that it would not pay royalties on sales of Blue Emu products because of Pro Emu's purported breach of its obligations under the Agreement. Doc. 146-14 at 2. NFI also filed its own lawsuit in the Eastern District of North Carolina alleging various breaches of contract and intellectual property claims. Doc. 146-12. In light of the dueling lawsuits, the parties ceased all communications, and in July, Pro Emu sold 19,000 gallons of oil to LB Processors without informing NFI. Doc. 144-1 at 9, 13. NFI removed Pro Emu's lawsuit to this court, and this matter is back on remand from the Eleventh Circuit.

### III. ANALYSIS

Based on the Eleventh Circuit's ruling, Pro Emu's only remaining breach of contract claims are based on NFI's purported failure to pay royalties on sales of Blue Emu for the full duration of the contract, including royalties for alleged off-the-book sales. Doc. 136 at 29. NFI contends that it is entitled to summary judgment on this claim because the Agreement terminated in September 2011, when Pro Emu informed NFI that it considered NFI in default, or, alternatively, in March 2012 when Pro Emu filed this lawsuit. *See generally* doc. 141 (Citing Section 4.2 of the Agreement). Pro Emu, in turn, disputes these contentions, and argues that, even with a default, the Agreement still required NFI to pay royalties

5

through its duration. *See generally* doc. 146-1. As such, Pro Emu has moved for summary judgment on the royalties issue. The court addresses these contentions below, beginning with the termination of the Agreement.

   A. *Whether the Contract was Terminated in Accordance with Section 4.2 of the Agreement*

Section 4.2 provides that either party may terminate the Agreement by providing a "termination notice" in the event of a default, a failure to make payments, or the passage of a regulation that makes it impossible for a party to do business.[3] Doc. 141-1 at 5. The Agreement does not require any specific language to evince the intent to terminate; rather, it only requires that the defaulting party receive notice of the default and an opportunity to cure. *Id.* The offending party has ninety (90) days to cure a default or thirty (30) days to make the payments.[4] *Id.* If the defaulting party fails to cure the defect, "th[e] Agreement **shall** terminate at the end of such period immediately without further notice." *Id.* (emphasis added); *see also id*. at 6 (Section 5.2 of the Agreement which provides that "[i]f the Party in default has not cured such default within the time period specified in Section 4.3, the notifying party shall be entitled, in addition to any other rights it may have

---

[3] Under Georgia law, which governs the parties' dispute, *see* doc. 146-3 at 8, "the cardinal rule of contract construction is to ascertain the intent of the parties . . . [and] [i]f the terms are unambiguous, the contractual terms alone determine the parties' intent," *Garrett v. Southern Health Corp. of Ellijay, Inc.,* 739 S.E. 2d 661, 667 (Ga. Ct. App 2013).

[4] In the case of a regulation or legal obstacle making it impossible for the parties to continue their business, upon delivery of the written notice, the Agreement is immediately terminated with no right to cure the defect. Doc. 141-1 at 5.

under this Agreement to terminate this Agreement as provided in said Section 4.3."). In other words, based on a plain reading of the Agreement, after notice of a default, in the absence of an attempt to cure, the Agreement automatically terminates at the end of the relevant time period. *Id.* at 5.

1. Alleged August 2011 Termination

NFI alleges that the Agreement terminated when Pro Emu informed NFI in August 2011 that NFI had purportedly breached the Agreement by ordering an excessive amount of oil, failing to pay the full amount of royalties owed, and improperly reducing the price per gallon. Doc. 141-2 at 2–3. Indeed, this letter operated as notice of default under Section 4.2 due to NFI's alleged delinquency in making royalty payments. *See generally id.* As a result, under the terms of the Agreement, NFI had 30 days to make the payments or 90 days to cure the default. NFI failed to do so and instead denied any wrongdoing. *See* doc.107-12. However, despite the failure to cure, the Agreement did not terminate because the parties' course of dealing thereafter, i.e., the status quo, indicated that they intended to ignore the automatic termination clause as it related to their then dispute.[5] *See* doc.

---

[5] As it relates to termination clauses, Georgia discourages compliance constructions that can lead to forfeiture and recognizes instead that a party may have a right to cure in those circumstances. *Johnson v. Kahrs,* 34 S.E. 2d 503, 504 (Ga. 1945) ("Where a forfeiture is dependent upon the giving of a certain written notice, if it be such as can be enforced, it must appear that the notice was given in compliance with the contract, both as to time and contents, and that the default occurred.") (internal citations omitted). Also, a party to a contract may also "waive contractual provisions for his benefit," *Greenberg Farrow Architecture, Inc. v. JMLS 1422, LLC*, 791 S.E. 2d 635, 640 (Ga. Ct. App. 2016), and "a waiver may be shown through a party's conduct," *id.*

116-1 at 5 (Andrew Martin Affidavit stating: "Pro Emu continued to sell oil to NFI and NFI continued to pay royalties after letters were exchanged between our lawyers and NFI's lawyers regarding the rights of the parties."). As such, the record demonstrates that the parties did not intend to terminate their relationship in the fall of 2011.

### 2. Alleged Second Default and Termination

Alternatively, NFI alleges that the Agreement terminated when Pro Emu filed this lawsuit. Indeed, in March 2012, Pro Emu again provided NFI written notice of a default by sending NFI a letter informing NFI that it had filed a lawsuit. *See* docs. 1-1 at 10–12; 107-13. The lawsuit alleged that NFI had engaged in a material breach: "NFI's breaches of contract are *material* breaches and *excuse Pro Emu further performance under the contract*." Doc. 1-1 at 13 (emphasis added). NFI responded by accusing Pro Emu of default, suspending royalty payments to Pro Emu, and filing its own lawsuit against Pro Emu. *See, e.g.,* docs. 116-1 at 5; 116-4 at 16; 146-11. *See also* doc. 155-6 at 3 (Andrew Martin: "NFI told us they were suspending all royalty payments due, so we figured the agreement was breached.").

To support its contention that the filing of this lawsuit did not terminate the Agreement, Pro Emu cites NFI's motion in April 2012 for a preliminary injunction

---

*(citing Vratsinas Constr. Co. v. Triad Drywall, LLC*, 739 S.E. 2d 493 (Ga. Ct. App. 2013). *See also Crawford v. First Nat. Bank of Rome*, 223 S.E. 2d 488, 490 (Ga. Ct. App. 1976) (parties may mutually depart from the terms of a contract) *and* U.C.GA § 11-2-202(a) (the UCC allows course of performance to supplement terms of any writing stating the agreement of the parties so that the true understanding can be reached).

seeking to enforce the Agreement, doc. 143-1, as proof that NFI evidenced a desire to maintain the status quo. The court is not persuaded, in part, because Georgia requires substantial compliance, rather than strict compliance, with a contract's terms, including termination clauses. *See* O.C.G.A. § 13-4-20; *DI Uniform Svcs. v. United Water Unlimited Atlanta,* 562 S.E. 2d 260, 265 (Ga. Ct. App. 2002) (citing *Lager's, LLC v. Palace Laundry, Inc.*, 543 S.E. 2d 773 (Ga. Ct. App. 2000)). Relevant here, termination is triggered by a notice by either party, doc. 141-1 at 5, and in this case, Pro Emu provided it through its letters and lawsuit. Indeed, NFI's president testified that he viewed Pro Emu's lawsuit as notice of its intent to terminate the contract under Section 4.2. *See* docs. 154-7 at 131–133; 110-7 at 3–6. Moreover, Pro Emu's lawsuit and NFI's response substantially comply with Section 4.2's notice provisions and are sufficient to trigger the termination clause.

Significantly, the notices of intent by NFI and Pro Emu are consistent with the parties' actions thereafter to cease all communication, and undertaking acts that were precluded by the Agreement—for example, Pro Emu selling its oil to third parties without first obtaining NFI's permission. *See* docs. 110-2 at 7; 144-1; 141-1 at 4–5 (Section 3 of the Agreement: "Except as specifically set forth in Section 3.2, [Pro Emu] shall not market, sell or distribute emu oil to any third party."). These actions further demonstrate that the parties believed they had terminated the Agreement. *See C. Brown Trucking Co. Inc. v. Henderson*, 700 S.E. 2d 882, 884

(Ga. Ct. App. 2010). In other words, unlike their course of conduct in the fall of 2011, the lawsuits each filed in 2012, coupled with their conduct thereafter, show that the parties intended to rely on the termination provisions in the Agreement and had resorted to litigation to seek to enforce their respective rights under the Agreement. *See* O.C.GA § 11-1-303. Therefore, the court finds that the Agreement terminated in July 2012, 90 days after NFI filed its lawsuit. *See* doc. 141-1 at 5 (Section 4.2, which provides a 90 day cure period for non-monetary breaches). This determination is also consistent with Pro Emu's July 2012 sale of emu oil to a third party. Therefore, Pro Emu cannot recover for any breach of contract claims after July 2012 and NFI's motion is due to be granted on this issue.

### B. *The issue of royalties for Pro Emu after March 2012*

The court turns next to the royalties due to Pro Emu for sales of Blue Emu.[6] Pro Emu contends that it is due royalties until the end of the Agreement and has moved for summary judgment on this issue. Basically, Pro Emu argues that because it used its "best efforts" to supply NFI's March 2012 order, NFI breached the Agreement when it failed to pay royalties due. Doc. 146-1 at 14. To compensate it for damages, Pro Emu wants royalties through December 2015. *Id.* at 29.

---

[6] Pro Emu has made the argument that a finding of contract termination would result in a forfeiture of royalties due through December 2015, the date stated in the Agreement. *See* doc. 143 at 22–23. This is unavailing because nothing in the Agreement provides for continued royalty payments in the event of early termination. Instead, the express terms of the Agreement provide for royalty payments "during the term of [the] Agreement." Doc. 146-3 at 4. Moreover, the case upon which Pro Emu relies for this contention, *Legacy Academy v. JLK, Inc.*, 765 S.E. 2d 472 (Ga. Ct. App. 2014), misses the mark as it involved lost royalty payments due to a franchisor from its franchisee after termination of the contract. Accordingly, the court does not find that the determination of early termination would result in an unenforceable forfeiture. *See, e.g., Fernandes v. Manugistics Atlanta, Inc.*, 582 S.E. 2d 499, 434 (Ga. Ct. App. 2003).

The court highlights the Eleventh Circuit's conclusion that "[t]he plain language of the Agreement requires that [NFI] pay royalties to [Pro Emu] on a monthly basis for the duration of the Agreement, irrespective of whether [Pro Emu] is providing oil. . . . [T]his is subject to [Pro Emu's] 'best efforts' obligation, and whether [Pro Emu] used its best efforts to supply oil is a question of fact to be answered by a jury." Doc. 136-1 at 13. Based on this ruling, NFI was not entitled to cease royalty payments due to Pro Emu's failure to provide it with emu oil, unless it shows Pro Emu failed to use its best efforts to supply emu oil. However, the Circuit's ruling does not address the royalty issue in the event of a termination of the Agreement, and instead asked this court to address it on remand. *Id.* at n.15. In that respect, there is no provision in the Agreement that lends support to Pro Emu's contention that NFI is still liable for royalties through the stated end of the Agreement in December 2015 even where, as here, the parties terminated the Agreement early. *See generally* doc. 146-3. In fact, the Agreement is clear that termination ceases all obligations. Doc. 146-3 at 9 (Section 9.8 indicating that the only provisions surviving termination of the Agreement are those relating to confidentiality, intellectual property rights, warranties, and a miscellaneous "catch all" section).

Therefore, because the court has determined that the parties' relationship terminated in July 2012, after which point Pro Emu processed and sold emu oil to

third parties without NFI's consent, there is no need for a jury to address whether Pro Emu used its "best efforts" thereafter to provide oil because it is clear that the plain language of the Agreement obligated NFI to pay royalties only during the duration of the Agreement. Docs. 136-1; 141-1 at 3–5. Accordingly, because the parties terminated the Agreement in July 2012, Pro Emu's motion for summary judgment is due to be granted, in part, on the limited issue of royalty payments from March 2012 until July 2012. The motion is denied as to royalty payments from August 2012 through December 2015.

## IV. CONCLUSION AND ORDER

Pro Emu's motion for summary judgment, doc. 140, is **GRANTED** with respect to the determination of contract termination. NFI's motion for summary judgment, doc. 146, is **GRANTED** as it relates to the issue of the royalties due for the entire duration of the Agreement. In all other respects, the motions are **DENIED**. In light of this ruling, the motion for oral argument, doc. 158, is **MOOT**.

Consistent with this opinion, other than the amount of royalties owed from March to July 2012, the only remaining issues are Pro Emu's claims for royalties on off-the-book sales of the 6 oz. Blue Emu products and the amount potentially due NFI as an adjustment for the price per barrel of emu oil dispute. *See* doc. 136-1 at 29–30. As to these issues, this matter is **SET** for a Pretrial Conference at 2:00

p.m. on August 29, 2017 and trial on October 2, 2017 at 9:00 a.m., both in courtroom 4A at the Hugo L. Black Courthouse in Birmingham, Alabama.

**DONE** the 9th day of August, 2017.

　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　**ABDUL K. KALLON**
　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE